INTERFAITH COMMUNITY
ORGANIZATION, et al.,
Plaintiff(s),

v.

HONEYWELL INTERNATIONAL,
INC., et al, Defendant(s).

Civil Action No. 95–2097(DMC).

United States District Court,
D. New Jersey.

May 21, 2003.

Robert G. Torricelli, Rosemont, NJ, Rosemont Associates, LLC, pro se.

Bruce J. Terris, Kathleen L. Millian, Steven J. German, Terris, Pravlik, and Millian, LLP, Washington, DC, Edward Lloyd, South Orange, NJ, for plaintiff.

Jeffrey Bruce Gracer, David W. Field, Lowenstein, Sandler, PC, Roseland, NJ, Timothy S. Haley, Montclair, NJ, William F. Mueller, Clemente, Mueller & Tobia, P.A., Morristown, NJ, for defendant/cross-claimant/cross-defendant.

John Michael Agnello, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, Christopher H. Marraro, William F. Hughes, Wallace, King, Marraro & Branson, PLLC, Washington, DC, for defendant/cross-claimant/cross-defendant/third-party plaintiff.

## AMENDED OPINION

CAVANAUGH, District Judge.

This is an action brought by Plaintiffs, Interfaith Community Organization (ICO), Lawrence Baker, Martha Webb Herring, Martha Webb, Reverend Winston Clark and Margarita Navis against Defendants, Honeywell International, Inc. (Honeywell), Roned Realty of Jersey City, Inc. (Roned) and W.R. Grace & Co., ECARG, Inc. and W.R. Grace, Ltd. (the Grace Defendants or Grace), seeking declaratory and injunctive relief mandating the cleanup of environmental contamination at Study Area No. 7 (the Site), located in Jersey City, New Jersey. There are also various cross claims by and between Defendants.

The parties tried this matter before me without the benefit of a jury on January 14, 15, 16, 21, 22, 23, 27, 28, 29, and 30, and February 3, 4, 5, 6, and 11 of 2003. This Court is asked to decide several issues. First, does the Site in question present an imminent and substantial endangerment to health or the environment under 42 U.S.C. 6972(a)(1)(B); if so, what steps must be taken to remediate this danger; and, perhaps most importantly, which party is responsible for the remediation.

I find that the Site in question does present an imminent and substantial endangerment to health or the environment; the appropriate remediation or cleanup entails the excavation, removal, and treatment of the hazardous waste and then restoration of the Site with clean fill; and the party responsible for the remediation and associated costs of same is Honeywell International, Inc.

These and other issues will be dealt with in greater detail below, as it is now incumbent upon me to make Findings of Fact and Conclusions of Law pursuant to Fed. R.Civ.P.52(a).

## FACTUAL FINDINGS REGARDING THE SITE (STUDY AREA 7)

The Site, known by the New Jersey Department of Environmental Protection (NJDEP) as Study Area 7 of the Hudson County Chromium sites, consists of three contiguous properties: Site 115 (the Roosevelt Drive–In Site), Site 120 (the

Furniture Depot, formerly Trader Horn) and Site 157 (formerly the Clean Machine Car Wash). The Site is located on Route 440 in Jersey City, Hudson County, New Jersey, adjacent to the Hackensack River (Block 1290.A, Lots 14D, 14H and 14J). The three properties consist of approximately thirty-four acres with Site 115 making up approximately thirty-one of those acres. The area surrounding the Site consists of commercial and industrial facilities and a residential development. Presently, the Roosevelt Drive-in and Clean Machine Car Wash sites are owned by ECARG, Inc., and the Trader Horn Site is owned by Roned Realty of Jersey City, Inc.

The parties have stipulated that the Site is a "facility" as that term is defined in CERCLA § 101(9), 42 U.S.C. § 9601(9) and N.J.A.C. § 7:1E–1.6.

From approximately 1895 to 1954, Mutual Chemical Company of America owned and operated a chromate production facility located across Route 440 (formerly the Morris Canal) from the Site. Until its close in 1954, this facility extracted chromium from chromium ores to produce chromate chemicals. This process generated chromium bearing waste or chromium ore processing residue which will hereinafter be referred to as COPR. Mutual acquired the property across Route 440 from its Jersey City facility for the purpose of disposing large amounts of COPR. This disposal of COPR by Mutual through a pipeline created a land mass from what was tidal wetlands. During this processing time period, Mutual generated and transported approximately one million tons of chromium contaminated COPR to the Site. The COPR is approximately fifteen to twenty feet deep, covers the entire Site and still remains at the Site today.

Approximately twenty-five percent (25%) to thirty-three per cent (33%) of the chromium in the COPR is in the form of highly toxic hexavalent chromium. As will be discussed in great detail below and as was testified to by numerous medical and scientific experts, hexavalent chromium is a known carcinogen, and depending on one's exposure, will cause a number of health related maladies, as well as environmental problems.

## THE PARTIES

Interfaith is a not for profit corporation incorporated under the laws of the State of New Jersey. The remaining individual Plaintiffs, Baker, Herring, Webb, Clarke and Navis, are concerned citizens living near the Site.

Honeywell is incorporated under the laws of the State of Delaware. Honeywell is the corporate successor to Mutual Chemical Company of America and Allied Signal, Inc., Allied Chemical & Dye Corporation, Allied Chemical Corporation, Allied Corporation, and is therefore liable for any and all acts, omissions, debts and liabilities of Mutual and Allied related to or arising out of the chromium contamination at the Site. The Allied Corporation and Honeywell International, Inc. will be referred to herein as Honeywell.

Defendant Roned Realty of Jersey City, Inc. owns the portion of the Roosevelt Drive–In Site No. 120 and designated as Lot 14D in Tax Block 1290A, Jersey City, Hudson County, New Jersey. In August, 1960, Amy Joy Realty transferred Site 120 to Hestor Realty Corporation. After a series of real estate transfers over the years, Site 120 came to be owned by Roned Realty in November, 1977. Roned is a corporation formed under the laws of the State of New Jersey and is the present owner of the Trader Horn property, alternatively known as Site 120 which comprises approximately three acres of the Study Area 7 Site.

Mutual, a subsidiary of Allied Signal, which ultimately merged with and became Honeywell, owned and operated the chromium chemical production facility across from the Site from 1895 to 1954. In or about 1954, Allied Chemical & Dye Corporation (later Allied Signal) acquired Mutual and sold the Site to Amy Joy Realty Corporation for the construction of a drive-in movie theater. The drive-in was completed in 1955.

In 1965, Amy Joy Realty Corporation subdivided the Site and leased a portion to Goodrich Associates for the construction of a commercial building. Diana Stores Corporation later joined this lease. Diana Stores Corporation merged into Daylin, Inc. in 1969. Daylin in turn was acquired in 1979 by W.R. Grace & Co. and W.R. Grace, Ltd. W.R. Grace, Inc. is a corporation formed under the laws of the State of Connecticut and W.R. Grace, Ltd. is a direct subsidiary of W.R. Grace, Inc. with a registered office in London, England.

In 1981, Daylin acquired two parcels of land constituting the largest portion of Study Area 7 (the Site). At that time, W.R. Grace & Co. and W.R. Grace, Ltd. were the sole stockholders of Daylin. In 1982, Daylin changed its name to the Grace Retail Corporation. In November, 1986 the Channel Acquisition Company (Channel) acquired Grace Retail/Daylin and pursuant to a letter agreement, Grace Retail was to distribute some of its assets, including its portion of the Site, to ECARG, Inc., a New Jersey corporation and a subsidiary of W.R. Grace & Co. formed in 1975. ECARG presently holds formal title to the Roosevelt Drive–In and Clean Machine Car Wash Sites, Lots 14H and 14J, which comprise approximately thirty-one acres at the Site.

I find Honeywell is the successor to the company (Mutual) which actually deposited the contaminated material at the Site, and Grace and Roned are the present owners of properties which comprise the Site.

## THE COMPLAINT AND CROSSCLAIMS

Plaintiffs filed their Complaint on May 3, 1995. The Complaint was amended on August 2, 1995. In Count One of the Amended Complaint Plaintiffs allege Defendants violated § 7002(a)(1)(B) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B), due to the fact that the chromium bearing waste at the Site may present an imminent and substantial endangerment to health or the environment. The remaining counts of Plaintiffs' Amended Complaint have been dismissed.

On or about May 17, 1996, Roned filed an Answer to the Amended Complaint along with various crossclaims. On January 3, 1997, Roned amended its crossclaims.

The Grace Defendants filed their Third Amended Crossclaims on October 4, 2000, seeking relief against Honeywell under RCRA, CERCLA, the New Jersey Spill Compensation and Control Act and Common Law and other declaratory relief. Honeywell has also asserted crossclaims against Roned and Grace seeking relief under RCRA, contribution under CERCLA, the New Jersey Spill Act and the New Jersey Joint Tortfeasors Contribution Law and other declaratory relief.

Shortly before trial, the Court was informed that Roned had settled its claims with Honeywell. As a result, Roned chose not to appear and took no part in the trial. Plaintiffs' claims against Roned however, remain viable.

While the form of Order pertaining to Honeywell's and Roned's settlement remains unsigned, the Court holds that the settlement has occurred and therefore will

treat Roned as a settling party as to its Co–Defendant Honeywell only.

Appropriate and timely pre-suit notice of claims under RCRA and the Clean Water Act were served and filed by the parties.

### THE TRIAL

The following is a listing of the witnesses who testified at trial, a brief summary of the subject matter of their testimony and a brief description of their backgrounds or qualifications. In addition, I include my impression as to the credibility of each witness and the weight to be afforded their testimony.

Plaintiffs' Witnesses:

*Benjamin I. Ross, Ph.D.* was offered by Plaintiffs and qualified as an expert in the area of groundwater and soil contamination. Dr. Ross holds a Bachelor of Science Degree in Physics from Harvard University and a Ph.D. in Physics from Massachusetts Institute of Technology. In addition, he has over twenty-five years of consulting experience in hydro-geology, ground water and soil contamination. Dr. Ross was a knowledgeable witness who testified in a coherent and forthright manner. I found him to be credible.

*Cheryl R. Montgomery, Ph.D.* was qualified as an expert in the areas of human health and ecological risk assessment. Dr. Montgomery holds a Bachelor of Science Degree and an Advanced Bachelor of Science Degree in Chemistry from McMaster University in Canada and a Ph.D. in Physical Organic Chemistry from the University of Guelph, Ontario, Canada. She is a principal and owner of Montgomery & Associates which provides strategic planning, oversight management, coordination and scientific technical support for projects involving hazardous waste, site risk assessments and pesticide product registration.

Most of her work involves risk assessment at hazardous waste sites.

This witness visited the Site and while she did not test or autopsy any animals, she did come to the conclusion that the amount of chromium at the Site greatly exceeded appropriate NJDEP Standards. She felt the ecosystem at the Site was at risk, which included organisms, plants, animals and birds, as well as people. She testified that the COPR or COPR soil could not support life or growth due to the high content of chromium. I found this witness to be very credible and knowledgeable. I therefore gave significant weight to her testimony as forthright and honest.

*Mr. William Sheehan* was offered as the Riverkeeper for the Hackensack River and the Executive Director of Hackensack Riverkeeper, Inc. Hackensack Riverkeeper, Inc. is a non-profit public interest organization whose mission is to protect, preserve and restore the natural living and recreational resources of the Hackensack River. This gentleman was very knowledgeable and had a great deal of experience with wildlife and the river itself. While I found Mr. Sheehan to be an honest and credible witness, I do not believe his testimony added much to the trial or did much to assist the Court in reaching a determination.

*Bruce Bell, Ph.D.* was qualified as an expert in the field of environmental engineering. Dr. Bell holds a Bachelor of Science and Masters Degree in Civil Engineering and a Ph.D. in Environmental Engineering from New York University. He is a licensed professional engineer in New York and New Jersey and a Diplomat of the American Academy of Environmental Engineers. He has also taught and published numerous articles in the field. Dr. Bell's testimony dealt mainly with the ongoing source of hexavalent chrome in the

sediment of the Hackensack River and its effects.

I found this witness to be knowledgeable and credible and therefore gave his testimony due consideration.

Plaintiff, *Reverend Winston Clarke* was offered as a fact witness. Rev. Clarke has resided at a condominium in the Society Hill Residential Development which is approximately one-quarter mile south of the Site. Presently, there are approximately 1,200 condominium units in the first phase of the Society Hill Residential Development and an additional 400 residential units are approved and under construction. The Hackensack River is only a few hundred feet from his home and borders on the Society Hill Residential Development where he has lived for ten years. Rev. Clarke was a credible witness.

Witnesses called by the Grace Defendants:

*Elizabeth Anderson, Ph.D.* was offered by Defendant Grace as an expert in the areas of human health and ecological risk assessments. Dr. Anderson holds a Bachelor of Science Degree in Chemistry from William & Mary College, a Masters Degree in Organic Chemistry from the University of Virginia and a Ph.D. in Organic Chemistry from American University. Dr. Anderson is the founder of the EPA's Carcinogen Assessment Group and oversaw the EPA's internal committee that wrote the first risk assessment and risk management guidelines for the EPA which were adopted in 1976. Dr. Anderson also had overall responsibility for the EPA's first health risk assessment on chromium which was published in or about 1984. Dr. Anderson has served on numerous peer review committees for the federal government and various state and international organizations, including the National Academy of Sciences, the U.S. Department of Agriculture, the Los Alamos National Lab-

oratory and the Committee to Advise the New Jersey DEP Commissioner. Dr. Anderson testified that there is a clear link between hexavalent chromium in humans and cancer as well as a variety of other medical problems which produce adverse effects on the DNA, create reproduction problems and cause respiratory and lung problems, as well as contact dermatitis. It was this witness's opinion that there can be no viable future use for this Site in its present condition. Any use would expose people to unacceptable health risks.

It is my assessment that Dr. Anderson was forthright and knowledgeable as well as credible and I therefore gave her testimony substantial weight.

*Peter M. Chapman, Ph.D.* was qualified as an expert in the fields of ecological risk assessments and sediment contamination. Dr. Chapman received a BSC in Marine Biology, a Masters Degree in Biological Oceanography and a Ph.D. in Benthic Ecology from the University of Victoria, British Columbia, Canada. He is employed by EVS Environmental Consultants as a Senior Scientist and has served as an Adjunct Professor at the University of Illinois. Dr. Chapman is presently retained by Environmental Canada (the Canadian equivalent of the EPA) to assist in determining the toxicity and characterization of all substances being used in commerce in Canada.

Dr. Chapman performed tests on samples at the Site and found chromium contamination of the sediment of the River. The tests revealed high toxicity which killed many of the amphipods. All stations tested closest to the Site showed toxicity and high mortality rates. He also felt certain samples taken from the swales located on the property and water coming off the swales were toxic to rainbow trout and other fish.

I found this witness to be knowledgeable and credible and therefore gave substantial weight to his testimony.

*Ronald L. Schmiermund, Ph.D.* was qualified as an expert in the areas of geo-chemistry and heaving (discussed in greater detail below). Dr. Schmiermund received his Bachelor of Science and Masters Degrees in Geo–Chemistry from Pennsylvania State University and a Ph.D. in Geo–Chemistry from the Colorado School of Mines. This witness discussed the heaving phenomena and opined that if the COPR remains on the property, heaving will continue to occur indefinitely. The Court found that Dr. Schmiermund was a knowledgeable and believable witness.

*Julio Valera, Ph.D.* was qualified as an expert in the field of geo-technical engineering and heaving. Dr. Valera received a Bachelor of Science Degree in Civil Engineering and a Masters Degree in Geo–Technical Engineering from the University of Notre Dame and a Ph.D. in Geo–Technical Engineering from the University of California at Berkeley. Dr. Valera is a licensed professional engineer in California and Colorado. He presently works for Valera Consultants performing geo-technical engineering and earthquake engineering consulting. Dr. Valera testified regarding the heaving phenomenon which is the movement and swelling of the ground upward and settling downward. Due to the instability of the ground caused by heaving, this witness is of the opinion that no buildings or structures can safely be built on this Site without remediation.

I was impressed with this witness and gave his testimony great weight.

*Donald V. Belsito, M.D.* qualified as an expert in the area of dermatology with specialized knowledge in the fields of allergic contact dermatitis and pathophysiology.

Dr. Belsito received a Bachelor of Science Degree in Biology and Chemistry from Georgetown University and a Medical Degree from Cornell Medical College. He also received a Masters Degree in Business Administration from the University of Canada. He completed a residency in Internal Medicine at Case Western Reserve University and a three-year dermatology residency and fellowship in Dermatologic Immunology at New York University. Dr. Belsito is Board Certified in Internal Medicine, Dermatology and Dermatologic Immunology. He is a professor at the University of Kansas Medical School and is presently on the staff at the University of Kansas Hospital and the Kansas VA Hospital. In addition, Dr. Belsito maintains a private medical practice in dermatology and sees approximately one hundred and fifty patients per week. He has treated approximately fifty patients for skin disorders as a result of exposure to chromium over the past eight years.

After reviewing the Site, it is Dr. Belsito's opinion that the Site is a present danger to residents, workers and trespassers due to the high chromium and pH levels present. As a result, those who came or come in contact with the Site would in all likelihood contract skin problems including dermatitis, chromium ulcers and possibly nasal septum perforations. The severity of the condition would depend upon the exposure.

I found Dr. Belsito to be both knowledgeable and credible and I therefore gave his testimony significant weight.

*Andrew O. Davis, Ph.D.* was qualified as an expert in the areas of geo-chemistry, hydro-geology and the fate and transport of contaminants in soil, groundwater and surface water. Dr. Davis holds a Bachelor of Science Degree in Aquatic Biology from Liverpool Polytechnic Institute, a Masters

Degree in Environmental Science from the University of Virginia and a Ph.D. in Geology from the University of Colorado. He is presently employed by Geomega, an environmental consulting company in Boulder, Colorado as Vice President and Director of Geo-chemistry. For over twenty years he has studied the fate and transport of organic and inorganic compounds, primarily at RCRA and CERCLA sites.

Through testing at the Site, he found high concentrations of hexavalent chromium at the Site exceeding New Jersey DEP standards. I found this witness to be both credible and believable and therefore gave his testimony great weight.

Grace called *Mr. James Wong* who is presently the Director of Global Due Diligence for Honeywell. Mr. Wong was offered as a fact witness employed by Honeywell as being most familiar with the Site on behalf of Honeywell. Mr. Wong received a Chemical Engineering Degree from Worchester Polytechnic Institute in 1974 and a Masters Degree in Environmental Engineering from Drexel University in 1981. He began working for Allied in 1977 and over the years received numerous promotions which included the positions of Project Engineer regarding the disposal of hazardous waste, Corporate Supervisor of Hazardous Waste Control which dealt with superfund sites for Allied, and Corporate Manager for Hazardous Waste Control and Manager/Site Remediation for Allied. This witness is most familiar with the health issues and heaving at the Site on behalf of Honeywell.

I found this witness to be less than candid. On occasion he would not answer questions directly and sometimes offered answers to questions that were not necessarily responsive to the question asked. Mr. Wong was definitely a partisan witness on behalf of Honeywell. His testimony was given diminished weight.

The Grace Defendants next called *Ms. Polly Newbold* as a fact witness. Ms. Newbold has been employed by Trillium, Inc., as a Quality Assessment Manager for approximately fifteen years. Trillium, Inc., is an environmental consulting company that specializes in environmental contamination. Ms. Newbold took environmental samples at the Site which were sent along to a laboratory for testing. Basically, Ms. Newbold was called for the purposes of creating a chain of possession between the samples taken and having them sent to the laboratory for testing. The Court was satisfied her testimony was credible.

The next witness called was *Mr. Harry Pierson.* Mr. Pierson holds a Bachelor of Science Degree from Temple University and a Law Degree from New York University. He is a member of the New York Bar and a Licensed Real Estate Broker in New York. In or about 1976, Mr. Pierson became Senior Vice President of Real Estate for W.R. Grace & Co. Retail Group. Since retiring from W.R. Grace in 1985, he has served as a consultant to W.R. Grace & Co. concerning operational issues, including the sale of its retail group in 1986. As a Senior Vice President of the Retail Group, Mr. Pierson was involved in strategic planning and was an ex officio member of the real estate committees of the various operating retail subsidiaries of W.R. Grace & Co.

Mr. Pierson was offered as a fact witness and testified regarding the planning and expansion of Grace properties. It was Mr. Pierson's testimony that he or Grace had no way of knowing the extent of the contamination at the Site since that did not fall within his area of expertise nor was it a problem that he would deal with as Senior Vice President of Real Estate.

Mr. Pierson is an elderly gentleman who I felt was a very credible and believable witness. There were occasions when he had a slight memory failure, but I attributed that more to his age and the passing years than anything else. Recognizing his many years of affiliation with Grace, I found him to be believable.

*Mr. Richard Kantor* was offered as an expert in the fields of real estate development and real estate financing. Mr. Kantor holds a Bachelor of Science Degree in Engineering from Purdue University. He is President of Miller Construction Company, a developer and general contractor in Jersey City, New Jersey for over thirty years. It was Mr. Kantor's testimony that a prudent builder would neither purchase nor invest in this Site without some form of remediation and that a prudent lender would not want to lend on a property such as this due to the cleanup uncertainties. Mr. Kantor was a credible witness.

Grace next called *Mr. Phillip Coop* who qualified as an expert on the standard and practice regarding pre-acquisition environmental site assessments. Mr. Coop holds a Bachelor of Arts Degree in Science and History from Harvard and is a Certified Hazardous Materials Manager. He is President of Ensafe, Inc., an environmental consulting firm which performs a full range of environmental consulting and engineering services including environmental site assessment, environmental investigation and environmental remediation and compliance. Mr. Coop has performed hundreds of site assessments throughout the United States and internationally for most types of property, including a great many for the retail department store industry. It is Mr. Coop's testimony that pre-acquisition assessments were not being done in 1981 due to the fact that there was a very low consciousness of environmental liability at that time. Accordingly, it is Mr.

Coop's view that neither Daylin nor Grace would have or should have done much in the way of due diligence or site assessment in 1981 due to the lack of standards.

I found Mr. Coop's testimony to be credible.

*Max Costa, Ph.D.* was qualified as an expert in the area of toxicology of chromium, including the carcinogenic and mutagenic effects of chromium. Dr. Costa received a Bachelor of Science Degree in Biology from Georgetown University and a Ph.D. in Pharmacology and Biochemistry from the University of Arizona. He is a Professor and Chairman of the Department of Environmental Medicine at New York University School of Medicine. He has been a Professor for approximately twenty-five years and associated with New York University since 1986. He has published numerous articles, many of which addressed the health effects of chromium which were peer reviewed. Dr. Costa has been an advisor to the EPA regarding the procedure for conducting metal risk assessments, and is currently working under several grants from the National Institute of Health to study chromium and nickle toxicology and carcinogenesis.

I found Dr. Costa to be a most believable witness. He explained in great detail how hexavalent chromium enters the cells of the body and causes damage to the body through adverse effects on the DNA protein. He was a credible and qualified witness and I therefore gave his opinion that hexavalent chromium is toxic to the environment and a carcinogen for people great weight.

*Kirk Brown, Ph.D.* was qualified as an expert in environmental remediation and heaving as it relates to remediation.

Dr. Brown received a Bachelor of Science Degree in Agronomy from Delaware Valley College, a Masters Degree of Sci-

ence in Agronomy/Physiology from Cornell University and a Ph.D. in Agronomy from the University of Nebraska. Dr. Brown is a Professor Emeritus at Texas A & M University where he has taught for thirty-one years at the graduate and undergraduate levels. His courses include the topics of soil physics and land disposal of waste materials including hazardous waste. In addition to his teaching position, Dr. Brown is employed by the SI Group in College Station, Texas where his projects include site remediation, site investigations and site permitting of hazardous waste sites. He has been involved in the remediation of several hundred contaminated sites, including a site contaminated with COPR in Jersey City.

Dr. Brown testified in great detail as to the various potential methods of remediation and his ultimate opinion that the only appropriate remediation for this Site, after studying numerous possible methods, would be to excavate the COPR, remove it, treat it, and bring in new clean fill.

I found Dr. Brown to be most believable and credible and I therefore afforded his testimony the greatest weight. Not only was he a knowledgeable and believable witness, but the subject of his testimony was perhaps the most significant in assisting the Court regarding the appropriate remediation at the Site. Dr. Brown was an excellent witness.

The next witness called by Grace was *Mr. Akos L. Nagy.* Mr. Nagy is employed by Grace as the Director of Real Estate since 1995. He is also the President of Glouster New Community Company, a land development company owned by Grace and he is Vice President of ECARG. Mr. Nagy holds a Bachelor of Arts Degree in Mathematics from Fairleigh Dickinson University and a Masters Degree in Business Administration from Rutgers.

Mr. Nagy's responsibilities at Grace fall into three categories: (1) management of W.R. Grace & Co. lease exposure related to approximately two hundred excess leased properties, (2) evaluation and maximization of the value of W.R. Grace & Co.'s excess fee owned properties throughout the world, and (3) assisting W.R. Grace & Co.'s operating units with various real estate issues worldwide, including acquisitions and divestments.

This witness has no involvement with the remediation aspects of the Site in question, but was merely trying to determine a way to make the Site usable, valuable property.

It was Mr. Nagy's testimony that there were few if any brokers or realtors who actually represented an appropriate buyer for the property because ECARG insisted on an indemnity regarding the property and no one would agree to same due to the environmental problems that existed. I found Mr. Nagy to be a credible witness.

*Mr. Hugh McGuire* was qualified as a real estate appraisal expert. Mr. McGuire is a Licensed Real Estate Broker in the State of New Jersey and a Licensed General Certified Appraiser in the State of New Jersey and holds a Certified Tax Assessors Certificate from New Jersey. He is the former President of the Hudson County Assessors Association and the current Chairperson of the New Jersey Chapter of the Council of Real Estate. I found Mr. McGuire to be knowledgeable regarding the values of properties and the uses of properties in Hudson County and especially Jersey City. Mr. McGuire testified as to the fair market value of the Site today, as well as the fair market value in 1981 when the property was sold from Daylin to Grace. The Court was impressed with Mr. McGuire's testimony and therefore gave it significant weight.

The remaining witnesses were called by Defendant Honeywell.

*Mr. James Wong* was recalled as a fact witness. My comments and views regarding the credibility of this witness remain unchanged from that which I stated previously. Accordingly, I do not afford Mr. Wong's testimony great weight.

*Mr. Peter Deming* was qualified as an expert in the field of soil mechanics and foundation design. Mr. Deming holds a Bachelor of Science Degree in Civil Engineering and a Masters Degree in Civil Engineering specializing in geo-technical work from the University of Texas. He also holds a Professional Engineering License in the State of New York.

Mr. Deming offered testimony in support of his view that large commercial structures could be built at the Site without excavating the Site. He acknowledged that the type of foundation that would be needed to support such a structure is somewhat experimental and that neither high-rise residential structures (beyond five floors) nor other multiple residential structures would be feasible.

I found Mr. Deming's testimony to be credible and I found Mr. Deming to be a knowledgeable witness in his field. I believe his testimony supported the theory that due to the heaving phenomenon of the COPR, construction on the Site is limited to large commercial structures rather than residential.

The next witness called was *Mr. Frank Faranca.* Mr. Faranca has worked for the NJDEP as a Case Manager for the Site since 1988. He is a Geologist and a Technical Coordinator responsible for managing hundreds of contaminated sites, including Area No. 7. Mr. Faranca is responsible for carrying out the provisions of the Administrative Consent Order executed by Honeywell and the NJDEP in June of 1993, which covers, among other things, the remediation of the Site.

I found Mr. Faranca to be a very believable witness. This witness testified at great length about the amount of time and effort that has been spent in attempting to resolve the problems at the Site and the lack of cooperation by Honeywell. In response to questions posed during cross examination, this witness clearly testified that there has been much foot-dragging and non-cooperation by Honeywell and that the Site is not much closer to final remediation now than it was when the problems were first brought to Honeywell's attention twenty years ago. I found Mr. Faranca to be a very credible witness.

*Mr. Peter Blanchard* was offered as an expert in the field of property redevelopment and Brownfield redevelopment. Mr. Blanchard is a real estate broker and principal of the Garribaldi Group, well respected commercial real estate brokers and developers. It is Mr. Blanchard's view that under the present zoning scheme and due to his site evaluation, the highest and best use for the property in question would be retail commercial rather than residential.

Mr. Blanchard was a knowledgeable and credible witness and his testimony was given appropriate weight.

*Mr. Fred C. Hart* was offered as an environmental due diligence expert.

Mr. Hart obtained a Bachelor of Science Degree in Civil Engineering from Cornell University, a Masters Degree in Civil Engineering from Stanford University and a Masters Degree in Business Administration from the University of Connecticut. He is a Professional Engineer licensed in the State of New York. Mr. Hart testified that in his opinion, Daylin knew or should have known at the time it purchased the property that there existed environmental problems with the Site that would require

remediation. During direct examination, the witness was shown various documents which he believed Daylin and Grace should have been aware of. These documents support his view that the purchaser would be aware of the environmental problems.

I was not impressed with this witness since I believe the evidence does not necessarily support his view that the documents he relied upon were ever seen by, or brought to the attention of representatives of Daylin or Grace. Accordingly, I afforded this witness's testimony little weight.

*Mr. Anthony J. Wells* was qualified as an expert real estate appraiser.

I found this expert to be well qualified, knowledgeable and believable. He was offered to rebut the testimony of Mr. McGuire who I also found credible. Accordingly, I am faced with two credible witnesses with differences of opinion. It should be pointed out further that Mr. Wells did conduct a commercial analysis of the property and Mr. McGuire did not.

*Mr. Richard Ninesteel* was offered as a fact witness. He received a Bachelor of Science Degree in Environmental Engineering from Pennsylvania State University and he is a Licensed Professional Engineer in Pennsylvania and Ohio. Mr. Ninesteel became the Project Manager for the remedial investigation of the Honeywell chromium sites in Hudson County, New Jersey in late 1996. Mr. Ninesteel discussed the various wells that were drilled on the Site and the taking of samples from these wells. While the Court finds Mr. Ninesteel to be a credible witness, he did not really offer much at trial.

Honeywell next offered *Eric Rifkin, Ph.D.* as an expert in the fields of human health and ecological risk assessment. Dr. Rifkin holds a Bachelor of Arts Degree in Biological Sciences from Rutgers Universi-

ty and a Master of Science and Ph.D. in Zoology from the University of Hawaii. He is presently President of Rifkin & Associates, an environmental consulting firm focusing on human health and ecological risk assessment. Rifkin & Associates have been serving as a consultant to Honeywell for approximately eleven years during which time Honeywell has been the source of 40% or more of Rifkin's annual income. Furthermore, Honeywell has been the primary client of Dr. Rifkin and Rifkin Associates for the last seven years. The majority of Dr. Rifkin's income has been the result of his relationship with Honeywell. As part of his work with Honeywell, Dr. Rifkin has advocated Honeywell's position to the NJDEP, including the preparation of comment letters and commenting on drafts of comment letters and also advised Honeywell on policy positions relating to risk assessments. Dr. Rifkin has represented Honeywell in meetings with the NJDEP regarding the chromium contamination at the Site.

The Court is troubled by Dr. Rifkin's testimony in that he alone seems to be at odds with most or all of the other experts who have found that the Site is contaminated to such a degree that it poses a risk to health and the environment. Dr. Rifkin attempts to downplay or minimize the risks and while he acknowledges that some remediation is necessary, he believes there is no significant risk at the present time.

I reject Dr. Rifkin's testimony and I find that he has little or no credibility. It is evident that Dr. Rifkin owes his livelihood to his ongoing relationship with Honeywell and I therefore believe his testimony is unfairly biased in favor of Honeywell.

The final witness offered was *Gary R. Walter, Ph.D.* who qualified as an expert in the area of fate and transport of ground water contamination. Dr. Walter holds a Bachelor of Science Degree from the Uni-

versity of Kansas and a Masters Degree in Geology from the University of Missouri at Columbia. He also holds a Ph.D. in Hydro–Geology from the University of Arizona. He is a Licensed Geologist in Arizona, California, Wyoming and Washington with an expertise in groundwater resources. He is a principal of the Southwest Institute. Basically, this witness testified regarding technical formulas he used to determine water flow and concentrations of hexavalent chromium from the Site. He also discussed the viability of a permeable reactive barrier wall as a form of remediation. While I felt Dr. Walter is a knowledgeable and credible witness, I do not believe his testimony assisted the Court when compared to testimony of others, more specifically Dr. Brown.

No further witnesses were called.

### FINDINGS OF FACT

As stated in the introduction, I conducted a non-jury trial during January and February of this year (2003). As a result of the trial, the numerous documents entered into evidence and the many witnesses presented, I make the following Findings of Fact and Conclusions of Law.

There are a number of facts that are not in dispute and I therefore will not deal with them any more than is necessary. There is no question but that Mutual, formerly one of the largest chromium producing companies in the United States and perhaps the world, deposited vast amounts of COPR with significant levels of hexavalent chromium at the Site during the first half of the twentieth century. There is also ample evidence that Mutual had knowledge of the health and environmental risks associated with hexavalent chromium as early as the 1920's. During the 20's, 30's and 40's, various articles, memos and studies were circulated among and between the officers and managers of Mutu-

al. These documents, which included records now maintained by Honeywell, make it clear that Mutual was aware of the adverse health effects posed by hexavalent chromium.

A significant issue to be decided is which party or parties is or are responsible for the Site remediation and the significant costs that will be incurred. Plaintiffs take the position that each of the Defendants is liable and therefore each should be responsible to some degree. It is Honeywell's position that while they acknowledge that they are liable, as successor to Mutual, Honeywell believes Grace or its predecessor should also be liable for remediation since Grace knew or should have known of the significant contamination problems at the Site when it was purchased, and by their actions thereafter as owners.

Grace denies knowledge of the contamination prior to purchasing the Site; claims to be an innocent purchaser who learned of the contamination subsequent to the purchase and claims to have fully cooperated with NJDEP since being notified of the contamination at the Site. It is their position that while they did indeed cooperate with the authorities and clean up certain abandoned drums and other debris placed at the Site by parties unknown, those cleanup efforts had nothing to do with the chromium contamination. Grace argues that the only responsible party is Honeywell.

### HONEYWELL IS LIABLE UNDER RCRA

Under RCRA, liability can be established by meeting the requirements of § 7002(a)(1)(b). Liability requires a showing that the Defendant (1) has contributed to or is contributing to (2) the past or present handling, storage, treatment, transportation, or disposal of (3) any solid or hazardous waste that (4) may present

an imminent and substantial endangerment to health or the environment.

Honeywell admits that its corporate predecessor, Mutual, transported and deposited hundreds of thousands of tons of chromium waste at the Site. See Final Pretrial Order, Stip. 45–77. This Court has found that Honeywell admits that it is the corporate successor to Mutual and that it is liable for any and all acts, omissions, debts and liabilities of Mutual relating to or arising out of the chromium contamination at the Site. I am satisfied that the chromium contamination of both the soil and groundwater exceeds the State standards and I reject Honeywell's arguments contrary thereto.

The Defendants admit that the chromium waste at the Site is both a "solid waste" and a "hazardous waste" under RCRA. See Honeywell's Second Amended Crossclaims, Paragraph no. 69, Pl.Ex. 1176,[1] Paragraph 4. Based on these facts and admissions, the Court finds that the chromium at the Site is a solid and a hazardous waste under RCRA.

The Court recognizes that in order to show that a solid or hazardous waste may present an imminent and substantial endangerment, it must be demonstrated that (1) there is a potential population at risk; (2) the contaminant is present at levels above that considered acceptable by the State; and (3) there is a pathway for current and/or future exposure. NJDEP has determined that (NJDEP December 1988 Directive, Pl.Ex. 409, p. 4 and Attach. 1):

[T]he uncontrolled discharges of hazardous substances from the chromate chemical production waste at the Sites listed in Attachment One are within an area of high population density in the State of New Jersey and that the risk of human exposure to chromate chemical production waste at the Sites listed in Attachment One is ongoing. Chromium compounds contained in the chromate chemical production waste are toxic to humans and include demonstrated human carcinogens. *These conditions create a substantial risk of imminent damage to public health and safety and imminent and severe damage to the environment.* [emphasis added]

Attachment 1 lists the Site. The Court gives substantial weight to the finding of NJDEP that the chromium contamination at this Site presents an imminent and substantial endangerment.

The Court finds that chromium contamination is present at the Site in several media at levels far in excess of the standards NJDEP set for the Site.

On April 28, 1983, NJDEP notified Honeywell that the Site was contaminated with chromium in excess of levels deemed acceptable by the State. The Court gives substantial weight to the finding of NJDEP that chromium is present at levels that exceed those deemed acceptable by the State and finds that chromium contamination of soil at the Site greatly exceeds all of New Jersey's Soil Clean–Up Criteria which NJDEP has determined apply at the Site.

New Jersey law provides that residential use soil clean-up standards are applicable unless the property owner consents to a deed restriction on the property, in which event the non-residential clean-up standard is applicable. The Grace property owners have informed Honeywell and NJDEP that they do not consent to a deed restriction on the property. The Roned property owners also initially refused to consent to a deed restriction. However, in a settlement reached with Honeywell on December 16, 2002, the Roned property

---

**1.** "Pl.Ex." refers to Plaintiffs' Trial Exhibits in evidence.

owners changed their original position and now agree to a deed restriction on the portion of the property they own.

New Jersey's residential use soil clean-up standard for hexavalent chromium based on risk of cancer from inhalation is 270 ppm. This standard was set so as to ensure that the risk of cancer is no greater than 1 in 1 million as required by N.J.S.A. 58:10B–12(d).

New Jersey's residential use soil clean-up standard for hexavalent chromium based on health risk from ingestion is 240 ppm.

New Jersey's non-residential use soil clean-up standard for hexavalent chromium based on risk of cancer from inhalation is 20 ppm. This standard was set so as to ensure that the risk of cancer is no greater than 1 in 1 million as required by N.J.S.A. 58:10B–12(d).

New Jersey's non-residential use soil clean-up standard for hexavalent chromium based on human health risk from ingestion is 6,100 ppm.

Honeywell admits that NJDEP has informed it that 240 ppm hexavalent chromium is the applicable clean-up standard for the soil at the Site.

This Court finds that soil contamination at the Site far exceeds all applicable soil clean-up standards: New Jersey's residential standard based on the risk of cancer from inhalation of 270 ppm; the residential standard for ingestion of 240 ppm; the non-residential standard based on the risk of cancer from inhalation of 20 ppm; and the non-residential standard for ingestion of 6,100 ppm. In addition, evidence was produced and I so find chromium contamination of groundwater, onsite surface water, and sediments near the Site in the Hackensack River all exceed the State Standards and therefore present an imminent and substantial endangerment to health and the environment. Accordingly, based upon the foregoing, I find that Honeywell is liable under RCRA. (See Conclusions of Law, *infra*).

## CHROMIUM TOXICITY

I find that the waste contamination at the Site presents an imminent and substantial endangerment to human health and the environment such that the remedy must be excavation, removal and treatment and I find that Honeywell is the responsible party and must bear the costs for remediation. I will now deal with these issues, other claims by and between the parties and the remedies to be imposed in greater detail.

There is no question but that Mutual generated and deposited approximately one million tons of COPR at the Site as of December of 1954 when Mutual ceased operations at its facilities. The COPR contains hexavalent chromium and other chromium compounds which are hazardous substances as defined by RCRA. When deposited at the Site, the COPR contained between 3% and 7% total chromium. Approximately 25% to 33% of the chromium in the COPR is in the form of highly toxic hexavalent chromium. The COPR is also highly alkaline having a pH of as high as 12. The high pH of the COPR causes the chromium to remain in its highly toxic hexavalent form rather than degrade to its less toxic trivalent form as would naturally occur in the environment. Due to the high pH of the COPR, the hexavalent chromium in the COPR is highly soluble in water and therefore freely leaches into the surface water and groundwater at the Site. In addition to chromium, the COPR contains toxic metals such as aluminum, antimony, barium, beryllium, cadmium, calcium, cobalt, copper, iron, lead, magnesium, manganese, nickel, potassium, silver, silicon, vanadium, zinc and titanium. The COPR

at the Site is between fifteen and twenty feet deep.

As has been testified to by a number of the experts, hexavalent chromium has been classified by the EPA's Carcinogen Assessment Group as a Grade A Carcinogen through the inhalation exposure route and the EPA has ranked the potency of hexavalent chromium in the first quartile of human carcinogens. EPA has determined that hexavalent chromium is a more potent human carcinogen than arsenic, benzene and PCB's. NJDEP has also determined that hexavalent chromium is a known human carcinogen.

Both hexavalent and trivalent chromium have been found to cross the placental border so that birth defects, such as cleft pallet, skeletal defects and neural tube defects have been attributed to both hexavalent and trivalent chromium in laboratory animals. Pregnant women exposed to chromium have been found to have three times as many clinical and delivery complications. Chromium exposure has been shown to cause mutation of mammalian cells, including chromosomal aberrations.

Hexavalent chromium can enter the human cell and cause DNA protein cross links which in turn cause cell abnormality and genetic mutation. Dr. Costa sampled chromium contaminated surface water from the Site and determined that the water at the Site may cause cell abnormality and genetic mutation. Humans may be exposed to hexavalent chromium through dermal contact, inhalation and ingestion. Such contact and exposure produces numerous and serious health problems as testified to by Drs. Anderson, Costa and Belsito.

Chromium is toxic to virtually every environmental receptor, with acute toxicity predominately from hexavalent chromium. The toxic effects of chromium in ecological receptors include reduced growth, reduced survival, reduced reproductive capabilities and birth defects. Total chromium has been adversely shown to impact benthic organisms. Chronic toxicity to saltwater vertebrates and invertebrates has been observed when the level of hexavalent chromium in the water ranges between 13 and 132 Ug/L. Chromium can also be acutely toxic to marine plants and cause reduced growth. Predators can receive chromium through the direct consumption of food items which contain chromium.

Based on these facts, the Court finds that exposure to chromium presents serious risks to human health and the environment. Testing at the site confirms that chromium is present and at significant levels above State standards.

### SITE HISTORY AND OWNERSHIP SINCE 1954

The Site in question became the subject of numerous sales, transfers, mergers and acquisitions since Mutual ceased its operations in 1954. I will now review in some detail the aforementioned activity pertaining to the Site.

Mutual sold the Site to Amy Joy Realty Company (Amy Joy) in December of 1954. Honeywell acknowledges through the testimony of its witness Mr. Wong, that although Wong has reviewed hundreds of Mutual documents during his twenty-year involvement with the Site, he has never located or seen a Mutual or Allied document notifying any party that the Site contained approximately one million tons of COPR.

In July of 1965, Amy Joy as lessor, entered into a lease with Goodrich Associates (Goodrich) as lessee, pertaining to the 14.7–acre tract of vacant land which comprises the easterly portion, Lot 14H of the ECARG property (ground lease). This ground lease was for a period of thirty-one years and permitted extensions in incre-

ments of at lease ten years up to a total of ninety-nine years. The ground lease provided that the leased premises could be used for "commercial, mercantile, or services (bowling) enterprises or for the operation of residential or office properties ..." Grace 128,[2] p. 4. The ground lease provided further that Goodrich was required to construct a building of not less than 100,000 square feet on the leased premises referred to as the "Goodrich (Valley Fair) Building" and that Goodrich would own fee title to the building.

On July 23, 1965, Goodrich, as lessor, entered into a lease with Diana Stores Corporation, as lessee, under the terms of which Goodrich was to construct a building (the Goodrich Building) for Diana Stores' use on the 14.7–acre tract Goodrich leased simultaneously from Amy Joy under the terms of the ground lease (the operating lease). The operating lease was for a period of thirty-one years and permitted two extension periods of ten years each. The operating lease provided that after the first eight years, the leased premises could be used for commercial or residential purposes. On July 23, 1965, Goodrich, as grantor, entered into an option agreement with Diana Stores, as grantee, whereby Goodrich gave Diana Stores the option to purchase a 50% interest in Goodrich's estate as lessee under the ground lease and its estate as lessor under the operating lease. Pursuant to the operating lease, Goodrich constructed a 180,800 square feet retail building on Lot 14H. On November 4, 1966, the Jersey City Superintendent of Buildings issued a Certificate of Occupancy to Goodrich for the Goodrich Building.

During Goodrich's construction of the retail building on Lot 14H, the New Jersey Department of Health conducted an occupational health study at the construction site and determined that several of the workers had contact dermatitis. Soil, water and air samples taken by the Department of Health on July 29, 1966 contained chromium.

No evidence was presented at trial that the health study mentioned above was ever provided to or the results shared with Goodrich, Diana or Daylin.

After construction was completed, the Goodrich Building was occupied by a Great Eastern Discount Store that subleased the building from Diana. In March of 1967, Goodrich and Diana entered into a joint venture agreement whereby Diana acquired an undivided one-half interest in both the Amy Joy/Goodrich ground lease and the Diana/Goodrich operating lease. By this joint venture agreement, Diana acquired an undivided one-half interest in the ownership of the Goodrich Building.

In 1969, Daylin, Inc. acquired Diana by merger. Daylin and Goodrich eventually became adversaries. In 1973, Daylin sued Goodrich in New Jersey Superior Court alleging faulty construction of the Goodrich Building. A settlement resulted whereby Goodrich agreed to make repairs to the Goodrich Building. Daylin agreed to advance Goodrich one-half of the repair costs and Goodrich agreed to reimburse Daylin the monies it advanced at a later time.

In March, 1974, during the course of Goodrich's building repairs, the faulty building construction was described to Morris Rayburn, a Daylin representative, by Moe, a consulting engineer. Moe's observations included column distortions, missing bolts from connections that had never been installed, concrete strength well below established standards, rotting under floor conduits, pile caps that had not been imbedded, out of plumb walls and no

---

**2.** "Grace" followed by a number refers to Grace Trial Exhibits in evidence.

binding of roof to deck through the entire system.

In May, 1974, Goodrich sued Daylin claiming that Goodrich had completed the building repairs as agreed to in the April, 1973 settlement agreement, but that Daylin failed to pay Goodrich all the advances owed for the building repairs as called for in the settlement.

In August, 1975, Daylin sublet the Goodrich Building to Valley Fair Jersey City, Inc. for operation of a discount food market and department store. The "net—net lease" was for a term of fifteen years at a rent of $280,000 per year. Extension periods of ten and seven years at an annual rent of $302,400 and $323,568 respectively were permitted.

The Goodrich (Valley Fair) Building was occupied as a discount store until sometime after 1979. Between January and March 1979, Mr. Pierson, Vice President of the retail group of Grace, visited Lot 14H and the Goodrich (Valley Fair) Building. At the time of Pierson's visit, the Goodrich Building was being operated as a discount store.

A videotape (Grace 1021), shown during the trial clearly depicted the destruction of the Goodrich (Valley Fair) Building caused by a phenomenon called heaving.[3] Based on the foregoing, the Court finds that the Goodrich (Valley Fair) Building suffered from structural problems as early as the 1970's. These problems continued at the building through the 70's and 80's and ultimately resulted in the need to demolish the Goodrich (Valley Fair) Building in the mid 1990's. I specifically find that the structural problems experienced at the Goodrich (Valley Fair) Building were caused by heaving.

In January, 1979, W.R. Grace & Co. initiated a hostile takeover of Daylin. Pri-

or to Grace acquiring the stock of Daylin, Grace had assembled a substantial group of retail businesses including Channel Home Centers, Orchard Hardware Supply, PayLess Cashways, Ole's, and Shepler Western Wear Stores. On March 20, 1979, Grace acquired the stock of Daylin. In connection with the acquisition, Grace caused Grace Retail Corporation (GRC) to be incorporated. Grace assigned the stock of Daylin to GRC on March 20, 1979. GRC was merged into Daylin on March 21, 1979, with Daylin being the surviving corporation.

Daylin acquired Lots 14H and 14J without knowledge of the contamination.

As testified to by Mr. Pierson, in or about the beginning of 1980, Daylin, with the approval of its majority shareholder Grace, developed a plan under which Daylin would maximize the value of its "excess properties". On or about February 26, 1981, a detailed memorandum which contained a comprehensive analysis of the status of Daylin's excess properties along with a plan for the disposition of the excess properties was submitted to Daylin's Board of Directors. The memorandum demonstrated that with respect to the Jersey City excess property, Lot 14H, the economics of Daylin's operating lease and the ground lease made it more advantageous for Daylin to purchase Lot 14H from General Cinema (successor by merger to Amy Joy), than to continue in the lessor-lessee relationship. In fact, Daylin was obligated to pay in excess of $600,000 annually as a result of its operating lease and ground lease obligations. Thus, Daylin was interested in acquiring fee title to Lot 14H, the property occupied by the Goodrich (Valley Fair) Building. However, General Cinema, the property owner, would not sell Lot 14H without selling the

---

**3.** Heaving will be explained later in this opinion.

adjacent property on which the drive-in movie theater was located, Lot 14J. As a result the plan for the Jersey City excess property called for the acquisition of both Lots 14H and 14J.

The transaction whereby Daylin would acquire Lots 14H and 14J involved a third party, Louis Feil. Feil's involvement in the acquisition had certain advantages. First, Feil was interested in purchasing another of Daylin's excess properties located in Elmont, New York. However, the tenant at Elmont, Times Square Stores, had a right of first refusal in its lease. In order to overcome the right of first refusal, it was necessary for Feil to offer a consideration that the Times Square Stores could not match. Feil's purchase of Lot 14H and the transfer of that property to Daylin as part of the consideration for the Elmont property created an offer which would be impossible for Times Square Stores to match. Second, Feil had a previous relationship with General Cinema and therefore it was believed that he might be in a better position to negotiate the price to be paid for Lots 14H and 14J. Third, there was a tax advantage to using Lot 14H as part of the consideration for Feil's purchase of the Elmont property.

Prior to Daylin's acquisition of Lots 14H and 14J, Pierson visited the property for a second time. During the second visit, Pierson was reassuring himself as to the position of the Goodrich (Valley Fair) Building on Lot 14H with respect to the adjacent property which Daylin was to acquire. Pierson wanted to make sure that the future development of Lot 14J would tie into the existing building and layout of Lot 14H. During this visit, Pierson went to the back of the Goodrich (Valley Fair) Building and decided it would be possible to expand the development of the property onto Lot 14J if the Goodrich (Valley Fair) Building was to remain standing, and that it would also be possible to commercially develop the two lots together if the Goodrich (Valley Fair) Building was removed.

During this second visit, Pierson saw no abandoned drums, abandoned trucks, or yellow water on the property. He saw the movie screen from a distance, the projection booth, and another small building behind the Goodrich (Valley Fair) Building. Pierson testified that had he seen any yellow colored water or streams or drums when he visited Lots 14H and 14J prior to Daylin's acquisition, he would have reported it to Daylin's management.

Pierson and Daylin were aware of the construction problems with the Goodrich (Valley Fair) Building prior to Daylin's acquisition of Lots 14H and 14J. However, prior to acquiring those lots, Pierson did not know there was approximately one million tons of chromium waste on these properties. The faulty construction of the Goodrich (Valley Fair) Building was specifically noted in the February 26, 1981, memorandum to the Daylin Board of Directors. The lawsuit instituted by Daylin regarding the faulty construction was likewise referenced in the February 26, 1981, memorandum, as was the settlement of the construction defect lawsuit. The settlement agreement between Daylin and Goodrich clearly sets forth those parties' recognition of the faulty construction.

Neither Pierson nor anyone at W.R. Grace & Co. was aware that Lots 14H and 14J had environmental problems pertaining to chromium prior to Daylin's acquisition of those properties in 1981.

On May 29, 1981, Louis Feil acquired the ECARG property from General Cinema. On June 1, 1981, Feil transferred the ECARG property to Daylin. Daylin paid $1.2 million for Lots 14H and 14J in 1981 which amount represented the fair market value of those properties.

Mr. Coop, Grace's expert, testified at trial that a "site assessment" determines actual or potential releases of chemicals on property and assesses their damage. A site assessment is a subset of environmental due diligence. The first site assessments were performed by the EPA and state regulatory agencies as part of an agency's investigations or enforcement actions. Environmental agencies would hear about problems and initiate investigations. In 1981, there were no standards for performing environmental site assessments.

Mr. Coop further testified that as of July 1981, the retail department store industry in the United States was not performing pre-acquisition environmental site assessments. Mr. Coop was performing environmental site assessments at that time and would have advised his retail clients to undertake such environmental assessments if such a practice was recognized in the retail industry. He stated further that in 1981, the consciousness of environmental liability in that industry (retail) was, very low, and they (pre-acquisition site assessments) simply just were not being requested. The customary practice in the retail industry in 1981 was not to perform any pre-acquisition site assessments. As examples, Mr. Coop testified that Federated Department Stores did not perform environmental site assessments prior to 1988, and that another large discount chain, Bill's Dollar Store, did not perform environmental assessments until 1990.

The State of New Jersey did not adopt the Environmental Cleanup Responsibility Act (ECRA), now the Industrial Site Recovery Act (ISRA), until 1984. That legislation required certain categories of properties to be assessed before they could be transferred. Retail stores were not subject to the ECRA requirements. Recognized standards for performing environmental site assessments did not come into being until approximately 1986. Since then, the standards have been refined to the point where they are now very formal.

Under the 1986 agreements wherein Channel purchased the Channel Home Centers business from GRC, W.R. Grace & Co. agreed with Channel that as between Channel and Grace, Grace would be responsible for liabilities relating to the ECARG property.

Mr. Coop testified that in 1986, intracompany transfers of real property, such as that between GRC and ECARG (more fully discussed below), did not trigger an environmental site assessment because the perception was that you could not create a liability merely by transferring property from one subsidiary to another.

Mr. Coop reviewed the 1981 transaction documents as well as his own work from the early 1980's and had his staff contact certain retail department stores and also spoke to Mr. Pierson. During cross-examination, Mr. Coop was asked, "and hypothetically speaking, if an individual from Daylin had gone onto the site and had observed an abandoned tank car, had observed pools of yellow liquid, had observed drums with liquid seeping from them, had observed rivers of colors green and colors yellow, and that was relayed to you by Mr. Pierson, would that change your opinion in this case?" Mr. Coop responded, "No, I don't think it would", adding:

> The issue here is not so much whether we have these chemicals there; it is what did they mean to people in 1981. So, if the person from Daylin had environmental knowledge, then I think maybe the answer would be yes, it should mean something to them; but if they didn't, I don't know as they would have viewed this as anything other than an expense to be fixed before they could rent the property.

Mr. Coop further testified that in his opinion, even if hypothetically Daylin knew that Lots 14H and 14J contained chromium waste, Daylin might have still purchased the property. Specifically, Mr. Coop testified "as scary as that sounds in 2003, in 1981, my expectation would be that Daylin would not necessarily have reacted negatively to that."

Mr. Hart testified on behalf of Honeywell as a due diligence expert. He was asked to provide an opinion as to whether Daylin knew or should have known about the environmental condition of the Site prior to Daylin's acquisition of Lots 14H and 14J. Mr. Hart acknowledged that he never spoke to anyone at Daylin, Grace or any of their subsidiaries regarding their knowledge of the Site in 1981. Mr. Hart also stated that he did not know what Daylin, Grace or its subsidiaries knew about the Site in June 1981. Accordingly, he acknowledged that his opinion was limited to what those entities "should have known".

In preparation for his testimony, Mr. Hart reviewed various documents including seventeen documents dated prior to June 2, 1981, (DH 12,[4] DH17, DH18, DH19, DH20, DH22, DH23, DH25, DH125, DH127, DH202, DH358, DH534, DH589, DH631, DH634 and DH739). These documents deal with construction related problems. Of the seventeen documents just mentioned, the words "contaminated" or "contamination" appear in only three of the documents and the words "health hazard" or "carcinogen" appear in none.

Although Mr. Hart relied on the aforementioned documents as the basis for his opinion that Daylin "should have known", he presented no evidence that either Daylin or Grace, or any of its subsidiaries actually ever received the documents he relied upon. For example, on cross-examination, Mr. Hart acknowledged that although DH534, an April 15, 1981 letter from Goodrich to Daylin regarding the lease between Goodrich and Diana was drafted prior to Daylin's acquisition of the Site, it was not received by Grace until after Daylin's purchase. DH534 was stamped received by Mr. Pierson on June 8, 1981 and by Frank Shea, who worked for Mr. Pierson, on June 9, 1981. Mr. Hart admitted that his review of the documents referenced in his expert report confirm that the documents addressed construction rather than environmental problems with the Goodrich (Valley Fair) Building. Although Mr. Hart's company, Fred C. Hart & Associates, conducted an environmental site inspection at the Site for the EPA in March or April of 1981, and found that the Site was contaminated with hexavalent chromium and posed a human health hazard, neither Mr. Hart nor his firm, nor the EPA nor NJDEP ever notified Amy Joy (General Cinema) or Daylin prior to June 2, 1981 that the Site was contaminated with hexavalent chromium.

Mr. Hart testified that the NJDEP and the EPA knew the Site was contaminated with chromium prior to March of 1981, however NJDEP did not notify Daylin of the contamination until April of 1982, almost one year after Daylin acquired Lots 14H and 14J.

Based on the foregoing, I find that at the time Daylin acquired title to Lots 14H and 14J in June of 1981, neither Daylin nor Grace had knowledge of the fact that Lots 14H and 14J were contaminated with chromium, or that the Site was filled with approximately one million tons of COPR. Nor does the evidence support Honeywell's theory that they should have known.

4. "DH" followed by a number refers to Honeywell's Trial Exhibits in evidence.

Grace and Daylin have exercised due care and have fully cooperated with the NJDEP. During trial, issues arose as to which parties did or did not cooperate with NJDEP regarding their responsibilities at the Site, and if they did cooperate, to what extent.

I find that Honeywell was less than cooperative and embarked on a dilatory, foot-dragging scheme for twenty years. I will discuss Honeywell's actions later. I will now deal with the Grace Defendants and their actions during this same time period.

As owners of the property, Grace also had responsibilities once they learned of the extent of the contamination. In late November 1981, Jersey City filed a municipal court complaint against Daylin complaining that excessive vegetation, rubbish and hazardous materials in drums existed at the theater property, Lot 14J. On December 29, 1981, Mr. Dorner, on behalf of Daylin, advised Jersey City that Daylin had just recently acquired the property, and it had no knowledge who was responsible for the dumping at the property. However, Daylin would take the necessary steps to remove the drums and other materials that had been abandoned on the theater property by unknown third parties.

On or about February 18, 1982, Grace, as parent of Daylin, authorized CECOS International to proceed with the removal of the drums as discussed with Jersey City in the December 29, 1981, letter.

In a memorandum dated March 29, 1982, Mr. Dorner made record of a conversation he had with Tex Aldredge, Director of Jersey City's Hazardous Waste Task Force, wherein Mr. Aldredge told Mr. Dorner that the ECARG property was a "big financial problem". On April 28, 1982, a meeting occurred at the ECARG property attended by representatives of NJDEP, Jersey City, Grace, Daylin and

their environmental consultants regarding the environmental issues relating to the Site.

On May 3, 1982, the City of Jersey City notified Allied (now Honeywell), as successor to Mutual, that the ECARG property posed a danger to the public health, safety and welfare.

In May of 1982, Charles Brooks, a Senior Vice President at Grace, on behalf of Daylin, advised David Shotwell of the NJDEP that although Daylin had just recently acquired title to the property in question, and had no involvement whatsoever with any of the contamination which may exist at the property, Grace agreed to the following: (1) "retain CECOS International to remove the thirty-eight waste-containing drums and surrounding contaminated soil, if any, from those drums by May 7, 1982; (2) analyze and remove the abandoned tank truck from the Site; (3) install a fence around the property to prevent access and (4) retain the firm of Geraghty & Miller, Inc. (environmental consultants) to analyze the conditions at the Site." In addition, Mr. Brooks provided NJDEP with analytic results of the samples taken from the Site.

By letter dated May 26, 1982, Mr. Brooks advised Mr. Aldredge that the drums had been removed and confirmed his understanding that Mr. Aldredge would dismiss the municipal court complaint filed against Daylin. By letter dated May 28, 1982, Mr. Brooks confirmed to Mr. Shotwell that all drums had been removed from the property and that CECOS advised that the tank wagon did not contain hazardous waste.

On June .9, 1982, Thomas R. Kelley, Executive Director of the Jersey City Economic Development Corporation noted in a Jersey City memorandum that "there is no question that W.R. Grace, when they pur-

chased the land (the ECARG property), had no idea of the problem that existed under the surface of the Site."

In June of 1982, approximately one year after Daylin purchased the ECARG property, the U.S. Environmental Protection Agency (EPA) notified Grace that the ECARG property contained high levels of chromium with a significant level of hexavalent chromium ions. By letter dated July 6, 1982, Mr. Brooks advised Mr. Shotwell that the ECARG property was previously owned by Mutual which merged into Allied in 1955. Mr. Brooks requested that the NJDEP use its enforcement powers to bring Allied, Mutual's successor, into the proceeding since Allied was responsible for any pollutants left on the property by Mutual.

By letter dated July 23, 1982, NJDEP formally thanked Grace for its cooperation and prompt remedial actions at the property and advised Grace that NJDEP was investigating the identity of parties responsible for the contamination.

In July 1982, Grace, on behalf of its subsidiary Grace Retail Corporation, retained Geraghty & Miller to investigate groundwater quality conditions at the property. The purpose of the study was to determine the chemical characteristics and thickness of the fill material beneath the ECARG property and to evaluate the quality of on-site ground and surface water. Geraghty & Miller directed the installation of five monitoring wells, installed a well near the bulkhead and set up three surface water measuring stations. Geraghty & Miller noted that the ECARG property contained five to eighteen feet of fill with two to ten feet of sandy silt beneath it. Selected soil samples revealed total chromium values ranging from 2,500 mg/kg(ppm) to 35,000 mg/kg(ppm) and hexavalent chromium values up to 4,800 mg/kg(ppm). The Geraghty & Miller investigation report was issued in February 1983 and Grace furnished Allied with a copy of the report. Geraghty & Miller discussed its study with NJDEP officials before and during its investigation. Since 1982, Grace and ECARG have cooperated with the NJDEP in connection with its ongoing efforts to have Honeywell investigate and remediate the chromium contamination at the property.

In January 1985, NJDEP issued a Directive Letter to Grace simultaneously with an identical Directive Letter to Allied (Honeywell). The letters required Grace and Allied to each pay $2.4 million to NJDEP so that NJDEP could undertake an RI/FS study at forty chromium sites in Hudson County (other than this site). NJDEP claimed that the forty other sites contained COPR from Mutual's Jersey City chrome plant and the Site. NJDEP did not require Grace to take remedial measures regarding the discharge of hexavalent chromium from the Site. The Directive Letter did not in any way address the COPR located at the Site. On February 6, 1986, Grace responded to the letter stating that Grace had been cooperating with NJDEP for two years in connection with Lots 14H and 14J, that Grace Retail Corporation and not W.R. Grace & Co. was the owner of Lots 14H and 14J and that Grace Retail Corporation was only a passive owner.

NJDEP never pursued the Directive Letter against Grace, but instead focused its enforcement efforts on the chromium producers including Allied. Thereafter, NJDEP issued multiple Directives to Allied pertaining to the property. No further NJDEP Directives were issued to any of the Grace defendants.

I find that Daylin and ECARG exercised due care and have fully cooperated with NJDEP. I find further that Daylin acquired fee title to Lot 14H and 14J in June

of 1981; that Daylin acquired Lot 14H and Lot 14J after Mutual's discharge of the hazardous waste at the property; that at the time Daylin acquired Lots 14H and 14J, it did not know and had no reason to know that any hazardous substance had been discharged at the property; that Daylin did not discharge the hazardous substance, is not responsible for the hazardous substance, and is not a corporate successor to the discharger or any entity in any way responsible for the hazardous substance, or to anyone liable for cleanup and removal costs; that Daylin notified NJDEP of Allied's (Honeywell's) responsibility for the hazardous substance located at Lots 14H and 14J after the actual discovery of the discharge; that Daylin and Grace fully cooperated with NJDEP upon the actual discovery of the discharge of the hazardous substance; and that at the time of Daylin's acquisition of Lots 14H and 14J, it made all appropriate inquiries as to the previous ownership and uses of Lots 14H and 14J based upon the generally accepted good and customary standards being followed at the time.

### THE INTRA–CORPORATE TRANSFER OF LOTS 14H AND 14J TO ECARG

In 1986, W.R. Grace & Co. made a corporate decision to divest its interest in the retail home improvement business in order to raise capital for corporate purposes. The Channel Acquisition Company (Channel), composed of the management of W.R. Grace & Co.'s Channel Home Center business, was formed to purchase the Channel Home Center business from W.R. Grace & Co. In November 1986, Channel acquired the stock of Grace Retail Corporation from W.R. Grace & Co. As part of the November 1986 acquisition of Grace Retail Corporation (GRC) by Channel, a repayment and distribution agreement was executed between W.R. Grace & Co., W.R. Grace, Ltd., and GRC on November 26, 1986. This agreement transferred non-operating assets out of GRC. This was accomplished because Channel only wanted to purchase the operating Channel Home Center stores, rather than incur the obligations associated with any non-operating assets of GRC. The repayment and distribution agreement provided that Grace was to receive a distribution of certain non-cash assets of GRC, including Lots 14H and 14J.

In connection with the sale of the Channel Home Center business in November of 1986, Grace directed that fee title to Lots 14H and 14J be transferred from GRC to ECARG. As a part of the transfer of title, Grace caused two deeds to be prepared in November of 1986 whereby GRC and ECARG intended that fee title to Lots 14H and 14J be transferred from GRC to ECARG. As part of the transfer of title to those lots, GRC and ECARG executed an "Assignment of Leases and Joint Venture" dated November 26, 1986, whereby GRC's interest in the ground lease, the operating lease, and the joint venture agreement was assigned from GRC to ECARG. As part of the transfer of title to Lots 14H and 14J, Goodrich and ECARG executed a new Joint Venture Agreement dated November 26, 1986, that superceded and replaced the March 15, 1967 Joint Venture Agreement between Goodrich and Diana. On December 4, 1986, John Poggioli, a real estate counsel at W.R. Grace, wrote Goodrich advising them that GRC had transferred all of its interest in Lots 14H and 14J to ECARG as of November 26, 1986.

In 1994, Plaintiff, ICO, notified Channel Home Center, Inc. that it was going to commence suit against Channel Home Center as owner of Lots 14H and 14J. Channel Home Center notified Mr. Nagy of Grace of the ICO notice and Mr. Nagy investigated, believing that ECARG, not Channel, already had fee title to the prop-

erty. Based upon this investigation, it was determined that the two deeds transferring Lots 14H and 14J from GRC to ECARG prepared in 1986 were inadvertently not executed and recorded.

In October 1994, the two deeds were executed and recorded to formally memorialize the intended and *de facto* transfer to ECARG on November 26, 1986, of fee title to Lots 14H and 14J. During the period 1986 through 1994 when the deeds were finally recorded, both W.R. Grace and Honeywell held out and referred to ECARG as the owner of Lots 14H and 14J. ECARG is the current owner of the ECARG property.

Based on the foregoing, testified to by Mr. Nagy at trial with supporting documentation, I find that ECARG held constructive title to Lot 14H and Lot 14J from November 26, 1986, to October 14, 1994, when ECARG obtained full legal title to the ECARG property.

I find further that the evidence presented at trial clearly indicated that ECARG has, since it acquired the ECARG property in November 1986, exercised due care and has cooperated with the NJDEP in connection with its ongoing efforts to have Honeywell investigate and remediate the chromium contamination at the Site. In so doing, ECARG contributed $89,750 toward the costs of interim remedial measures installed by Honeywell at the property. In 1990, ECARG provided cooperation to Honeywell in connection with its repair of the bulkhead at the ECARG property, which was required to prevent further discharges of COPR from the ECARG property into the Hackensack River.

In 1994, ECARG incurred costs to demolish the former Goodrich (Valley Fair) Building which had become structurally unsound and unuseable and presented a risk to the public due to the heaving of the COPR.

In 1997, ECARG entered into a license agreement with Honeywell· to provide it with continuing access to the property so that Honeywell could conduct a cleanup of the chromium contamination. The license agreement requires Honeywell to fully and completely comply with all applicable laws which would include but not be limited to cleaning the ECARG property to the NJDEP residential soil criteria of 240 ppm.

In 1995, Grace, on behalf of ECARG, cooperated with NJDEP to remove three underground storage tanks that were associated with the operations of the former gas station/car wash tenant at Site 157. Dames & Moore, Grace's environmental consulting firm, submitted an underground storage tank closure plan to NJDEP that was approved by NJDEP in May of 1995. Dames & Moore investigated and removed all petroleum contaminated soil associated with the underground storage tanks. In 1999, NJDEP confirmed that the petroleum contaminated soil was remediated to NJDEP's stringent cleanup standards. In the course of removing the petroleum contaminated soil, Grace, on behalf of ECARG, incurred increased disposal costs of $126,000 because the petroleum contaminated soil was also contaminated with chromium which required special, more expensive disposal.

Also in 1999, Grace received NJDEP approval for a natural attenuation monitoring remedy for the petroleum groundwater contamination at Site 157. Grace, on behalf of ECARG, is implementing the NJDEP approved groundwater monitoring remedy.

### *HONEYWELL'S DILATORY TACTICS*

After twenty years of studies, debate, negotiation and delay, there is no permanent remedy for the Site. On May 3, 1982,

the City of Jersey City notified Allied, as successor to Mutual, that the ECARG property posed a danger to the public health, safety and welfare. In October of 1982, NJDEP wrote Allied and requested information regarding the materials which Allied placed at the Site. On February 1, 1983, Allied responded to NJDEP acknowledging Mutual's disposal of significant quantities of chrome ore processing waste at the Site.

On April 28, 1983, NJDEP wrote to Allied confirming the following: (1) there was as much as one million tons of COPR at the Site, (2) the COPR was toxic, (3) the groundwater at the Site exceeded New Jersey Standards for chromium content, (4) the pH at the Site exceeded applicable standards, and (5) approximately 12,600 gallons per day of groundwater was being discharged from the Site into the Hackensack River. NJDEP directed Allied to prepare a plan to fully delineate the extent of the contamination at the Site within sixty days and to implement pollution abatement measures necessary to protect the public health and environment from the hazards posed by the chrome ore processing waste discharged by Mutual at the Site.

On June 27, 1983, Allied responded to NJDEP's April 28 letter advising that it would begin to take steps to investigate the contamination of the Site caused by the COPR placed at the Site by Mutual. For the next twenty years, Allied (Honeywell) and representatives of NJDEP discussed, debated and negotiated the appropriate measures necessary to remediate the Site and eliminate any dangers posed to the environment. There is no question but that Honeywell (Allied) has known of the chromium contamination at the Site since 1982, and although they have been directed by NJDEP on numerous occasions to take steps necessary to provide a permanent remedy for the property, Honeywell has failed to do so. The trial record is replete with instances of Honeywell's avoidance tactics. Rather than respond and solve the problems, Honeywell continually took the path of further testing, further debate and negotiation.

As an example of Honeywell's behavior, Mr. Faranca who testified on behalf of NJDEP, experienced a pattern whereby Honeywell, when faced with proposals relating to the remediation of the Site, would make a proposal, NJDEP would reject it, it would be discussed, and sometime thereafter, Honeywell would return with the same or a similar rejected proposal. This pattern occurred frequently during the twenty-year period and frustrated DEP's continued efforts to design an appropriate permanent remedy for the Site. It became clear to me, that the NJDEP was understaffed and overworked, and therefore, susceptible to these and other delaying tactics.

## HONEYWELL'S INTERIM REMEDIAL MEASURES DO NOT ELIMINATE EXPOSURE PATHWAYS

An Interim Remedial Measure ("IRM") is a discrete action or set of actions, used to address both emergency and non-emergency environmental threats, that can be conducted without the extensive evaluation of a remedial investigation or feasibility study.

On April 28, 1983, NJDEP notified Honeywell that the Site was contaminated with chromium that exceeded levels deemed acceptable by the State. NJDEP instructed Honeywell to "take measures necessary to protect the public health and the environment from hazards posed by the wastes deposited at the Mutual Site." Honeywell was directed to submit, within 60 days, plans to (1) remove all contaminated material from the Site to restricted

areas where the public could not contact them, and to (2) "fully delineate the extent of contamination." Honeywell took no such actions in the 60–day period.

When no interim or permanent remedial measures had been implemented by December 1988, NJDEP issued a Directive, which ordered Honeywell to install IRMs t the Site. NJDEP listed the Site as a "high priority Site." NJDEP expressed concern over the threat posed by the discharge of chromium into the waters of the State and the effects of chromium exposure on human health.

Pursuant to the December 1988 Directive, on April 3, 1989, Honeywell submitted a work plan to NJDEP for the implementation of IRMs at the Site. NJDEP rejected the work plan because it was incomplete.

In July 1989, Honeywell submitted a revised work plan. On August 3, 1989, NJDEP determined that the plan was still incomplete and directed that certain items be included. In its first comment, NJDEP directed that the plan must be revised to include the following statement:

> The purpose of the IRMs to be implemented are to prevent the discharge of chromium and its compounds by way of *all routes* of potential human exposure and shall include measures to prevent the airborne, erosional or surface water runoff of chromium contamination. (emphasis added)

On August 4, 1989, Honeywell responded to NJDEP by letter and submitted another revised work plan:

> All comments cited in your letter have been incorporated in this submittal, with the exception of comment number 1. *I'm sure NJDEP is aware that proposed IRM measures will substantially reduce potential discharges of chromium and its compounds through various routes. However, to "prevent" all discharges of chromium compounds at the Daylin– Grace Site is beyond the scope of these interim measures.* (emphasis added)

NJDEP conditionally approved this work plan on August 31, 1989.

This Court finds that the IRMs have been damaged consistently since their installation and have been constantly in need of repair. However, Honeywell has only repaired the when specifically ordered to do so by NJDEP.

As early as March, 1992, Honeywell identified tears and rips in the two-year old IRM geomembrane liner. The damage was attributed to inclement weather conditions. In an effort to prevent further damage, in June 1992, Honeywell covered four acres of the damaged geomembrane with a geotextile cover and crushed rock. There is no evidence that the damage to the liner was repaired.

In February 1993, Honeywell identified cracks in the asphalt IRM cap. NJDEP required Honeywell to patch the cracks with tar or asphalt. At the same time, the additional 14 acres of geomembrane, which had remained exposed since installation, were covered with geotextile and crushed stone.

By 1993, the extent of damage to the geomembrane IRM liner was so great that it required approximately 55,400 feet of PVC material to patch damaged areas. In addition, approximately 240 holes were patched.

On October 31, 1995, NJDEP inspected the Site 115 IRM. NJDEP observed "several deficiencies" at the Site and ordered Honeywell to address those deficiencies "as soon as possible to protect human health and the environment." NJDEP expressed particular concern with "leaks" and "breaks" in the liner system, which allowed chromium-contaminated surface

water to discharge from the Site into the Hackensack River. The inspection identified areas where the geomembrane and geotextile were exposed. At the same time, "yellow-green water" was observed discharging from the swales into the Hackensack River.

In response to NJDEP's order, Honeywell prepared a work plan in March 1996 for liner repairs to the south swale liner and the liner near the south end of the former Valley Fair building foundation. The repairs were designed to prevent the migration of chromium-contaminated onsite soils and groundwater.

NJDEP rejected Honeywell's March 1996 work plan because it did not address the on-going discharge of yellow water into the Hackensack River as required in the 1988 Directive. In doing so, NJDEP ordered Honeywell to develop: a comprehensive plan to control the groundwater and surface water emanating from the Site that would be consistent with a final remedy; a detailed plan to protect human health and the environment; and an engineering evaluation of the integrity of the existing liner:

> [The March 1996 IRM Work Plan] does not address a continuing discharge of yellow water into the Hackensack River as noted during the inspection at the north ditch. The yellow water noted in the swales during the inspection is a result of ground water from beneath the liner, migrating to the surface from cracks in the liner or moving beneath the liner directly to the river. This ground water is in excess of the New Jersey Surface Water Quality Standards (50 ppb hexavalent chromium). Be advised, the Department has a growing concern and a heightened awareness of this impact to the environment. This problem which has continued at least

since February 1983 * * * needs to be addressed.

\* \* \* \* \* \*

The interim remedial measures installed at this location in the winter of 1989/1990 were designed to last 5 years to enable the Department and Allied sufficient time to perform the remedial investigation, feasibility study and remedial action design. In the interim, this work has not taken place, and this IRM has continued to deteriorate. * * * It is therefore, the Department's opinion that Allied must begin to develop a comprehensive plan to control the ground water and surface water which is emanating from the Roosevelt Drive–In Site (Site 115). It is envisioned that such a plan must consider long term control such that it would be consistent with all final remedial actions at this site.

In August 1996, Honeywell submitted a supplemental IRM work plan. On October 29, 1996, the NJDEP conditionally approved Honeywell's supplemental work plan, stating that "these measures are considered interim in nature." However, NJDEP remained concerned that Honeywell's work would "do nothing to prevent the yellow water from discharging to the river," that "the bulk of the contamination is still discharging via groundwater underneath the liner directly to the river," and that, based on Honeywell's IRM work plan, NJDEP "cannot be certain that other portions of the liner have not deteriorated . . . ."

Honeywell observed damage to the asphalt and concrete paving and IRM liner during inspections conducted on August 3 and September 1, 1998.

The record is replete with evidence that the geotextile cover and geomembrane liner at the Site are significantly damaged due to wear and tear and/or as a result of

the extensive surface heaving that takes place at the Site. This Court finds that Honeywell's IRMs have consistently failed to prevent the discharge of chromium into the Hackensack River. Based on the past twelve years of repeated IRM failures and ineffective upgrades, I find that the IRMs present at the Site are not sufficient to prevent the migration of chromium from the Site into the environment including the groundwater below, the air and the Hackensack River. I find further that the liner and cover are inadequate to prevent human and environmental contact with chromium from the Site. I also find that the asphalt and concrete IRMs are inadequate to prevent human and environmental contact with chromium from the Site.

There is also evidence of human trespass such as holes and damage to the fence, discarded food and wrappers, toys, fishing poles and equipment, as well as graffiti. All of this evidence makes it clear that trespassers enter the Site. Once on the Site, trespassers may come into contact with the hexavalent chromium contamination in the soil through breaches in the cap and with surface water and shallow groundwater which has seeped to the surface of the Site.

Accordingly, I find that Honeywell has failed to maintain a protective fence and warning signs around the Site to prevent unauthorized access to the Site. It should be noted, that even if a fence were properly maintained, this would in all likelihood not prevent wildlife from entering the Site and being exposed to chromium contamination.

The above supports my view that removal of the COPR is the only viable remediation and, unless someone is appointed to oversee the project, it will not occur. Honeywell's failure to delineate the extent of the contamination at the Site and implement a permanent remedy has been well documented and I will not repeat it again here.

I find that through Honeywell's actions, or more appropriately inactions, they have failed to design a permanent remedy which would satisfy NJDEP's 240 parts per million soil cleanup criteria, and therefore has allowed the property to remain a risk to human health and the environment. As will be discussed below, the Court will appoint a Special Master to oversee remediation of the Site.

### SITE REMEDIATION

A permanent remedy is necessary to eliminate the imminent and substantial endangerment to health and the environment caused by the condition of the Site. As stated earlier, the Court was most impressed with the testimony of Dr. Brown. His testimony was the most complete and coherent regarding the various types of remediation that are available. He discussed each of these alternatives in detail and explained why each, except one, was rejected. I find his testimony to be reasonable, credible and compelling. In fact, no reasonable or compelling testimony was offered in contradiction of Dr. Brown. Accordingly, I find that the most reasonable and appropriate remediation method for the entire site is to excavate, remove, treat, and refill with clean fill.

In addition to the contaminated soil which must be removed, I am also concerned about the contaminated deep groundwater at the Site which may also present an imminent and substantial endangerment to health or the environment. This problem requires further study. Accordingly, Honeywell will be required to test and fully delineate the extent of chromium contamination in the deep groundwater at the Site in order to ensure that this contaminated water does not discharge to the Hackensack River, or flow to

any fresh water aquifer that is used as a water supply, or to the bedrock. If it is found that the contaminated deep groundwater beneath the Site is discharging or threatening to discharge, into the Hackensack River or any other surface water body, or is migrating, or threatening to migrate into the bedrock or an area of a freshwater aquifer that is used as a drinking water supply, Honeywell must take appropriate remedial actions necessary to prevent such discharge or migration. Depending on these test results, the Court will enter a further injunctive order setting forth the appropriate relief. The Court will rely upon the tests and the recommendations of the Special Master in determining appropriate relief.

I also find that the discharge of chromium from the Site to sediments in the Hackensack River has caused an imminent and substantial endangerment which must be remedied. Honeywell will be required to remedy the chromium toxic hot spots in the Hackensack River which are affected by the Site so that such hot spots do not exceed the State's ER–M Standard of 370 ppm total chromium.

This Court is not unmindful of the potential costs involved. Dr. Brown estimates costs for remediation could be $400 million. However, due to the nature of the waste, and the heaving phenomenon, short of a restricted use of the property, total excavation and fill is the only viable remediation alternative.

The present owners of the property (Grace) have stated that they refuse to agree to a deed restriction. Furthermore, as their real estate experts testified, if the Site were cleaned up it would have great value as residential property. The present owners played no part in the property contamination and were innocent purchasers when they obtained the property. I see no reason why this Court should dictate as to how they should ultimately use the property. Furthermore, the evidence shows that Jersey City officials also believe the property should be developed as residential, if possible. Therefore, it is assumed that the property will eventually be used for residential housing.

Honeywell offered a witness, Mr. Deming, who testified at some length regarding an experimental "floating" foundation which would allow a large retail structure (100,000 to 150,000 square feet) to be built on top of the COPR. Even if the Court accepts Mr. Deming's testimony regarding this experimental foundation, he acknowledges no residential housing could be built at the Site.

In addition to the obvious problems caused by the hexavalent chromium contamination and the potential health hazards associated with it, the Site suffers from the phenomenon described as heaving. None of the witnesses seemed to be sure as to why this phenomenon occurs, however all of those knowledgeable with heaving agree that it does occur, and will continue to occur indefinitely. The Court takes this to mean that it may continue decades into the future, unless the problem is addressed now.

### HEAVING

This geo-technical problem refers to the large bumps and ridges that appear on the surface of the property as a result of a chemical reaction that causes the expansion of the COPR beneath the property surface. These ridges rise several feet high and destroy or damage anything that is constructed at the surface, such as buildings or even parking lots. In addition, heaving will cause problems with utilities which would normally be built under the ground, such as sewer or water lines. Despite years of study and testing, no solution has been found to solve the heaving

problem. It is impossible to predict when or where the heaving will occur and therefore it is impossible to build on or pave over the property. The only rational solution is removal of the COPR.

Although Mr. Deming did arrive at a possible solution when building a large retail structure, he acknowledged that the same type of foundation would not be viable for multiple dwellings or high rise type apartments in excess of five stories. These are precisely the types of residential dwellings contemplated by the property's owner.

In addition, other testimony was offered that convinced the Court that the only appropriate remedy is excavation and removal. Any other type of remedial action would require substantial maintenance for years, and a recognition that future generations would be required to abide by whatever restrictions were placed on the property. The Court realizes that to cap or otherwise wall off and treat this property would create maintenance problems for decades into the future. Human nature being what it is, I am not satisfied that future generations will necessarily abide by today's restrictions. Accordingly, the only viable remedy is excavation, removal and treatment and refilling with clean fill.

It is the finding of this Court that: (1) heaving at the Site is caused by COPR; (2) heaving will continue to occur at the Site for an indefinite period of time and it is impossible to predict the depth and magnitude of the heaving; (3) heaving caused serious structural damage to the Goodrich (Valley Fair) building requiring its demolition; (4) capping the property is not a viable environmental remedy due to the fact that heaving would destroy the cap and allow the contaminated substance to become airborne and contaminate surface water and ground water; and (5) the property cannot be developed due to the heaving unless the COPR is removed.

## PLAINTIFFS' CLAIMS AGAINST GRACE AND RONED UNDER RCRA

Plaintiffs also assert claims against the Grace Defendants and Roned under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), however I find that neither Grace nor Roned ever engaged in the disposal or other relevant activity regarding the approximately one million tons of COPR that Mutual disposed of at the Site and therefore I find that there is no basis for imposing liability on the present owners of the property.

Plaintiffs rely upon *United States v. Price,* 523 F.Supp. 1055 (D.N.J.1981) *affd.* on other grounds 688 F.2d 204 (3d Cir. 1982) basing its allegations on the Defendant's "passive indifference" as a property owner. However, the plain language of RCRA makes clear that liability should only be imposed on those who actively manage or dispose solid or hazardous waste. The Court accepts Defendant Grace's argument that a straight forward reading of RCRA compels a finding that only active human involvement with the waste is subject to liability under § 7002(a)(1)(B). Accordingly, I find that the only responsible party is Honeywell. (See Conclusions of Law *infra* ).

## DAMAGES SUFFERED BY ECARG

ECARG, Inc., a present owner of the property, claims to have suffered or will suffer in the future, significant damages as a result of the property contamination caused by Honeywell. I make the following findings regarding ECARG's alleged damages.

*Lost Rents*

On July 20, 1965, Amy Joy, as lessor, entered into a lease with Goodrich as lessee, pertaining to the 14.7 acre tract of vacant land which comprises the easterly portion (Lot 14H) of the property (ground lease). On July 23, 1965, Goodrich entered into a lease with Diana Stores, as lessee, under the terms of which Goodrich was to construct the Goodrich Building for Diana Stores' use on the 14.7 acre tract which Goodrich leased simultaneously from Amy Joy under the terms of the ground lease (operating lease). On July 23, 1965, Goodrich, as grantor, entered into an option agreement with Diana Stores as grantee, whereby Goodrich gave Diana Stores the option to purchase a 50% interest in Goodrich's estate as lessee under the ground lease and its estate as lessor under the operating lease. The certificate of occupancy for the Goodrich Building which was constructed pursuant to the requirements of the operating lease was issued on November 4, 1966. On March 15, 1967, Goodrich and Diana Stores entered into a joint venture agreement whereby Goodrich sold to Diana Stores a one-half interest in Goodrich's estate as lessee under the ground lease and its estate as lessor under the operating lease. Diana Stores was merged into Daylin on December 16, 1969.

Daylin succeeded to Diana Stores' interest as the lessee under the operating lease and the owner of a 50% interest in the lessee under the ground lease. On October 31, 1972, Amy Joy was merged into its parent corporation, General Cinema Corporation. On March 20, 1979, W.R. Grace & Co. and W.R. Grace Ltd. acquired the stock of Daylin. W.R. Grace & Co. and W.R. Grace, Ltd. assigned the stock of Daylin to Grace Retail Corporation on March 20, 1979. GRC was merged into Daylin on March 21, 1979. On May 29, 1981, Louis Feil acquired the ECARG property from General Cinema. On Monday, June 1, 1981, Feil transferred the property to Daylin. As of June 1, 1981, Daylin, having succeeded to the interest of Amy Joy (General Cinema) as the fee owner of Lots 14H and 14J, became the lessor under the ground lease. On May 21, 1982, Daylin changed its name to Grace Retail Corporation. In 1986, Lots 14H and 14J (the ECARG property) were transferred from Grace Retail Corporation to ECARG as the result of an intra-corporate transaction.

The Goodrich (Valley Fair) Building consisted of 180,900 square feet of space. As of May 1990, the fair market rental value of the Goodrich (Valley Fair) Building was $2.50 per square foot.

ECARG, a successor to Daylin, as lessee under the operating lease, as holder of a 50% interest in the lessor under the operating lease, as holder of a 50% interest in the lessee under the ground lease, as lessor under the ground lease and as fee owner of the ECARG property could, but for the heaving problem, have subleased the Valley Fair Building in 1990 for an annual rent of $452,250 on a triple net basis (180,900 square feet times $2.50 per square foot equals $452,250). The Valley Fair Building was vacant as of February 1981. If the Valley Fair Building could have been sublet commencing in May of 1990, ECARG would have had expenses against the $452,250 in annual rental it would have realized from the subleasing of the Valley Fair Building. The expenses against the subleasing of the Goodrich (Valley Fair) Building in 1990 would have consisted of the operating lease rent, which had two components. First, $18,229.17 per month, or $218,750 annually, plus the incremental increase in ground lease rent totaling $30,057 annually. The monthly loss experienced by ECARG as a result of its inability to sublease the Valley

Fair Building equals $16,953.83 commencing in May of 1990. The inability to sublease the Valley Fair Building because of the heaving also caused ECARG to lose its 50% portion of the profit that ECARG/Goodrich joint venture would have realized as lessor under the operating lease. That 50% portion of the profit of the joint venture totaled $816.91 per month beginning May 1990.

ECARG's inability to sublease the Goodrich (Valley Fair) Building also caused it to lose the rental it would have received as the lessor under the ground lease. That amount totaled $6,213.81 per month as of May 1990. Notwithstanding ECARG's inability to rent the Goodrich (Valley Fair) Building because of the heaving problems, the Goodrich/ECARG joint venture was still responsible to pay the mortgage relating to the construction of the Goodrich (Valley Fair) Building. ECARG was paying its own 50% share of the mortgage as well as Goodrich's 50% share of the monthly mortgage payment which totaled $12,886.03 per month.

ECARG's inability to sublease the Goodrich (Valley Fair) Building also resulted in a loss of rents ECARG would have realized under the lease agreement between Grace Retail Corporation (formerly Daylin) and Weja, Inc. pertaining to the gas station/car wash property also known as Site 157 (the Weja lease DH–744; J–44). The Weja lease provided for a monthly rental of $4,017.62 for the period October 1, 1987 through September 30, 1992. From 1992 through September 30, 1997, that lease provided for a monthly rental of $4,821.14. These rent amounts were due provided at least 70,000 square feet of the Goodrich (Valley Fair) Building was being rented.

During the period from May 1990 to September 1997, Weja, as lessee, paid less than the amount it would have been required to pay under the Weja lease had ECARG been able to sublease at least 70,000 square feet of the Goodrich (Valley Fair) Building. As a result of ECARG's not being able to sublease the building, ECARG lost rental income from Weja lease in the amount of $2,086.27 per month during the period May 1990 to September 1992; $2,889.80 per month during the period October 1992 through December 1993; and $4,821.14 per month during the period January 1994 through September 1997.

Grace's expert, Mr. McGuire, reviewed the various lease documents in connection with the calculation of ECARG's economic loss stemming from ECARG's inability to sublease the Goodrich (Valley Fair) Building from May 1990 through December 1997. Grace 1314 presents a summary of the monthly losses sustained by ECARG as a result of its inability to sublease from 1990 forward breaking that time period into specific segments to account for changes in expenses and in the amounts of lost rentals. During the period May 1990 through February 1992, the monthly loss sustained by ECARG as a result of its inability to sublease was $38,956.85.

During the period March 1992 through September 1992, the monthly loss was $26,070.82. During the period October 1992 through December 1993 the loss sustained was $26,874.35. From January 1994 through 1997, the monthly loss was $26,805.69. And finally, during the period of October 1997 through December 1997 the monthly loss sustained by ECARG as a result of its inability to sublease the Goodrich (Valley Fair) Building was $23,984.55.

*Past Costs*

A. Demolition: As previously stated, the Valley Fair Building had to be demolished as a result of the structural damage caused by heaving. The demolition cost

the Grace Defendants $630,500. This amount has been stipulated between Grace and Honeywell.

B. Interim Remedial Measures: The Grace Defendants and Honeywell have stipulated that the Grace Defendants paid $89,750 toward the cost of the interim remedial measures at the Site installed by Honeywell.

C. Site Security: Grace and Honeywell have stipulated that Grace has spent $132,000 on security for the Site. The security costs incurred by Grace are broken down as follows: Fencework, $32,000; Guard Dogs, $87,500; Caretaker, $12,300.

D. Disposal of Chromium Contaminated Soil: Grace and Honeywell have stipulated that Grace spent $126,000 for the disposal of chromium contaminated soil in connection with the cleanup of the gas station/car wash.

E. Real Estate Taxes: The Grace Defendants and Honeywell have stipulated that the Grace Defendants have paid real estate taxes on the ECARG property in the amount of $222,900.

### APPOINTMENT OF SPECIAL MASTER

Honeywell and/or its predecessor has been aware of the Site contamination for more than twenty years. During that time they have studied, tested, restudied and retested over and over the problems which are evident to all the parties involved, including the NJDEP. I am convinced beyond any doubt that unless directed otherwise by some authority, the studies and testing will continue, no remediation will occur and the dangerous condition will continue to exist. As Mr. Faranca of the DEP made clear during his testimony, Honeywell has engaged in foot-dragging and regulatory ping-pong with respect to the Site and its ultimate cleanup. In addition, the injunctive relief this Court will grant, may require this Court to consider technical issues in the future concerning the implementation of the remedy. Pursuant to Fed.R.Civ.P. 53, I find that exceptional conditions exist and therefore I will order the appointment of a Special Master to oversee all aspects of the remediation and to ensure timely compliance with a remediation schedule.

With Court approval, the Special Master will be authorized to take whatever reasonable steps are necessary to successfully carry out his duties. He may retain the services of professionals and/or other technical people, as needed, and expend as much of his time as is required to ensure the remediation project is completed in a timely manner. The Special Master and those retained by him will receive reasonable compensation for their time and expenses, said compensation to be paid by Honeywell upon approval by the Court.

It is my intention to order Honeywell to either escrow funds or obtain a letter of credit in such an amount that will assure completion of the remediation project. It will be the Special Master's initial obligation to determine a reasonable estimate for the overall cost of the remediation project and recommend to the Court, based upon that estimate, an appropriate and fair escrow amount. General estimates were offered at trial, however I am not satisfied as to their accuracy and I therefore request further clarity on this subject.

I will retain jurisdiction of this matter until the cleanup has occurred during which time the Special Master will keep the Court and the parties apprised of all progress and problems through regular progress reports.

## CONCLUSIONS OF LAW [5]

### Honeywell is liable under RCRA.

Honeywell is liable for the imminent and substantial endangerment created by the chromium waste at the Site.

This action is brought pursuant to RCRA, 42 U.S.C. 6972(a)(1)(B), which provides that injunctive relief may be issued against:

any person * * * including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

■ Under RCRA, liability can be established by meeting the requirements of § 7002(a)(1)(B), 42 U.S.C. 6972(a)(1)(B). Under this statute, liability is established if Honeywell: (1) has contributed or is contributing to (2) the past or present handling, storage, treatment, transportation, or disposal of (3) any solid or hazardous waste that (4) may present an imminent and substantial endangerment to health or the environment. *Interfaith Community Org. v. Honeywell Int'l, Inc., supra,* 188 F.Supp.2d at 502 (citing 3 S. Cooke, The Law of Hazardous Waste, §§ 15.01[3][a] at 15–6 (2001)).

■ This Court has found that Mutual owned and operated a chromate chemical production facility adjacent to the Site and that it used the Site to dispose of approximately one million tons of COPR from its chromate plant. By its own admission, Honeywell is the corporate successor to Mutual and therefore it is liable for any and all acts, omissions, debts and liabilities of Mutual relating to or arising out of the chromium contamination at the Site. I conclude, therefore, that Honeywell has contributed to "the past or present handling, storage, treatment, transportation or disposal of the chromium waste at the Site." *See Interfaith Community Org. v. Honeywell Int'l, Inc., supra,* 188 F.Supp.2d at 502.

RCRA sets forth statutory definitions for the terms "solid waste" and "hazardous waste".

Section 1004(27) of RCRA, 42 U.S.C. 6903(27), defines the term "solid waste" as:

[A]ny garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or by product material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923).

Section 1004(5) of RCRA, 42 U.S.C. 6903(5), defines the term "hazardous waste" as:

[A] solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

Honeywell has admitted that the chromium waste at the Site is both a "solid waste" and a "hazardous waste" under RCRA.

This and other courts have found that chromium, particularly hexavalent chromium, is a hazardous substance under RCRA. *See, e.g., Interfaith Community Org. v. Honeywell Int'l, Inc., supra,* 188 F.Supp.2d at 503; *United States v. Power Engineering Co.,* 10 F.Supp.2d 1145, 1157–1158 (D.Colo.1998), affirmed, 303 F.3d 1232 (10th Cir.1999), certiorari denied, 529 U.S. 1086, 120 S.Ct. 1718, 146 L.Ed.2d 640 (2000) (hexavalent chromium is a form of hazardous waste and of solid waste under RCRA and Colorado regulations); *Steel Manufacturers Ass'n v. EPA,* 27 F.3d 642, 645(D.C.Cir.1994) (electronic arc furnace dust is considered to be a form of hazardous waste by the EPA, in part, because, it contains hexavalent chromium). Under RCRA, EPA classifies waste that contains five parts per million (ppm) or more of chromium as hazardous. 40 C.F.R. 261.24.

The Court further finds that the chromium waste that Mutual disposed of at the Site is the cause of the extensive chromium contamination of soil, groundwater, surface water and sediments at and near the Site.

The final element of liability under RCRA requires a showing that the solid or hazardous waste at issue may present an imminent and substantial endangerment to health or the environment.

This Court has found that "compliance (or non-compliance) with federal or state environmental standards is a determinative factor in assessing whether a particular form of contamination presents the possibility of imminent or substantial endangerment." *Interfaith Community Org. v. Honeywell Int'l, Inc., supra,* 188 F.Supp.2d at 503.

■ RCRA was "designed to provide a remedy that ameliorates present or obviates the risk of future 'imminent' harms * * *." *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 486, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). "An imminent and substantial endangerment exists if there is 'reasonable cause for concern that someone or something may be exposed to a risk of harm if remedial action is not taken.'" *ICO v. Shinn,* D.N.J. Civ. No. 93–4774(JCL), slip op., November 24, 1998, p. 15.

■ This Court concludes that Plaintiffs need not show actual harm to health or the environment. It is enough to show that such an endangerment *may* exist. *Interfaith Community Org. v. Honeywell Int'l, Inc., supra,* 188 F.Supp.2d at 503 (citing 3 S. Cooke, The Law of Hazardous Waste, §§ 15.01[3][e] at 15–11 n. 45–47 (2001)). *See also Meghrig v. KFC Western, Inc., supra,* 516 U.S. at 486, 116 S.Ct. 1251 (imminence "implies that there must be a threat which is present now, although the impact of the threat may not be felt until later"); *Dague v. City of Burlington,* 935 F.2d 1343, 1355–1356 (2d Cir.1991), reversed on other grounds, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Price v. United States Navy,* 39 F.3d 1011, 1019 (9th Cir.1994); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 193 (W.D.Mo.1985).

This Court has found that Plaintiffs have shown actual harm to health and the environment.

■ An "endangerment" is present if there is merely threatened or potential harm. *Interfaith Community Org. v. Honeywell Int'l, Inc., supra* 188 F.Supp.2d at 503; *Dague v. City of Burlington, supra,* 935 F.2d at 1356. Only the risk of harm, rather than actual harm, must be imminent. *Interfaith Community Org. v. Honeywell Int'l, Inc., supra* 188 F.Supp.2d at 503. In *Price v. United States Navy, supra,* 39 F.3d at 1019, the Ninth Circuit stated:

A finding of "imminency" does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: "An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." Imminence refers "to the nature of the threat rather than identification of the time when the endangerment initially arose."

In applying the "imminent and substantial endangerment" standard, courts should err in favor of protecting human health or the environment. In *United States v. Conservation Chem. Co., supra,* 619 F.Supp. at 194, the court stated:

[I]f an error is to be made in applying the [imminent and substantial] endangerment standard, the error must be made in favor of protecting public health, welfare and the environment. Thus, just as the word "endangerment" does not require quantitative proof of actual harm, the word "substantial" does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that "excess deaths" will occur, or that a water supply will be contaminated to a specific degree).

In *United States v. Price,* 688 F.2d 204, 214 (3d Cir.1982), the Third Circuit stated that the "imminent and substantial endangerment" standard was enacted to "invoke * * * the full equity powers of the federal courts in the effort to protect public health, [and] the environment * * * from the pernicious effects of toxic wastes." The Court found that RCRA allowed courts to take action when there was only a risk of harm, a more lenient standard than the traditional requirement of threatened irreparable harm *Id.* at 213–214.

RCRA is not only concerned with threats to human health. Suit may also be brought where there may be "an imminent and substantial endangerment to * * * the environment." 42 U.S.C. 6972(a)(1)(B); *PMC, Inc. v. Sherwin–Williams Co.,* 151 F.3d 610, 618 (7th Cir.1998) (imminent and substantial danger where toxic wastes were buried and posed a "constant danger to the groundwater * * *"); *Aiello v. Town of Brookhaven,* 136 F.Supp.2d 81, 115 (E.D.N.Y.2001) (imminent and substantial endangerment under RCRA based on harm to environment, even though plaintiffs conceded no harm to human health); *Raymond K. Hoxsie Real Estate Trust v. Exxon Educ. Found.,* 81 F.Supp.2d 359, 367 (D.R.I.2000) (liability under RCRA may be based solely on contamination of groundwater and/or soil at the site in levels "exceeding state standards" because "the statute clearly speaks of endangerment to the 'environment' "); *Lincoln Properties, Ltd. v. Higgins,* 1993 WL 217429, *13 (threat to "living organism" need not occur for finding of imminent and substantial endangerment to the environment. "Neither the statute nor the case law interposes an additional requirement that humans or other life forms be threatened." Harm to water, air, or soil alone constitutes "imminent and substantial endangerment.")

In *ICO v. Shinn,* this Court set forth the showing that is needed for an imminent and substantial endangerment under RCRA. It held that a site "may present an imminent and substantial endangerment" within the meaning of RCRA where: (1) there is a potential population at risk; (2) the contaminant at issue is a RCRA "solid" or "hazardous waste"; (3) the contaminant is present at levels above that considered acceptable by the state; and (4) there is a pathway for current and/or future exposure. *ICO v. Shinn, supra,* slip op. pp. 15–16. *See also Foster v. United States,* 922 F.Supp. 642, 661 (D.D.C.1996)

 This Court has found that the State of New Jersey has determined that the Site presents a "risk of imminent danger to public health and safety and imminent and severe damage to the environment." This determination by the State is entitled to considerable weight by this Court.

### Sampling Data Shows that Chromium Contamination at the Site Substantially Exceeds Acceptable State Standards

*New Jersey Law.* In New Jersey, environmental contamination is deemed "acceptable by the State" if the level of contamination does not exceed the clean-up levels established by the State under the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B–1, *et seq.* (hereafter "the Remediation Act"). *ICO v. Shinn, supra,* slip op., pp. 17–18.

In the Remediation Act, New Jersey found that strict remediation standards are necessary to protect the public and the environment from the risks posed by hazardous substances. N.J.S.A. 58:10B–1.2. Accordingly, NJDEP was charged with

adopting minimum remediation standards. N.J.S.A. 58:10B–12(a). Such standards are adopted through rulemaking or on a case-by-case basis until the rulemaking occurs. *Ibid.* Under either alternative, the minimum remediation standards for soil must ensure that, for human carcinogens, the cancer risk is no greater than 1 in 1 million and that, for noncarcinogens, the Hazard Index is no greater than 1. N.J.S.A. 58:10B–12(d).

New Jersey law requires that minimum remediation standards be established for residential and non-residential future uses of the property. *e.g.,* N.J.S.A. 58:10B–12(c). Residential use is the preferred future use of all property subject to remediation. N.J.S.A. 58:10B–12(g). *See also* N.J.S.A. 58:10B–13(b). Non-residential use may only be used if the property owner consents to a deed restriction and agrees to maintain any remediation controls[6] that are imposed in lieu of a full clean up of the property to the established remediation standard. N.J.S.A. 58:10B–13(a)–(d). Residential standards are to be set at a level that allows unrestricted use of the property without the use of remediation controls. N.J.S.A. 58:10B–12(c).

Under the Remediation Act, any party charged with remediating a site may propose to NJDEP that alternative minimum soil remediation standards (hereafter "ARS") be used in lieu of standards set by NJDEP. N.J.S.A. 58:10B–12(f)(1). NJDEP may only agree to the use of an ARS if it is demonstrated that the ARS protects health to the same degree as NJDEP's standards. *Ibid.* In other words, an ARS soil standard may not be used in lieu of the NJDEP standard unless

---

**6.** Remediation controls refer to institutional controls or engineering controls. Institutional controls limit human activity in the vicinity of the contamination. N.J.S.A. 58:10B–1.

Engineering controls utilize an engineered mechanism to contain the contamination, such as caps, covers, signs and fences. *Ibid.*

it is demonstrated that the standard ensures that, for human carcinogens, the cancer risk is no greater than 1 in 1 million and that, for noncarcinogens, the Hazard Index is no greater than 1. N.J.S.A. 58:10B–12(f)(1). A different ARS may be used for each potential exposure pathway.

Here, NJDEP has set remediation or clean-up standards for the Site for chromium for soils, groundwater, and surface water. It has also set screening guidelines and a remediation action goal for sediment contamination in the Hackensack River. Those standards are addressed below. This Court concludes that although contamination at levels above that of a single standard would be sufficient to show an imminent and substantial endangerment, here all the applicable NJDEP standards are exceeded. This site is so contaminated and the contamination is so mobile that the standards for all media—soil, groundwater, surface water and sediments—are exceeded. Even the ARS's that Honeywell itself has proposed for dermal contact with soil are exceeded. Since the acceptable state standards are exceeded, the first part of the test for an imminent and substantial endangerment is satisfied.

*Hexavalent Chromium in Soils at the Site.* This Court concludes that all applicable state standards for hexavalent chromium in soil (20 ppm, 240 ppm, 270 ppm, and 6,100 ppm) are far exceeded by the content of hexavalent chromium in the soil at the Site.

*Total and Hexavalent Chromium in Groundwater at the Site.* This Court concludes that the applicable state standard for total chromium in groundwater (100 ppb) is far exceeded by the content of chromium in the groundwater at the Site.

This Court concludes that the applicable State standard for hexavalent chromium in groundwater which seeps to the surface and is discharged to the Hackensack River

(50 ppb) is far exceeded by the content of hexavalent chromium in the groundwater at the Site.

*Hexavalent Chromium in Surface Water at the Site.* This Court concludes that the applicable state standard for hexavalent chromium in surface water (50 ppb) is far exceeded by the content of hexavalent chromium in the swales at the Site which discharge to the Hackensack River.

This Court concludes that the applicable state standard for hexavalent chromium in surface water which applies as a minimum elicitation threshold (MET) for allergic contact dermatitis (ACD)(25 ppm) has been exceeded or approached by the surface water on the Site.

*Total Chromium in Sediments in the Hackensack River Adjacent to the Site.* This Court concludes that the applicable state sediment screening values for total chromium in sediments, Effects Range–Low (ER–L) (80 ppm) and Effects Range–Median (ER–M) (370 ppm), are far exceeded by the content of chromium in the sediments of the Hackensack River adjacent to the Site.

This Court concludes that discharges from the Site have caused the applicable state sediment screening values for total chromium in sediments in the Hackensack River to be exceeded.

*Hexavalent Chromium in the Waters of the Hackensack River Downstream from the Site.* This Court concludes that Honeywell has measured hexavalent chromium in the Hackensack River, close to and downstream from the Site, at levels which EPA has found to be chronically toxic to saltwater vertebrates and invertebrates.

*Chromium at the Site Is Hazardous to Humans and the Environment through Current and Future Pathways*

This Court concludes that there are current and future pathways for the exces-

sively high chromium both at the Site and emanating from the Site to reach humans and the environment, thus putting humans and the environment at risk.

This Court concludes that hexavalent chromium is a known human carcinogen and that the seriousness of the potential harm caused to human health by exposure to hexavalent chromium is well-documented and not open to dispute.

This Court concludes that hexavalent chromium is toxic to nearly every environmental receptor and that both chromium and hexavalent chromium cause serious harm to the environment.

***Current and Future Pathways Exist for Exposure of Humans and the Environment to Unacceptable Levels of Chromium***

This Court concludes that there is a substantial risk that trespassers, construction and utility workers, future commercial workers, future residents and other persons may come in contact with the high levels of chromium contamination at the Site.

This Court concludes that the groundwater at the Site and the Hackensack River immediately adjacent to the Site are receptors of chromium contamination from the Site.

This Court concludes that local fish populations, wildlife and communities of lower trophic organisms, which comprise the base prey that supports higher trophic levels are all potential receptors of chromium contamination.

This Court concludes that Honeywell has not raised any valid defense to liability under RCRA.

***The Interim Remedial Measures Are Not Sufficient to Abate the Imminent and Substantial Endangerment at the Site***

In 1989–1990, NJDEP required Honeywell to install an interim cap over approximately 17 acres of the Site. The interim cap consists of 30–mil PVC liner, a geotextile cover, and a 3/4″ layer of sharp-edged crushed stone cover. Other portions of the Site are covered with asphalt or concrete slabs. The interim cap, the concrete, and the asphalt cover are collectively referred to as the Interim Remedial Measures or IRMs.

Honeywell argues that the current IRMs eliminate any potential endangerment to humans or the environment. Defendant Honeywell International, Inc.'s Trial Brief, November 14, 2002 (hereafter, "Honeywell Trial Brief"), p. 5; *see also Interfaith Community Org. v. Honeywell Int'l, Inc., supra*, 188 F.Supp.2d at 504.

This Court concludes that the current IRMs do not eliminate the imminent and substantial endangerment to health and the environment posed by the chromium contamination at the Site.

This Court concludes that Honeywell, contrary to its present argument, specifically informed NJDEP, at the time it began installation of the IRMs, that the IRMs could not prevent all discharges of chromium contamination from the Site.

This Court concludes that NJDEP has rejected Honeywell's risk assessment for the Site, in part, because the assessment did not adequately consider risk by failing to assume that no IRMs exist at the Site.

Based on the Grace defendants' insistence on a residential cleanup for the Site, risks must be assessed without the IRMs because New Jersey law prohibits the use of engineering controls, such as physical barriers like the cap, with residential use.

This Court concludes that the IRMs are severely compromised. The interim cap has been in place well beyond its useful life and is ripped and leaking. The asphalt

which covers other portions of the Site is cracked and heaving.

■ Honeywell contends that human health risks due to future exposure to the COPR "cannot be based on an unrealistic and implausible assumption that, despite knowledge of the presence of COPR at Study Area 7, utility or construction workers would excavate into the soil without any protective equipment." Honeywell Trial Brief, p. 6. However, to prevail on a claim of imminent and substantial endangerment under RCRA, plaintiffs "need not establish an incontrovertible harm to health and the environment. The operative word is 'may'" (citations omitted) *Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.*, 138 F.Supp.2d 482, 488 (S.D.N.Y.2001). Thus, plaintiffs need only show, as they have done, that there is a risk that utility or construction workers may be exposed to COPR in the future.

Honeywell cites *Price v. United States Navy, supra*, 39 F.3d at 1019, for the proposition that there is "no imminent and substantial endangerment where contamination remained on site" where there are cap, asphalt and cement barriers in place. Honeywell Trial Brief, pp. 4–5.

This Court concludes that *Price v. United States Navy*, is readily distinguished from this case.

In *Price v. United States Navy*, the Ninth Circuit held that there was no imminent and substantial endangerment where: (1) "there was no threat of migration of contaminants through ground or surface water or air"; (2) "tests revealed no significant contamination beneath the foundation"; (3) the "[s]tate certified that all appropriate response actions had been completed and that no further removal/remedial action [was] necessary"; and (4) "repairs and/or renovation might not cause a release of contaminants." 39 F.3d at 1019–20. These facts do not exist here.

This Court concludes that, unlike in *Price*, despite the IRMs, contaminants are migrating into the environment.

This Court concludes that, unlike in *Price*, despite the IRMs, there are extremely high levels of contamination beneath the interim cap.

This Court concludes that, unlike in *Price*, the State has taken the position that further remedial action is necessary at the Site. Moreover, even Honeywell admits that there must be further remediation at the Site.

Unlike the cement barrier in *Price*, which was the foundation of a house, the IRM barriers here include a damaged PVC liner over 17 acres of the Site which is years beyond its useful life and concrete and asphalt which is cracked and heaved.

This Court concludes that, unlike the cement barrier in *Price*, the integrity of the barriers at the Site will continue to be compromised due to heaving. Since the chromium waste at the Site is known to cause or create conditions that cause pavements to heave and to penetrate foundations of buildings, barriers that might have blocked the pathway in other situations are not acceptable barriers for the chromium waste at the Site.

### The State Surface Water Standards Apply to the Discharges as They Leave the Site

This Court concludes that, as a matter of law, the New Jersey surface water standard applies to discharges from the Site as they enter the Hackensack River.

Honeywell argues that no finding of an imminent and substantial endangerment can be based on exceedances of the 50 ppb hexavalent chromium standard because that standard applies, not to the discharge at the end-of-the-swale, but to the discharge after it has been diluted in the

Hackensack River outside of an area that is referred to as the mixing zone. Honeywell Trial Brief, pp. 5–6.

This Court concludes that the mixing zone regulations do not apply to Honeywell's discharges from the Site.

A mixing zone is a localized area in the water body designated by NJDEP for mixing, dispersing, or dissipating discharges into the water body. N.J.A.C. 7:9B–1.4. Water quality within a mixing zone may exceed promulgated criteria, but nuisances, hazardous conditions, and acute mortality to aquatic organisms is not allowed within the mixing zone. *Ibid.* A party must apply for a mixing zone and obtain the State's approval to obtain one for a site. Honeywell has not requested a mixing zone and NJDEP has not approved one.

Where no mixing zone applies, the water quality criteria, such as the 50 ppb standard, "apply throughout the waterbody including at the end of any discharge pipe, canal or other discharge point" [*e.g.*, the swales]. 40 C.F.R. 131.36(c)(2)(i).

This Court concludes that NJDEP has applied the 50 ppb standard to hexavalent chromium discharges from the swales.

This Court concludes that, by Honeywell's own expert's admission, discharge from the Site causes the 50 ppb standard for hexavalent chromium to be exceeded in the Hackensack River close to the Site.

### Honeywell's Arguments as to Groundwater Contamination Are without Merit

This Court concludes that, as a matter of law, the New Jersey groundwater standard applies to the groundwater beneath the Site.

Honeywell argues that since no one is drinking the groundwater beneath the Site, contamination from the groundwater at the Site does not present a risk to human health. Honeywell Trial Brief, p. 5.

This Court concludes that contaminated groundwater seeps to the surface of the Site, presenting a risk of allergic contact dermatitis to trespassers, utility and construction workers, future commercial workers, future residents, and others who come on the Site.

This Court concludes that Honeywell's failure to delineate the deep groundwater may pose a potential risk to human health since human ingestion of contaminated groundwater from the Site is possible.

Under New Jersey law, groundwater is an environmental receptor in its own right. N.J.A.C. 7:26:E–1.8.

■ An "imminent and substantial endangerment" exists when buried hazardous waste poses a "constant danger to the groundwater * * *." *PMC, Inc. v. Sherwin–Williams Co., supra*, 151 F.3d at 618. "The water's designation as non-potable is not fatal. The statute clearly speaks of endangerment to the 'environment.' Groundwater, potable or not, and soil are a part of the environment." *Raymond K. Hoxsie Real Estate Trust v. Exxon, supra*, 81 F.Supp.2d at 367. In *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429, *13, the court stated:

> RCRA does not define the term "environment." However, it presumably encompasses the air, soil and water, including groundwater. In this case, the environment has already been degraded significantly by the contaminants' invasion of the water table. The groundwater * * * now contains [pollutants] in concentrations far exceeding federal and state standards.

Honeywell argues that "no ecological receptors are exposed to the groundwater except where it discharges to surface wa-

ter." Honeywell Summary Judgment Opp. Br., July 10, 2001, p. 3.

The Court concludes that the "exception" noted by Honeywell undermines its argument. Honeywell's "exception" is significant since surface water is a major pathway of exposure at the Site. This Court has concluded that contaminated groundwater discharges to the Hackensack River where fish, wildlife, and benthic organisms are exposed to the contamination. Contaminated groundwater also forms on-site seeps where it exposes human and ecological receptors.

Honeywell contends that New Jersey's Groundwater Quality standard of 100 ppb for chromium in groundwater is not applicable at the Site, based on *Federal Pacific Electric Co. v. NJDEP*, 334 N.J.Super. 323, 759 A.2d 851 (2000). Honeywell Trial Brief, p. 5, note 10.

To the extent that Honeywell still presses this argument, this Court finds the argument to be without merit.

First, this Court concludes that Honeywell has likely abandoned this argument, since it informed NJDEP in June 2002 that it would remedy groundwater discharges from the Site that exceed the 100 ppb standard.

Second, the facts here are entirely different than those in *Federal Pacific*. While the 100 g/l has not been promulgated as a remediation standard under the Remediation Act, NJDEP has stated that it is one of the standards that applies to this Site after years of reviewing the conditions at the Site and considering the impact of this contamination.

Since NJDEP may establish standards on a case-by-case basis under the Remediation Act (N.J.S.A.58:10B–12(a)), this standard is fully applicable. In fact, Honeywell adopted this standard in its own site-specific RI to evaluate groundwater at the Site.

Moreover, Honeywell could have, but did not, propose a different site-specific groundwater standard which NJDEP would have evaluated, and possibly selected, as the case-by-case standard for the Site. The plaintiff in *Federal Pacific* sought review of the dispute between itself and NJDEP as to what standard would be applied to the Site where NJDEP had not promulgated a standard through formal rulemaking. 334 N.J.Super. at 327, 759 A.2d 851. By failing to make such a proposal to NJDEP, Honeywell has waived its right to seek any alternative to the selected standard.

RCRA § 7002(e) provides that a court, "[i]n issuing any final order in an action brought pursuant to [§ 7002] ... may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate." 42 U.S.C. § 6972(e). Having concluded that Plaintiffs have prevailed on their claim against Honeywell under RCRA § 7002(a)(1)(B), and finding that the award of costs is appropriate, the Court hereby orders Honeywell to pay Plaintiffs' all reasonable attorneys fees, expert witness fees and other costs Plaintiffs have incurred in furtherance of its RCRA claim against Honeywell in this action.

A petition setting forth all costs (including attorneys fees and expert witness fees) being claimed by Plaintiffs under 42 U.S.C. § 6972(e) shall be submitted to the Court within sixty (60) days from the date of entry of the Order issued herewith

### THE GRACE DEFENDANTS ARE NOT LIABLE UNDER RCRA

■ Plaintiffs assert claims against the Grace Defendants under RCRA

§ 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). Having found that none of the Grace Defendants ever engaged in the disposal or other relevant activity related to the approximately one million tons of COPR that Mutual disposed at the ECARG Property, the Court finds that there is no basis for imposing RCRA liability on the Grace Defendants in this action. Thus, the Court will enter judgment in favor of the Grace Defendants on Plaintiffs' and Honeywell's RCRA claims. The basis for the Court's ruling is set forth below.[7]

### The Plain Language of RCRA Makes Clear That Liability Should Only Be Imposed On Those Who Actively Manage Or Dispose Solid or Hazardous Waste

The Supreme Court of the United States has instructed that the intent of Congress is to be determined by the plain language of a statute and, absent an indication from Congress to the contrary, words in a statute are to be given their "ordinary contemporary, common meaning." *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).

The Court finds that a straightforward reading of RCRA compels a finding that only *active* human involvement with the waste is subject to liability under RCRA § 7002(a)(1)(B). In this regard, RCRA § 7002(a)(1)(B) provides that liability may attach only if a person *"has contributed or is contributing* to the handling, storage,[8] treatment, transportation or disposal of a solid or hazardous waste that may pose an imminent or substantial endangerment to human health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). The ordinary meaning of "contribute" is "to act as a determining factor." *Webster's II New Riverside University Dictionary* (1998). Thus, Congress intended to impose liability only where a person is shown to have affirmatively acted as a determining factor over the waste management activities listed in RCRA 7002(a)(1)(B). No other reading is possible as the phrase "has contributed or is contributing to" in § 7002(a)(1)(B) modifies the specified waste management activities of "handling," "treatment," "transportation," "storage" and "disposal" in that provision.

The legislative history also supports the conclusion that Congress intended that RCRA § 7002(a)(1)(B) reach only persons engaged in the active management of waste. In this regard, Congress stated:

> The amendment reflects the long-standing view that generators and other persons *involved* in the handling ... disposal of hazardous wastes must share in the responsibility for the abatement of the hazards arising from *their activities.*

---

**7.** In a previous ruling, this Court, in reliance upon *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981) *aff'd. on other grounds* 688 F.2d 204 (3d Cir.1982), held that co-defendant Roned Realty could be held liable under RCRA § 7002(a)(1)(B) based solely on its alleged "passive indifference" as a property owner. *See* June 13, 2002 Decision at 9–11. Upon further consideration, the Court concludes that its prior ruling is not in accordance with the plain language of RCRA, controlling Third Circuit precedent, and all other post-*Price* federal court decisions that have addressed the liability of land owners under RCRA. The Court would also note that the

Third Circuit's opinion in *Price* affirmed the District Court's decision in *Price* on grounds not relevant to the issues involved in this case. The Third Circuit only addressed he District Court's denial of the United States' motion for a preliminary injunction, and not the District Court's denial of the defendant's summary judgment motion on the issue of RCRA liability. 688 F.2d at 211.

**8.** RCRA defines "storage" to mean the temporary placement of waste; this definition is mutually exclusive of the term "disposal." *See* 42 U.S.C. § 6903(33).

H.R. Conf. Rep. No. 98–1133, at 119 (1984) (emphasis added).

**All Federal Court Decisions Except *Price* Have Held That Active Involvement With a Waste Is a Prima Facie Element Of Liability Under RCRA § 7002(a)(1)(B)**

The Second Circuit in *ABB Industrial Systems, Inc. v. Prime Technology, Inc. et al.,* 120 F.3d 351, 359 (2d Cir.1997), is the only Circuit Court to have considered the issue of whether a property owner may be held liable under RCRA for alleged indifference or failure to remediate pre-existing contamination. In that case, plaintiff ABB purchased a property from defendant Zero–Max in 1985. Subsequently, in 1989, ABB discovered that the property was contaminated. ABB then sued Zero Max and other predecessors-in-title under RCRA § 7002(a)(1)(B) to compel a cleanup. No evidence was adduced that Zero–Max spilled, handled or disposed of the waste during its ownership. However, ABB did contend that the prior contamination continued to spread during Zero–Max's ownership, and that Zero–Max did nothing to stop the spreading of such contamination during its period of ownership. The Second Circuit affirmed the dismissal of the RCRA § 7002(a)(1)(B) claim against Zero Max "because ABB cannot show that Zero Max spilled hazardous chemicals or otherwise contaminated the site ..." 120 F.3d at 359.

Three post-*Price* district court decisions have similarly held that a property owner's "studied indifference" is insufficient to impose RCRA liability. These courts have all ruled that RCRA's plain language requires proof of active human involvement in the past or present "handling, storage ... disposal" of a waste. *See Delaney v. Town of Carmel,* 55 F.Supp.2d 237, 255–

257 (S.D.N.Y.1999)(holding that defendant Layhill, who purchased property 15 years after disposal ceased and who did not contain the waste after learning of the problem, was not liable under RCRA); *Marriott Corporation v. Simkins Industries, Inc.,* 929 F.Supp. 396, 398 n. 2 (S.D.Fla. 1996) (dismissing RCRA claim against Marriott on basis that a "delay in taking remedial action upon discovery of contamination caused by a previous owner does not constitute wrongful handling or storage of hazardous waste"); *First San Diego Properties v. Exxon,* 859 F.Supp. 1313 (S.D.Cal.1994) (expressly rejecting *Price* and dismissing RCRA claim brought by waste generator, Exxon, against plaintiff property owner who purchased the property years after Exxon contaminated groundwater; Exxon alleged plaintiff had exacerbated the environmental conditions by plaintiff's "indifference" in not investigating or cleaning up the property after it had discovered the contamination.).

**The Third Circuit Has Rejected *Price's* Fundamental Premise By Ruling That "Disposal" Under RCRA Does Not Include Passive Migration of Contaminants**

In reaching its conclusion that liability could be imposed under RCRA for mere "studied indifference" towards contamination, the *Price* court focused on RCRA's definition of "disposal" and concluded that it encompassed the migration of contaminants from previously dumped waste. Because the RCRA definition of disposal includes the term "leaking," [9] the *Price* court reasoned that "[t]he gravamen of a section 7003 action ... is not defendants' dumping which admittedly ceased ... in 1972, but the present imminent hazard posed by the *continuing disposal (leaking) of contaminants into the groundwater.*" *Price,* 523

---

9. 42 U.S.C. § 6903(3).

F.Supp. at 1071 (emphasis supplied). From there, the Court reasoned that a property owner's "studied indifference" with regard to the migrating contaminants constituted "contributing to ... disposal" of a waste.

The Third Circuit, in *United States v. CDMG Realty Co. et al.*, 96 F.3d 706 (3d Cir.1996), specifically rejected the legal underpinning of *Price, i.e.*, that the RCRA "disposal"[10] definition includes migration of contaminants from previously dumped waste. In the *CDMG* case, the defendant (Dowel) purchased a New Jersey landfill almost ten years after waste dumping had ceased, having full knowledge before the purchase that waste materials were at the site. Dowel did not dump any new waste at the property. However, previously dumped waste was alleged to be leaching to the groundwater and migrating at and from the landfill. Dowell moved for summary judgment arguing that "disposal" required active involvement in the waste dumping. The Third Circuit agreed, holding "that the passive migration of contamination dumped in the land prior to Dowel's ownership does not constitute disposal." *CDMG*, 96 F.3d. at 711. In so holding, the Third Circuit cited as "unpersuasive" *Price's* holding that "disposal" encompasses the passive migration of contaminants. 96 F.3d at 713. The court ruled that the term "leaking" does not denote "the gradual spreading of contamination alleged here." *Id.* The court found as a strong argument that "in the context of the definition [of disposal] 'leaking' and 'spilling' should be read to require affirmative human action." *Id.*

Accordingly, the Court concludes that RCRA liability may be imposed on the Grace Defendants in this case only upon a showing that they actively engaged in the management or disposal of COPR at the Site, and not upon evidence that they merely displayed alleged "studied indifference" to pre-existing chromium contamination resulting from Mutual's COPR disposal activities. *CDMG*, 96 F.3d at 711–713; *ABB Industrial Systems, Inc.*, 120 F.3d. at 359; *Delaney*, 55 F.Supp.2d at 255–257; *Marriott Corporation*, 929 F.Supp. at 398 fn. 2; *First San Diego Properties*, 859 F.Supp. 1313.

**The Grace Defendants Have Not Disposed Of Any COPR At The Site**

This Court has already found that neither W.R. Grace & Co. nor W.R. Grace Ltd. have ever owned, operated or taken any action regarding the ECARG Property specifically related to pollution or environmental compliance. *See ICO v. Honeywell International, Inc.*, 215 F.Supp.2d 482, 498–502 (D.N.J.2002). Similarly, there is no evidence that ECARG ever disposed of any COPR at the ECARG Property. Accordingly, the Court finds no basis on which to hold the Grace Defendants liable under RCRA § 7002(a)(1)(B), and therefore will enter judgment in favor of Grace on Plaintiffs' and Honeywell's RCRA claims.

**The Removal Of Abandoned Drums And Alleged Handling And Disposal Of Petroleum Do Not Provide Any Basis For Imposing RCRA Liability On The Grace Defendants**

The Court specifically rejects Plaintiffs' and Honeywell's argument that the removal of abandoned drums left at the ECARG Property by "midnight dumpers" or the alleged handling and/or disposal of petrole-

10. Although CMDG addressed CERCLA liability, the Court was interpreting the RCRA definition of "disposal," which is incorporated by reference into CERCLA. *See* 42 U.S.C. § 9601(29).

um[11] provide a basis for imposing RCRA liability on the Grace Defendants in this action. No evidence has been presented to the Court demonstrating that these activities have caused or contributed in any way whatsoever to the "imminent and substantial endangerment to health or the environment" posed by the roughly one million tons chromium waste that Honeywell's predecessor, Mutual, disposed of at the Site. The term "which" in the statutory phrase *"which* may present an imminent and substantial endangerment to health or the environment" in RCRA § 7002(a)(1)(B) requires Plaintiffs' and Honeywell to establish that the drum removal and/or petroleum release presented the "imminent and substantial endangerment." No such showing was made. This case is concerned with chromium contamination—not petroleum contamination. *See, e.g., Maine People's Alliance, et al. v. Holtrachem,* 211 F.Supp.2d 237, 255 (D.Me.2002) (holding that in a RCRA citizen's suit there must be a causal link between the disposal of a particular contaminant and the "imminent and substantial endangerment" complained of.); *Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Company,* 138 F.Supp.2d 482, 487–88 (S.D.N.Y.2001) (requiring proof that defendant disposed PCBs at site because PCBs were alleged to be causing an "imminent and substantial endangerment").

Accordingly, having been presented with no evidence linking drum removal or alleged petroleum handling/disposal activities to the "imminent and substantial endangerment" posed by chromium at the Site, the Court concludes that these activities provide no basis for imposing RCRA liability on any of the Grace Defendants.

Although Roned chose to absent themselves from the trial as a result of their settlement with Honeywell, claims against them by Plaintiffs persist. For the same reasoning the Court finds no RCRA liability against the Grace Defendants, it finds no RCRA liability against Roned.

### GRACE DEFENDANT'S THIRD AMENDED CROSSCLAIMS v. HONEYWELL AND HONEYWELL'S CLAIMS v. GRACE

#### 1. Honeywell Is Liable Under RCRA

In Count I of its Third Amended Cross–Claims, ECARG asserts a claim against Honeywell pursuant to Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B). Section 7002(a)(1)(B) provides, in pertinent part, that injunctive relief may be issued against "any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial en-

---

11. In Plaintiffs' proposed Finding of Fact, Plaintiffs state: "W.R. Grace & Co. arranged for the backfilling of excavated chromium contaminated soils onto Site 157. Memorandum from Ingram, W.R. Grace & Co., Pl.Ex. 686, p. 2. W.R. Grace & Co. therefore handled hazardous wastes at the Site." This proposed Finding of Fact is rejected. P–686 is a memo requesting additional funding for costs relating to the removal of the underground storage tanks ("USTs") at the gas station/car wash property (Site 157). P–686 does not contain any evidence that "W.R. Grace arranged for the backfilling of excavated chro-

mium contaminated soils onto Site 157." To the contrary, P–686 confirms that in connection with the NJDEP-approved UST removal, 1,040 tons of BTEX/chromium contaminated soil was removed and disposed of offsite (P–686, p. 1) and that the excavation was then backfilled (P–686, p. 2). As further evidence of the fact that the excavated soil was removed and disposed of offsite, Honeywell and the Grace Defendants have stipulated that the incremental increase in the offsite disposal cost as a result of the presence of chromium in the soil was $126,000. *See* Amended Past Costs Stipulation, filed March 14, 2003, ¶ 4.

dangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

The Court has already analyzed Honeywell's liability under RCRA and therefore concludes as a matter of law that Honeywell is liable to ECARG under RCRA.

Having concluded that all three elements of Honeywell's liability under RCRA § 702(a)(1)(B) are established, the Court finds that Honeywell is liable to ECARG under Count One of its Third Amended Crossclaims for the injunctive relief, attorneys' fees and costs.

As stated previously, a mandatory injunction will issue directing excavation and removal of COPR as the only effective remedy that will address the health and environmental risks as well as the heaving problem at the ECARG property. Upon removal of the COPR, Honeywell must completely backfill the entire ECARG property with clean fill. Since I have already concluded that the sediments in the Hackensack River in the vicinity of the ECARG property are contaminated with chromium at levels exceeding NJDEP's (ER–L) and ER–M toxicity levels, it will be necessary that Honeywell remedy all Hackensack River sediments that have been contaminated with chromium from the Site. I also conclude that chromium contaminated groundwater from Study Area 5 (the location of the former Mutual plant) located to the east of the ECARG property flows in the direction of the ECARG property, and therefore there is a substantial likelihood that the property could become recontaminated with hexavalent chromium after the COPR is removed. Accordingly, I conclude that as an additional remedy, Honeywell must implement hydraulic controls on the eastern perimeter of the ECARG property so as to prevent recontamination of the Site from Study Area 5.

As provided in the Order issued herewith, the parties shall meet with the Special Master, within thirty days of his appointment, and arrive at a Work Plan. The Work Plan shall contain a time table and benchmark dates for the excavation, removal, treatment and offsite disposal of all COPR on the Site, and the backfilling of the Site with clean soil in order that the 240 ppm hexavalent chromium residential soil cleanup level is attained throughout the Site.

The Court concludes that sediments in the Hackensack River located in the vicinity of the ECARG Property are highly contaminated with chromium at levels greatly exceeding NJDEP's "ER–L" and "ER–M" toxicity screening levels, that the approximately one million tons of COPR that Mutual disposed at the ECARG Property is the source of such sediment contamination, that the contaminated sediments are, and will continue to be, highly toxic to fish, plankton, barnacles, mussels, crabs, clams, crustaceans, worms and/or other organisms living in and around them, and therefore that these contaminated sediments "may present an imminent and substantial endangerment to . . . the environment." 42 U.S.C. § 6972(a)(1)(B).

On the basis of these findings, the Court concludes that, in order to remedy the serious, on-going environmental risks posed by the chromium contaminated river sediments, it is necessary for Honeywell to remedy all Hackensack River sediments that have been contaminated with chromium from the Site at levels at or exceeding 370 ppm, which is NJDEP's ER–M toxicity screening level. *See ICO v. Schinn, supra*, at 15–16. The Court finds that no remedy other than that set forth above will be effective in abating the endangerment to the environment posed by the contaminated sediments.

As provided in the Order issued herewith, the parties shall meet with the Special Master, within thirty days of his appointment, and arrive at a Work Plan, with a time table and benchmark dates to remedy all Hackensack River sediments that have emanated from the Site such that the chromium ER–M of 370 ppm is attained in the Hackensack River for such chromium contaminated sediments.

The Court concludes that chromium-contaminated groundwater from Study Area 5 (the location of the former Mutual Jersey City Chrome Plant) located to the east of the ECARG Property flows in the direction of the ECARG Property, and thus that there is substantial likelihood that the ECARG Property could become re-contaminated with hexavalent chromium after the COPR is excavated and replaced with clean fill by Honeywell. As set forth in above, re-contamination of the ECARG Property with hexavalent chromium would present health risks to humans, including future construction workers, future utility workers and future residents, who will be working/living at the ECARG Property after the COPR is remediated and ECARG is permitted to implement its development plans.

Honeywell must implement hydraulic controls on the eastern perimeter of the ECARG Property so as to prevent the re-contamination of the Site with hexavalent chromium contamination from Study Area 5. The Court concludes that installation of such hydraulic controls is necessary to protect human health at the ECARG Property.

As provided in the Order being issued herewith, the parties shall meet with the Special Master, within thirty days of his appointment, and arrive at a Work Plan for installing such hydraulic controls as may be necessary to prevent the Site from becoming re-contaminated with hexavalent chromium at levels exceeding the applicable 240 ppm residential limit due to groundwater flow from Study Area 5.

The Court will require Honeywell to provide and maintain financial assurances to insure that the excavation, removal and backfilling work required to comply with this Court's injunctive order is accomplished. Both New Jersey and federal statutory law recognize the appropriateness of requiring financial assurances in connection with the remediation of contaminated property. In New Jersey, the party responsible for remediation of contaminated property is required to provide financial assurances in an amount equal to or greater than the estimated cost of the remediation; is required to increase the amount of the financial assurances if the estimated cost of the remediation increases; is permitted to use the financial assurance to pay for actual costs of the remediation; is permitted to request a decrease in the amount of the financial assurance when the estimate of the cost of the remediation decreases; and is required to maintain the financial assurances in effect for a term not less than the actual time necessary to perform the remediation.

An appropriate financial assurance amount based upon the estimated costs of the remediation will be included in the Court's final judgment, based upon the recommendation of the Special Master.

RCRA § 7002(e) provides that a court, "in issuing any final order in any action brought pursuant to [section 7002] ..., may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate." 42 U.S.C. § 6972(e). Having concluded that ECARG has prevailed on its claim against Honeywell under RCRA § 7002(a)(1)(B), and finding that the award of costs is

appropriate, the Court hereby orders Honeywell to pay ECARG all reasonable attorneys' fees, expert witness fees and others costs ECARG has incurred in furtherance of its RCRA claim against Honeywell in this action.

A petition setting forth all costs (including attorneys' fees and expert witness fees) being claimed by ECARG under 42 U.S.C. § 6972(e) shall be submitted to the Court within sixty days from the date of entry of the Order issued herewith.

### 2. Honeywell is strictly liable to ECARG under New Jersey Common Law

In Count V of its Third Amended Cross-Claims, ECARG seeks to hold Honeywell strictly liable under New Jersey common law for damages and injunctive relief arising out of Mutual's disposal of COPR and the resulting chromium contamination at the ECARG Property.

■ To prevail on a claim for strict liability, two elements must be demonstrated: (1) that the defendant's disposal of waste constituted an "abnormally dangerous activity," and (2) that such activity has harmed the plaintiff. *See T & E Industries v. Safety Light Corp.*, 123 N.J. 371, 587 A.2d 1249 (1991); *New Jersey Turnpike Authority v. PPG Industries, Inc., et al.*, 16 F.Supp.2d 460, 479 (D.N.J. 1998); *Department of Environmental Protection v. Ventron*, 94 N.J. 473, 468 A.2d 150 (1983). As set forth below, the Court concludes that both of these elements of Honeywell's strict liability under common law are established in this case.

■ In determining whether Mutual's disposal of COPR at the ECARG Property and its failure to remove the COPR constitutes an "abnormally dangerous activity," the Court must consider the factors set forth in the *Restatement (Sec-*

*ond) of Torts* § 520, which are: (a) "the existence of a high degree of risk of some harm to the person, land or chattels of others;" (b) "the likelihood that the harm that results from it will be great;" (c) "the inability to eliminate the risk by the exercise of reasonable care;" (d) "the extent to which the activity is not a matter of common usage;" (e) "the inappropriateness of the activity to the place where it is carried on;" and/or (f) "the extent to which its value to the community is outweighed by its dangerous attributes." *Ventron*, at 159. A determination of whether an activity is "abnormally dangerous" must be made on a case-by-case basis, taking all relevant circumstances into consideration. *Id.*

■ As demonstrated below, the Court concludes that under each of the factors set forth in the Restatement (Second) of Torts § 520, Mutual's disposal and failure to remove the COPR at the ECARG Property constitutes an "abnormally dangerous activity" that subjects its successor, Honeywell, to strict liability.

The Court concludes that Mutual's disposal of COPR at the ECARG Property poses a "high degree of risk of some harm to the person, land or chattels of others" within the meaning of *Restatement (Second) of Torts* § 520. The Court reaches this conclusion on the basis of evidence discussed above, which demonstrates that: (1) Mutual's disposal of COPR has caused extensive chromium contamination in soil, surface water, groundwater and sediments at and near the ECARG Property in levels greatly exceeding all applicable NJDEP environmental limits; and (2) the COPR and resulting chromium contamination at the ECARG Property present imminent and substantial risks to both humans and environmental receptors. *See, e.g., Jersey City Redevelopment Authority*, 1987 WL 54410 at *4 (finding that the disposal of

chromium waste at plaintiff's property posed a "high degree of risk of some harm to the person, land or chattels of others" because the waste contained hexavalent chromium, a known human carcinogen, and chromium contamination in soil at the plaintiff's property exceeded NJDEP's chromium cleanup value).

The Court concludes that Mutual's disposal of COPR at the ECARG Property also satisfies the Restatement factor that "the likelihood that the harm that results [from the activity] will be great." *Restatement (Second) of Torts* § 520. This factor is satisfied based on the evidence discussed in Section I, *supra*, which demonstrates that Mutual's COPR contains highly toxic hexavalent chromium; that hexavalent chromium presents serious health risks (including cancer); and that Mutual's disposal activities at the ECARG Property continue to cause chromium contamination in soil, surface water, groundwater and sediments in levels hundreds of times higher than NJDEP's acceptable limits. *See, e.g., Jersey City Redevelopment,* 1987 WL 54410 at *6 (finding this element of the Restatement satisfied because chromium contamination from the waste that had been disposed of at the site at issue had "migrated and entered ... ground water"); *Ventron,* 94 N.J. at 492, 468 A.2d 150 (finding that mercury contamination in creek sediments satisfied this element of the Restatement, and explaining that "[d]etermination of the magnitude of the damage includes recognition that the disposal of toxic waste may cause a variety of harms, including groundwater contamination via leachate, surface water contamination via runoff or overflow, and poison via the food chain").

The Court concludes that the risks posed by Mutual's disposal of COPR at the ECARG Property could not be eliminated "by the exercise of reasonable care." *Restatement (Second) of Torts* § 520. As the New Jersey Supreme Court observed in *Department of Environmental Protection v. Ventron, supra,* "[w]ith respect to the ability to eliminate the risks involved in disposing of hazardous wastes by the exercise of reasonable care, *no safe way exists to dispose of [toxic waste] by simply dumping it onto land or into water." Ventron,* 94 N.J. at 492, 468 A.2d 150 (emphasis added). Just like the waste at issue in *Ventron* (mercury), the evidence in this case demonstrates that there was no safe way to dispose of chromium waste at a property like the ECARG Property, which is located in a densely-populated urban area, given the capacity of hexavalent chromium to cause cancer, chrome sores, allergic contact dermatitis and other serious adverse health effects in humans. *See Jersey City Redevelopment,* 1987 WL 54410 at *6 (finding that this element of the *Restatement* analysis had been met because the defendants' disposal of chromium waste on the plaintiff's property posed significant health risks against which the unsuspecting public is not equipped to protect itself). The serious health and environmental risks posed by the COPR that Mutual disposed at the ECARG Property clearly could not have been "eliminated by the exercise of reasonable care" on the part of Mutual. *Restatement (Second) of Torts* § 520. To the contrary, as set forth above, those risks can only be abated by excavating and removing all of the COPR from the Property.

Turning to the next two Restatement factors, the Court concludes that Mutual's disposal of approximately one million tons of toxic, highly alkaline COPR at a property located on a river and in an urban area such as Jersey City was neither "a matter of common usage" nor "appropriate to the place where it was carried out" within the meaning of *Restatement (Second) of Torts*

§ 520. The Court finds support for this conclusion in the *Ventron* case, in which the New Jersey Supreme Court recognized that the disposal of toxic hazardous waste "is particularly inappropriate in the Hackensack Meadowlands, an environmentally sensitive area where the arterial waterways will disperse the pollution through the entire ecosystem." *Ventron,* 94 N.J. at 492, 468 A.2d 150; *see also T & E Industries,* 123 N.J. at 394, 587 A.2d 1249 (finding that the defendant's processing and disposal of radium in the Jersey City area was an abnormally dangerous activity because doing so "is particularly inappropriate in an urban setting"). The Court finds that Mutual's disposal of chromium waste at the ECARG Property clearly was "inappropriate" to the place it was conducted because, as in *Ventron,* it involved the disposal of toxic waste into and around the Hackensack River. *See Ventron,* 94 N.J. at 492, 468 A.2d 150. Mutual's disposal activities have caused hexavalent chromium to disperse throughout the environment at and near the ECARG Property, including environmentally sensitive groundwater, surface water and river sediments, at levels greatly exceeding all applicable NJDEP environmental limits.

The Court further finds that the "inappropriate" nature of Mutual's COPR disposal activities at the ECARG Property is demonstrated by the evidence, demonstrating that it was foreseeable that this 34 acre toxic waste dump created by Mutual would be developed someday as a residential development thereby exposing future construction workers, future utility workers and future residents at the Site to an unacceptable risk of harm. It is also foreseeable that such a large tract in an urban area would attract trespassers. *See Jersey City Redevelopment,* 1987 WL 54410 at *6 (finding that disposal of chromium waste in Jersey City was "inappropriate" within the meaning of the *Restatement*

because "it was foreseeable for [defendants] to anticipate the utilization of said [chromium] fill in residential areas" such as the plaintiff's property).

Turning to the last Restatement factor (*i.e.,* the extent to which the "value to the community," if any, of the activity "is outweighed by its dangerous attributes"), the Court takes notice of the fact that in *Ventron,* the New Jersey Supreme Court found that the disposal of dangerous toxic waste into the environment "is a critical societal problem in New Jersey," and thus that the value of such disposal activities, if any, is substantially outweighed by the serious health and environmental problems caused by them. *See Ventron,* 94 N.J. at 492, 468 A.2d 150. This sentiment was echoed in the *Jersey City Redevelopment Authority* case, in which this Court concluded that although the chromium waste at issue was claimed to have served some limited utilitarian purpose as fill, such alleged value "is far outweighed by its dangerous attributes and the risks that it posed to the environment." *Jersey City Redevelopment,* 1987 WL 54410 at *6 (emphasis added); *see also T & E,* 123 N.J. at 394, 587 A.2d 1249 (holding that because the risks associated with the handling and disposal of radium waste materials in the environment far outweigh the usefulness of radium to society, defendant's disposal activities were "abnormally dangerous").

Here, the Court has been presented with no evidence of any redeeming qualities of the COPR that Mutual disposed of at the Site. Instead, as discussed above, the record is replete with evidence that the COPR and chromium contamination caused thereby pose serious health and environmental risks, demonstrating that the "dangerous attributes" of Mutual's disposal activities far outweigh any alleged value attributed to them by Honeywell.

The Court finds the New Jersey Supreme Court's decision in *T & E Industries v. Safety Light Corp.*, is directly on point and especially instructive in determining whether Mutual's disposal activities constitute an "abnormally dangerous activity" within the meaning of the *Restatement (Second) of Torts* § 520. In the *T & E Industries* case, the defendant (USRC) had disposed radium waste on a tract of land in Orange, New Jersey from approximately 1917 to 1926, during which time it had reason to know that radium posed serious health risks to humans. *T & E Industries*, 123 N.J. at 376–78, 587 A.2d 1249. USRC never cleaned up the property, and in 1943 sold the site to a third-party (Arpin) who used it as a manufacturing facility for a period of time and eventually sold it to the plaintiff (T & E) in 1974. *Id.*, at 376–379, 587 A.2d 1249. USRC never notified Arpin, T & E or anyone else about the presence of the radium on the property. *Id.*, at 382–83, 587 A.2d 1249. Shortly after T & E purchased the site in 1974, state inspectors determined that it was highly contaminated with radium at levels exceeding applicable federal and state regulatory limits. *Id.*, at 379–380, 587 A.2d 1249. The court held that USRC's disposal of toxic radium waste into the environment, exacerbated by its failure to warn the successors in title, constituted an "abnormally dangerous" activity that subjected USRC to strict liability for all of the plaintiff's cleanup costs and other resulting damages. *Id.* Significantly, the court rejected USRC's *caveat emptor* and "assumption of the risk" defenses despite T & E's apparent knowledge of the radium contamination at the site. *Id.*

Another case directly on point is *Jersey City Redevelopment Authority v. PPG Industries, Inc.*, 1987 WL 54410 (D.N.J. 1987), in which the District Court held that the distribution and disposal of *COPR* containing *hexavalent chromium* was an "ab-

normally dangerous activity." *See Jersey City Redevelopment*, 1987 WL 54410 at *6–7. In that case, the plaintiff sought to hold defendant PPG strictly liable for cleanup costs that the plaintiff incurred as a result of another party's disposal of PPG's chromium waste on plaintiff's property. Applying the *Restatement* factors, Judge Sarokin found PPG liable and held the disposal to be an "abnormally dangerous activity" due to (1) the fact that plaintiff's property had become contaminated with hexavalent chromium at levels in excess of the NJDEP cleanup levels; and (2) the serious adverse health effects associated with chromium, which PPG was fully aware of at the time the disposal occurred. *Id.*, at *4.

The Court concludes that this case is on "all fours" with *T & E Industries* and *Jersey City Redevelopment*. Just as in the *Jersey City Redevelopment* case, the COPR that Mutual disposed at the Site is a "hazardous waste" containing high levels of hexavalent chromium. Moreover, just as in *Jersey City Redevelopment* (as well as *T & E Industries*), the disposal of Mutual's COPR at the Site has resulted in extensive environmental contamination in soil, surface water and groundwater in concentrations greatly exceeding NJDEP limits. As described above, exceedances of these applicable environmental limits demonstrate that Mutual's disposal of COPR at the Site posed "a high degree of risk of some harm to the person, land or chattels of others" and that the resulting harm was "great" within the meaning of the *Restatement*, and thus that it was "abnormally dangerous." *T & E Industries*, 123 N.J. at 394, 587 A.2d 1249.

Further, just as in *Jersey City Redevelopment* and *T & E Industries*, the record in this case demonstrates that Mutual disposed its COPR at the Site with full knowledge of the serious adverse health

effects caused by hexavalent chromium, including lung cancer. Mutual's own documents demonstrate that during the period it was dumping COPR at the Site, Mutual was besieged by compensation claims from its employees for nasal perforations and chrome sores suffered at Mutual's Jersey City Chrome Plant, and that Mutual knew that employees at the Jersey City plant were contracting lung cancer from exposure to hexavalent chromium. Indeed, the evidence demonstrates that Mutual even commissioned a special study to explore alternative disposal methods for its COPR in Jersey City, the results of which caused Mutual's president to acknowledge that the company's chromium waste presented a "danger" and "might cause a great deal of trouble." Such knowledge necessarily put Mutual on notice of the serious potential health and environmental hazards posed by the COPR it was disposing at the Site. *See, e.g., Jersey City Redevelopment,* 1987 WL 54410 at *9; *T & E Industries,* 123 N.J. at 395, 587 A.2d 1249.

The Court rejects Honeywell's argument that Mutual's knowledge about occupational health hazards associated with chromium did not equate to knowledge that its COPR could present health or environmental risks to the public. The New Jersey Supreme Court specifically rejected this same argument in *T & E Industries,* stating:

> Here defendant knew that it was processing radium, a substance concededly fraught with hazardous potential. It knew that its employees who handled radium should wear protective clothing; it knew that some employees who had ingested radium had developed cancer; and prior to the sale of the property, it knew that the inhalation of radon could cause lung cancer. Despite that wealth of knowledge concerning the harmful effects of radium exposure, defendant contends

that it could not have known that disposal of the radium-saturated byproducts behind the plant would produce a hazard. That contention appears to rest on the idea that somehow the radium's potential for harm miraculously disappeared once the material had been deposited in a vacant corner of an urban lot, or at the least that one might reasonably reach that conclusion—a proposition that we do not accept. (*T & E,* 123 N.J. at 395, 587 A.2d 1249.)

The Court further finds that Mutual's own documents strongly suggest that Mutual actually knew during the period prior to its sale of the ECARG Property to Amy Joy in 1954 that Mutual's COPR had the potential to cause lung cancer and/or adverse health effects. This fact is demonstrated by evidence in the record including: (1) a 1937 study conducted by the Mellon Institute led the Vice President of Mutual to conclude that use of the COPR as a fertilizer would be "dangerous" and pose "a great deal of trouble"; (2) a 1951 internal Mutual memorandum in which the Vice President of Mutual was informed of high concentrations of hexavalent chromium in the air at the "Residue Department" at the Jersey City Chrome Plant; and (3) a 1953 study by U.S. Public Health Service (in which Mutual was a participant) in which it was concluded that "pulmonary carcinoma found in this industry is associated primarily with the *roast and residue materials*", that acid soluble chromium compounds thought to be carcinogenic appeared *"principally in the residue,"* and that chromium was "present in appreciable amounts wherever roast or residue is encountered."

The Court further finds that despite having knowledge of the serious adverse health effects posed by chromium and its COPR, Mutual did not provide any warn-

ings to the unsuspecting public and instead irresponsibly sold the property to Amy Joy Realty in 1954, who immediately developed the Site as a drive-in theater. Significantly, there is no evidence that Mutual ever warned Amy Joy or any other subsequent owner (including Daylin) of the chromium waste or the health risks posed by the property.

The Court concludes that Mutual's behavior clearly amounts to "abnormally dangerous activity" within the meaning of the Restatement.[12] *See, e.g., T & E Industries,* 123 N.J. at 390–95, 587 A.2d 1249; *Jersey City Redevelopment,* 1987 WL 54410 at *6.[13]

■ The Court concludes that the second element of Honeywell's strict liability (*i.e.,* that ECARG has been "harmed" by Mutual's abnormally dangerous activities)

has been established due to the fact that ECARG has suffered substantial monetary damages including but not limited to the costs incurred in connection with the demolition of the Goodrich (Valley Fair) Building, security, removal and disposal of chromium-contaminated soil, legal fees, lost rents, and the loss of its ability to sell or develop the ECARG Property. *See, e.g., T & E,* 123 N.J. at 399, 587 A.2d 1249 (holding that the owner of property contaminated by the disposal of radium waste had been "harmed" because (i) it had incurred cleanup costs to address the contamination, and (ii) the contamination had caused it to curtail its business operations on the property); *Jersey City Redevelopment,* 1987 WL 54410 at *8–9 (plaintiff suffered "harm" due to costs incurred in remediating chromium contamination).

**12.** The Court rejects Honeywell's argument that Mutual's abnormally dangerous disposal activities at the ECARG Property were not "abnormally dangerous" because the federal government allegedly was purchasing chromium products from Mutual for a short period during World War II. This argument fails on several grounds, not the least of which is the fact that Mutual began disposing chromium waste at the property in or before 1905—a minimum of 35 years before the war effort began. Although World War II ended in 1945, the end of the war apparently did not stop Mutual from dumping more toxic COPR at the property. The evidence shows that Mutual's disposal activities continued for at least nine more years until at least 1954. Finally, there is absolutely no evidence that during World War II the government ever approved, controlled, or much less even knew about Mutual's disposal of toxic COPR at the ECARG Property. The Court finds that the decision to dispose of chromium waste at the Site was Mutual's and Mutual's alone.

**13.** The Court also rejects Honeywell's attempt to blame Mutual's disposal activities on the State of New Jersey, which Honeywell alleges granted Mutual the right to pollute the environment when the state deeded property to Mutual along the shoreline of the Hackensack River. The Court finds that the "riparian grants" to which Honeywell cites in support

of this argument simply conveyed certain "land under water" along the shore of the Hackensack River and the right to use such property for "solid filling" and/or construction of "piers." There is absolutely no mention of chromium in these grants, nor any evidence that the State of New Jersey intended for Mutual to "fill" the Site with highly toxic, highly alkaline chromium wastes generated at Mutual's Jersey City Chrome Plant. The Court concludes that these grants were not intended by the State to serve as a blanket license for Mutual to poison the ECARG Property or adjacent Hackensack River with highly toxic hexavalent chromium. This is evidenced by the fact that NJDEP has subsequently penalized Honeywell for its disposal activities and ordered it to take action to remediate the severe conditions that resulted. In any event, the State's "riparian grants" certainly do not shield Honeywell from liability for any damages incurred by ECARG arising out of Mutual's "abnormally dangerous" COPR disposal activities. *See, e.g., Kenney v. Scientific, Inc.,* 204 N.J.Super. 228, 249–50, 497 A.2d 1310 (Law Div.1985) (fact that New Jersey licensed the landfill at issue did not prevent land owners from bringing strict liability claims against waste generators who had disposed of waste at the site).

On the basis of the foregoing, the Court concludes that Mutual's successor, Honeywell, is strictly liable under New Jersey common law for all damages ECARG has incurred as a result of Mutual's disposal and failure to remove the COPR at the ECARG Property and the extensive chromium contamination that plagues the ECARG Property. *See T & E Industries,* 123 N.J. at 399–400, 587 A.2d 1249 (awarding plaintiff its cleanup costs, the costs of relocating its business, and such other damages that "flowed from defendant's inappropriate disposal of [waste]"). In addition, ECARG is entitled to a declaratory judgment awarding it full "indemnification" from Honeywell for any and all future costs that ECARG may incur until the chromium contamination is fully remediated by Honeywell. *T & E,* 123 N.J. at 398, 587 A.2d 1249.

The Court rejects Honeywell's argument that ECARG "assumed the risk" of the chromium contamination by allegedly having knowledge of the chromium when it acquired the ECARG Property. This argument fails because the Court finds that when Daylin purchased Lot 14H and Lot 14J in 1981, Daylin did not "knowingly and voluntarily encounter the risk" posed by Mutual's chromium disposal activities. *T & E,* 123 N.J. at 390, 587 A.2d 1249.

■■■■ To show that such an "assumption of risk" occurred, Honeywell must demonstrate that Daylin actually knew of the COPR and extensive chromium contamination when it bought Lot 14H and Lot 14J in 1981. *See, e.g., Bowen Engineering, et al. v. Estate of Reeve, et al,* 799 F.Supp. 467, 482 (D.N.J.1992). Assumption of the risk requires that a person *"knowingly and voluntarily* encounter the risk." *T & E Industries,* 123 N.J. at 390, 587 A.2d 1249 (emphasis added). For the risk to be "voluntary and knowing," a person must be shown to "understand and appreciate the risk." *Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 197, 406 A.2d 140 (1979). In making this determination, "[t]he courts must apply a *subjective test* to determine whether a plaintiff voluntarily assumed the risk, examining *'what the particular plaintiff in fact sees, knows, understands and appreciates.'* " *Bowen,* 799 F.Supp., at 482, *quoting Restatement (Second) of Torts § 496D, cmt. C* (1965) (emphasis added).

■■■■ The Court concludes that Daylin did not have knowledge of the presence of COPR or chromium contamination at Lot 14H and Lot 14J when it acquired them in 1981.[14] The record reveals that Daylin believed it was acquiring property on which the Goodrich (Valley Fair) Building (which Daylin leased) was located. Daylin paid $1.2 million for Lot 14H and Lot 14J, a price that was based upon the best price Feil was able to obtain from General Cinema during his arm's length negotiation and which McGuire testified was fair market value.

---

**14.** The Court rejects Honeywell's argument that Daylin and/or W.R. Grace & Co. "should have known" that Lot 14H and Lot 14J were contaminated with chromium. Honeywell's argument is based upon the testimony of its due diligence expert, Hart, and his review of documents which relate to the construction of the Goodrich (Valley Fair) Building and the construction problems that were experienced at the Goodrich (Valley Fair) Building from the early 1970's through and beyond 1981. The Court finds Hart's testimony to be unpersuasive and further finds that the documents that Hart and Honeywell rely upon to support the "should have known" argument do not relate to contamination or environmental problems (with the exception of two October 1980 internal DEP memos (DH–20, DH–22) which Hart testified he had absolutely no evidence that Daylin ever received prior to June 1981), but instead, relate to the construction of the Goodrich (Valley Fair) Building and/or construction problems experienced at the Goodrich (Valley Fair) Building.

The Court further finds that it was not until 1982 that Daylin actually learned of the presence of chromium at the ECARG Property and that, upon being advised of the chromium contamination, Daylin fully cooperated with the NJDEP by fencing the property, conducting an environmental investigation, and taking steps to identify the party actually responsible for the contamination, *i.e.*, Allied/Honeywell. Based on the record, the Court concludes that Daylin did not "assume the risk" of the COPR or chromium contamination at the ECARG Property, and thus that ECARG may prevail on its strict liability claim against Honeywell. *See T & E,* 123 N.J. at 390, 587 A.2d 1249.

The Court notes that allowing Honeywell to shield itself from liability through an "assumption of the risk" defense would have the perverse effect of transferring responsibility from the polluter to an innocent party that played absolutely no role in causing the chromium contamination at the ECARG Property. The New Jersey Supreme Court specifically counseled against such a result in the *T & E* case, in which it held that the polluter could not hide behind an "assumption of the risk" defense where it had failed to warn the plaintiff (the owner of the property who purchased the site over thirty years after the polluter had sold it to an unsuspecting purchaser) of the risks posed by the polluter's disposal activities. *See T & E Industries,* 123 N.J. at 390, 587 A.2d 1249. In the same vein, Honeywell will not be permitted to shift the blame to ECARG due to any alleged "assumption of the risk" by Daylin. The Court finds no evidence that Mutual, Allied or any of Honeywell's other predecessors ever warned any subsequent purchaser of the Site (including Daylin) of the one million tons of toxic COPR it disposed of at the Site over a period of approximately sixty years.

The Court concludes that the "abnormally dangerous" activities attributable to Honeywell at the ECARG Property constitute "continuing torts," and therefore that ECARG's strict liability claim is not barred by the six-year statute of limitations, N.J. Stat. Ann. § 2A:14–1, as Honeywell contends. *See Russo Farms v. Vineland Bd. of Educ.,* 144 N.J. 84, 675 A.2d 1077, 1084–86 (1996).

In *Russo Farms v. Vineland Bd. of Educ.,* the New Jersey Supreme Court held that a party who creates a hazard (there, an incorrectly constructed drainage system that caused repeated flooding of plaintiff's property) that "can be physically removed or legally abated" is under a continuing legal duty to remedy the condition. *Russo Farms,* 675 A.2d at 1086. As long as the condition persists, the defendant is deemed to have "commit[ted] a new tort, including a new breach of duty, each day, triggering a new statute of limitations." *Id.,* at 1084.

The Court concludes that, like the recurring flood damage suffered by the plaintiff in *Russo Farms,* Mutual's disposal of COPR and resulting chromium contamination at the ECARG Property will continue to cause harm to ECARG until Honeywell removes the COPR, that these conditions "can be physically removed or legally abated" by excavating and removing the COPR from the property, and thus they constitute a "continuing tort" that triggers a new statute of limitations each day the COPR remains at the property. *Russo Farms,* 675 A.2d at 1086; *see T & E Indus., Inc. v. Safety Light Corp.,* 227 N.J.Super. 228, 243, 546 A.2d 570 (App.Div.1988), *aff'd as modified,* 123 N.J. 371, 587 A.2d 1249 (1991)(holding that the disposal of radon waste constituted an "abnormally dangerous activity" and "continuing tort" because "[w]hile the act of disposing of the toxic waste took place many years ago, the ef-

fects ... from the radium tailings will be felt from that time forward until such time that permanent curative action is taken ... [t]herefore, the tort emanates from the act of dumping *and the continuous presence of the toxic waste and the resultant hazardous byproducts*"); *see also National Tel. Coop. Assoc. v. Exxon Corp.,* 38 F.Supp.2d 1, 5–6 (D.D.C.1998) (applying continuing tort doctrine and rejecting the contention that landowner's claims for strict liability, negligence, trespass, and nuisance against gasoline company on adjacent lot were barred by statute of limitations); *325–343 E. 56th Street Corp. v. Mobil Oil Corp.,* 906 F.Supp. 669, 675 (D.D.C.1995) (applying continuing tort doctrine to strict liability claim for injuries to real property brought by landowner against prior occupants of land).

Accordingly, the Court holds that ECARG may recover all damages it sustained during the six-year period immediately preceding the filing of its cross-claims against Honeywell, and all damages incurred thereafter until an appropriate cleanup of the COPR is completed by Honeywell.

**Damages**—Having found Honeywell strictly liable to ECARG, under Count V of its Third Amended Cross–Claims, for all damages resulting from Mutual's disposal of COPR at the ECARG Property and Honeywell's and its predecessors' failure to remediate the COPR, the Court hereby awards ECARG the following damages:

(a) Demolition Costs—$630,500.00 for the costs ECARG incurred in connection with the demolition of the Goodrich (Valley Fair) Building, which was necessitated due to severe structural damage caused by heaving COPR;

(b) Site Security—$132,000 for the costs ECARG incurred in providing security at the ECARG Property (consisting of $32,200.00 for fence work, $87,500.00 for guard dogs, and $12,300.00 for a property care taker);

(c) Chromium Contaminated Soil—Incremental Cost—$126,000.00 for the incremental cost increase incurred by ECARG in the disposal of chromium contaminated soil at an off-site hazardous waste facility;

(d) Certain IRMs—$89,750.00 for the costs incurred by ECARG for certain interim remedial measures that were installed at the ECARG Property to address the chromium contamination;

(e) Real Estate Taxes—$229,900 for real estate taxes paid on the ECARG Property.

(f) Lost Rents—5/90 through 12/97—$2,810,955.39 for ECARG's lost rents during the period from May 1990 to December 1997. McGuire testified as to the amount of rents which ECARG lost during the period May 1, 1990 through December 31, 1997, as a result of the inability to use the Goodrich (Valley Fair) Building.[15] McGuire based his calculation of lost rents on the fair rental value of the Goodrich (Valley Fair) Building as of May 1990. McGuire's calculation took into account the income and expenses that ECARG would have experienced during that period. Annexed to Grace's Proposed Findings of Fact and Conclusions of Law as Attachment 4 is a calculation of the rent lost by ECARG on a year-by-year basis for the period May 1, 1990 through December 1997 based upon McGuire's testimony and the exhibits introduced regarding ECARG's lost rent claim, *i.e.,* Gr–1313, 1313A and 1314.

---

**15.** December 31, 1997, was the date on which the Ground Lease and the Joint Venture Agreement expired thereby freeing up the ECARG Site for sale or rental without the expense of the Ground Lease.

(g) Prejudgment Interest—5/90 to 12/97 Lost Rents—The Court concludes that ECARG is entitled to an award of prejudgment interest on its 5/90 through 12/97 lost rent claim.

█ Prejudgment interest is governed by the law of the forum state. *Zippertubing Co. v. Teleflex Incorporated,* 757 F.2d 1401, 1414 (3d Cir.1985) (citing *Jarvis v. Johnson,* 668 F.2d 740, 746 (3d Cir.1982)). With respect to state law claims adjudicated in federal court, the law of the forum state controls the award of prejudgment interest. *Hatco Corporation v. W.R. Grace & Co.—Conn.,* 849 F.Supp. 931, 980 (D.N.J.1994) (citation omitted).

Under Rule 4:42–11 of the Rules Governing the Courts of the State of New Jersey, prejudgment interest may be awarded on Grace's common law claims. Principles of equity guide a court in determining whether or not prejudgment interest should be awarded. *Hatco,* 849 F.Supp. at 980 (citing *Gilbert v. Durand Glass Mfg. Co.,* 258 N.J.Super. 320, 331, 609 A.2d 517 (App.Div.1992)). *See also* PRESSLER, Current N.J. COURT RULES, R. 4:42–11, Comment 9 (GANN). "The equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled but which has been retained by another.'" *Electric Mobility Corporation v. Bourns Sensors/Controls, Inc.,* 87 F.Supp.2d 394, 403 (D.N.J.2000) (quoting *North Bergen Rex Transport, Inc. v. Trailer Leasing Co., A Division of Keller Sys., Inc.,* 158 N.J. 561, 574–75, 730 A.2d 843 (1999) (further citation omitted)). *See also De Puy, Inc. v. Biomedical Engineering Trust,* 216 F.Supp.2d 358, 380 (D.N.J.2001); PRESSLER, Current N.J. COURT RULES, R. 4:42–11, Comment 8 (GANN) ("[P]rejudgment interest is not a penalty but rather its allowance simply recognizes that until the judgment is entered and paid, the de-fendant has had the use of money rightfully the plaintiff's").

█ Prejudgment interest begins to run from the date on which the damaged party loses the use of its funds—*i.e.* from the time the expenditures were made. *BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp.,* 147 F.Supp.2d 333, 346 (D.N.J.2001) (citation omitted).

Based upon the attached charts annexed to Grace's Proposed Findings of Fact and Conclusions of Law, the total prejudgment interest on ECARG's lost rent claim from May 1, 1990 through April 30, 2003 is $1,438,556.75.

The Court concludes that ECARG is entitled to an award of prejudgment interest in the amount of $1,438,556.75 through April 30, 2003, with per diem interest thereafter. The Court further concludes that the award of prejudgment interest based upon New Jersey's prejudgment interest rule is consistent with the law in this Circuit.

(h) Weja Back Rent Award—Credit— ECARG is the plaintiff in an action filed in the Superior Court of New Jersey, Hudson County, entitled *W.R. Grace & Co. and ECARG, Inc. v. Weja, Inc., et al.,* Docket No. L–7908–95, Superior Court of New Jersey, Law Division, Hudson County. One of ECARG's claims in the *Weja* case was for the recovery of lost rents. In the *Weja* case, the proofs revealed that actual rent which should have been paid by the tenant, Weja, under the terms of the Weja Lease (DH–744) was $1,931.35 per month or $23,176.20 per year. ECARG's claim for back rent in the *Weja* case is set forth in ECARG's trial brief in that case (DH–719) at page 53. The back rent claim in the Superior Court was based upon Weja's rent being $1,931.35 per month because under the Weja Lease, the rent was to increase above $1,931.35 per month only if

70,000 square feet of the Goodrich (Valley Fair) Building was occupied. The occupancy condition never occurred because of the structural problems with the Goodrich (Valley Fair) Building caused by heaving. Thus, Weja was only responsible for $1,931.35 per month. As set forth in ECARG's trial brief in the *Weja* case, the back rent owed to ECARG through December 31, 1995 (the date of eviction) based upon rent of $1,931.35 was $48,283.75 plus a late charge of 10% (*i.e.*, $4,828.38) totaling $53,112.13.[16] In addition, Weja owed ECARG rent for the period January 1, 1996 to the end of the term of the Weja Lease in the amount of $40,558.35, plus a late charge of 10% (*i.e.*, $4,055.84) for a total of $44,614.19.[17] Thus, ECARG's total back rent claim in the *Weja* case was $97,726.32.[18]

ECARG's claim against Honeywell in this case is for all of the rent which could have been earned by ECARG under the Weja Lease had the Goodrich (Valley Fair) Building been able to be used as it was intended. In calculating the damages for lost rent, McGuire referenced the Weja Lease and its provision which required an increased rent to be paid provided at least 70,000 square feet of the Goodrich (Valley Fair) Building was rented. Thus, ECARG's lost rent claim against Honeywell in this matter is based, in part, upon the amount ECARG would have received had the Goodrich (Valley Fair) Building not been destroyed by the heaving caused by the COPR.

ECARG has not collected any portion of the $97,730.70 in back rent that it was awarded by Judge McLaughlin in the

*Weja* case. Tr. Vol. 15 (Colloquy)— 2895:25–2896:20. This Court will credit against ECARG's lost rent claim, the amount of the back rent award in the *Weja* case, the amount of ECARG's lost rents for the period 5/90 through 12/97 and prejudgment interest thereon through April 30, 2003 (totaling $4,249,512.14), should be reduced by a sum not to exceed $97,730.70, the actual amount of the credit to equal the amount ECARG actually collects as a result of the back rent award in the *Weja* decision.

(i) Lost Rents 1/98 through 4/03— $2,412,000 for ECARG's lost rents during the period from January 1998 to April 2003. McGuire's testimony with respect to lost rents addressed the period from May 1, 1990 through December 1997 (the date on which the Ground Lease and the joint venture agreement expired). Commencing January 1, 1998, and continuing through the present, ECARG should have been able to continue to rent the Goodrich (Valley Fair) Building at a rental of at least $2.50 per square foot (the figure which McGuire said was the fair rental value of the Goodrich (Valley Fair) Building as of May 1990). Based upon the $2.50 per square foot rental figure, the rents which ECARG lost commencing January 1998 amounted to $452,250.00 per year or $37,687.50 per month. Annexed to Grace's Proposed Findings of Fact and Conclusions of Law as Attachment 16 is a summary of the rents lost by ECARG during a period of January 1, 1998 through April 2003.

16. On page 37 of the *Weja* Decision (DH–793) Judge McLaughlin inadvertently uses a figure of $53,116.52.

17. Judge McLaughlin used a figure of $44,614.18 in his Decision. *See* DH–793, p. 37–38, 41.

18. Judge McLaughlin awarded ECARG $97,730.70 ($53,116.52 + $44,614.18). *See* DH–793, p. 41.

(j) Prejudgment Interest—1/98 through 4/03 Lost Rents—The Court concludes that ECARG is entitled to an award of prejudgment interest on its 1/98 through 4/03 lost rent claim in the amount of $344,156.83 through April, 2003 with *per diem* interests thereafter. Annexed to Grace's Proposed Findings of Fact and Conclusions of Law as Attachment 17 is a summary of the prejudgment interest due on the monthly rental payments which were lost during the period of January 1998 through April 2003. Annexed as Attachments 18 through 23 are breakdowns of the prejudgment interest due on the monthly lost rents for the years 1998 through April 2003.

(k) Future Rents—Judgment will be entered in favor of ECARG and against Honeywell in the amount of $37,687.50 per month for lost future rents, from May 1, 2003 forward, to be paid monthly by Honeywell on the first of each month from the date judgment in this matter is entered until the date that the excavation, removal and back filling of the ECARG Property is complete.

(*l*) Future Real Estate Taxes—Judgment will be entered in favor of ECARG and against Honeywell requiring Honeywell to pay all future real estate taxes on the ECARG Property as they become due from the date judgment in this matter is entered until the date that the excavation, removal and back filling of the ECARG Property is complete.

### Injunction[19]

Having found Honeywell liable to ECARG on Count V of its Third Amended Cross–Claims, the Court enters an injunction requiring Honeywell to:

(1) Excavate, remove, treat and dispose off-site all COPR at the ECARG Property and backfill the ECARG Property with clean soil such that the 240 ppm hexavalent chromium residual soil cleanup level is attained throughout all of the ECARG Property; and

(2) Establish a hydraulic gradient on the eastern boundary of the Site such that contaminated groundwater from Study Area 5 does not re-contaminate the ECARG Property; and

(3) Remediate chromium contaminated sediments in the Hackensack River in the vicinity of the ECARG Property such that the ER–M of 370 ppm is attained for such sediments; and

(4) Provide work plans with time tables and benchmark dates to the Special Master as provided for in the Conclusions of Law.

### Indemnification

The Court awards Grace Defendants a declaratory judgment under Count V of its Third Amended Cross–Claims, pursuant to 28 U.S.C. §§ 2201 and 2202 and the Uniform Declaratory Judgments Law, N.J.S.A. § 2A:16–50 et seq., awarding Grace Defendants full, total and complete indemnification from Honeywell for any and all future costs and/or liabilities that Grace Defendants may incur in connection with or arising out of the COPR or other chromium contamination at the ECARG Property, including, but not limited to, any and all liabilities and/or costs (including defense costs) that may be incurred by ECARG in connection with or as a result of any third-party claim relating to any

---

**19.** This Court concludes that Honeywell's common law tort liability, based upon the Grace Defendants' cross-claims against Honeywell, also supports the issuance of injunctive relief. See RESTATEMENT (SECOND) OF TORTS § 936 (1977); *Sheppard v. Township of* *Frankford,* 261 N.J.Super. 5, 9–10, 617 A.2d 666, 668–69 (App.Div.1992) (adopting § 936 in New Jersey and ruling that trial court erred in failing to issue permanent injunction for continuing tort claim).

COPR or other chromium contamination at, near or from the ECARG Property. *T & E Industries,* 123 N.J. at 398, 587 A.2d 1249.

### A. Honeywell Is Liable To W.R. Grace & Co. And ECARG Under CERCLA § 107(a) For All Response Costs Incurred At The Site

In Count II of their Third Amended Cross–Claims, W.R. Grace & Co. and ECARG assert a cost recovery claim against Honeywell pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), which imposes strict and joint and several liability on any "covered person" listed in CERCLA § 107(a)(1)-(a)(4) for *all* past and future costs of response that may be incurred by a CERCLA § 107 plaintiff. *See* 42 U.S.C. § 9607(a); *New Castle County, et al v. Halliburton NUS Corp.,* 111 F.3d 1116, 1124 (3rd Cir.1997).

■ To prevail on a claim under CERCLA § 107(a), a party must show that: (1) the property at issue is a CERCLA "facility"; (2) there has been a "release" of a "hazardous substance"; (3) the defendant falls within at least one of the categories of "covered persons" defined in CERCLA § 107(a); (4) the costs sought by the plaintiff constitute recoverable "costs of response"; and (5) the plaintiff is not itself a liable party under CERCLA. *See* 42 U.S.C. § 9607(a); *New Castle County,* 111 F.3d at 1124. All five elements are established in this case.

The Court concludes that the first two elements of Honeywell's liability are established under CERCLA § 107(a) on the basis of the parties' stipulation that the ECARG Property is a CERCLA "facility," and that there have been "releases" or threatened "releases" of hexavalent chromium, a CERCLA "hazardous substance," at the property.

■ As set forth below, the Court concludes that the third element of Honey-

well's liability under CERCLA § 107(a) is established on the basis of stipulated facts demonstrating that Honeywell is a "covered person" under CERCLA §§ 107(a)(2), 107(a)(3) and 107(a)(4), each of which provides an independent basis for imposing liability on Honeywell.

■ CERCLA § 107(a)(2) provides that "any person who *at the time of disposal* of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is strictly liable for response costs incurred by any other person at such facility. 42 U.S.C. § 9607(a)(2)(emphasis added). As the statutory language makes clear, section 107(a)(2) renders liable any party who owned a facility at the time hazardous substances were being "disposed" on the property. *See, e.g., United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1506-08 (6th Cir.1989). The Court concludes that Mutual owned the Site from approximately 1895 to 1954 during which time it was actively disposing chromium, a "hazardous substance," throughout the property, and thus Mutual's successor, Honeywell, is a "covered person" under 42 U.S.C. § 9607(a)(2).

CERCLA § 107(a)(3) imposes strict liability upon "any person who by contract, agreement or otherwise arranged for disposal ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility." 42 U.S.C. § 9607(a)(3). As the Third Circuit has recognized, section 107(a)(3) covers any party who has taken action to dispose of its hazardous substances at a facility. *See United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 266 (3d Cir.1992). The Court concludes that Mutual generated approximately one million tons of COPR, a "hazardous substance," at Mutual's Jersey City Chrome Plant during the period from approximately 1895 to 1954, and "arranged" for the disposal of such sub-

stances at the Site, thus rendering Mutual and its successor Honeywell a "covered person" under 42 U.S.C. § 9607(a)(3).

■■■ Section 107(a)(4) of CERCLA imposes strict liability on "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ..." U.S.C. § 9607(a)(4). This provision encompasses any person who has caused a hazardous substance to be transported to a disposal site. *See, e.g., Tippins Inc., v. USX Corp.,* 37 F.3d 87, 90 (3d Cir.1994). The Court concludes that Mutual "transported" chromium waste, a hazardous substance, to the ECARG Property through an above ground conveyor during the period from approximately 1895 to 1954, and thus that Mutual and its successor, Honeywell, are "covered persons" under 42 U.S.C. § 9607(a)(4).

■■■ The Court concludes that W.R. Grace & Co. and ECARG have incurred recoverable "costs of response" under CERCLA, and thus that the fourth element of Honeywell's CERCLA liability has been met. Although CERCLA does not define the phrase "costs of response," it broadly defines the term "response" as "remove, removal, remedy and remedial action," which are in turn defined to include "such actions as may be necessary to monitor, assess and evaluate the release or threat of release of hazardous substances," "[t]he cleanup of released hazardous substances from the environment," and "the disposal of removed material." *See* 42 U.S.C. §§ 9601(23) and (25). Courts construing these definitions have held that

CERCLA "costs of response" include all site investigation costs, costs of providing site security, and any costs that may be required to remove hazardous substances from a contaminated property. *See, e.g., Bowen Eng'g,* 799 F.Supp. at 476 (costs of testing soil for the presence of hazardous substances deemed recoverable "response costs"); *Gen. Elec. Co. v. Litton Indus. Automation Sys.,* 920 F.2d 1415, 1419–20 (8th Cir.1990) (costs of excavating and removing soil contaminated with hazardous substances found to be recoverable "costs of response" under CERCLA); *Hatco Corp. v. W.R. Grace & Co.,* 849 F.Supp. 931, 971 (D.N.J.1994) (costs of investigating nature and extent of hazardous substances at site were recoverable "costs of response"); *Amoco Oil Co. v. Borden,* 889 F.2d 664, 672 (5th Cir.1989).

The Court concludes that W.R. Grace & Co., on behalf of its former subsidiary Daylin, incurred "costs of response" at the Site during the early and mid–1980's by fencing the property and taking other security measures to protect unsuspecting members of the public from the chromium on the site. The Court further concludes that since it acquired the ECARG Property in 1986, ECARG has incurred "costs of response" by paying the incremental cost increase for the disposal of chromium-contaminated soil excavated at the gas station/car wash property, by paying for a portion of the cost of certain interim remedial measures, and by providing site security. These are clearly "costs of response" as defined in CERCLA.[20] *See* 42 U.S.C. §§ 9601(23) and 9601(25); *Bowen Eng'g,*

---

20. The Court concludes that the response costs incurred by W.R. Grace & Co. on behalf of Daylin and ECARG are "necessary" within the meaning of CERCLA. The record in this case is replete with evidence of chromium seeping from the ECARG Property into the Hackensack River, the groundwater, and even pushing up through cracks in the asphalt. The record further shows that the chromium contamination vastly exceeds all applicable regulatory limits at the ECARG Property. *See* Section I.A, *supra.* Accordingly, the costs incurred by W.R. Grace & Co. on behalf of Daylin and ECARG to address this contamination were "necessary." *See, e.g., Bethlehem Iron Works v. Lewis,* 1996 WL 557592 *52 (E.D.Pa.1996) (costs "necessary" if in response to threat to health or the environ-

799 F.Supp. at 476; *Gen. Elec. Co.*, 920 F.2d at 1419–20; *Hatco,* 849 F.Supp. at 971; *Amoco Oil Co.*, 889 F.2d at 672.

The fifth element to be established in a CERCLA § 107 cost recovery action is that the plaintiff is not itself a liable party under CERCLA. A party is not liable under CERCLA if: (1) it does not fall within one of the categories of "covered persons" set forth in CERCLA § 107(a), *or* (2) it qualifies for one of the statutory defenses in CERCLA § 107(b). *See New Castle County,* 111 F.3d at 1124.

This Court has previously held that W.R. Grace & Co., is not a liable party under CERCLA § 107(a) because it never owned or operated the Site. *See ICO v. Honeywell International, Inc.,* 215 F.Supp.2d at 502. Hence, the Court concludes that W.R. Grace & Co., satisfies the fifth element and is entitled to bring a CERCLA § 107(a) cost recovery action against Honeywell. *New Castle County,* 111 F.3d at 1124.

██ The Court concludes that ECARG also is entitled to bring a CERCLA § 107 claim against Honeywell because ECARG qualifies for the "third party" defense set forth in CERCLA § 107(b)(3), 42 U.S.C. § 9607(b)(3). Under this provision, the owner of a contaminated site has a complete defense to CERCLA liability if it is established that: (1) the release of hazardous substances at issue was caused solely by a third party (Mutual), provided that such third party's "act or omission" causing the contamination did not "occur in connection with a contractual relationship existing directly or indirectly with the defendant" (ECARG); and (2) ECARG exercised "due care" with respect to the chromium and took "precaution against the foreseeable acts of omissions of such third party . . ." 42 U.S.C. § 9607(b)(3).

The Court concludes that ECARG satisfies the first element of the "third party" defense because Mutual is solely responsible for the dumping of approximately one million tons of COPR at the Site. Further, Mutual and ECARG never had any direct or indirect contractual relationship.

The Court concludes that the second element of the CERCLA "third party" defense is satisfied because ECARG exercised requisite "due care" with regard to the chromium at the ECARG Property. Under the CERCLA third-party defense, "due care" must be exercised by an owner after it becomes aware of the presence of the hazardous substance. *See, e.g., Town of New Windsor v. Tesa Tuck, Inc.,* 935 F.Supp. at 310, 313 (S.D.N.Y.1996); *HRW,* 823 F.Supp. at 349. Where, as here, the owner has cooperated with state authorities, it has satisfied the "due care" and "reasonable precautions" requirements of CERCLA § 107(b)(3). *See, e.g., New Windsor,* 935 F.Supp. at 314. The Court concludes that this requirement of the § 107(b)(3) defense is satisfied because ECARG fully cooperated with NJDEP in its attempts to compel Honeywell to conduct an investigation and remediation of the property, ECARG provided site security measures to protect the public from the chromium, ECARG incurred costs to prop-

ment); *Amoco v. Borden,* 889 F.2d 664 (5th Cir.1990) (costs "necessary" and recoverable if expended in response to contamination exceeding state regulatory limit). Furthermore, the Court finds that these costs are consistent with the applicable requirements of the National Contingency Plan ("NCP") because such costs were incurred for site security, disposal of chromium-contaminated soil, and certain interim remedial measures at the

ECARG Property. These costs were recognized in *Amland* as "clearly within the definition of removal actions" and therefore "compensable under CERCLA." *Amland,* 711 F.Supp. at 795; *see also Amoco,* 889 F.2d at 671 (granting summary judgment as to liability upon proof that plaintiff incurred response costs, including "security measures and site investigation," where contaminants at site exceeded applicable regulatory thresholds).

erly dispose of chrome contaminated soil from the property, and ECARG has entered into an access agreement with Honeywell to facilitate remediation of the contamination.

Accordingly, the Court concludes that ECARG qualifies for the CERCLA "third party" defense, and thus is entitled to bring a cost recovery action against Honeywell under CERCLA § 107(a). *New Castle County*, 111 F.3d at 1124.

On the basis of the foregoing, the Court concludes that Honeywell is strictly and jointly and severally liable to W.R. Grace & Co. and ECARG under Count II of their Third Amended Cross–Claims, pursuant to 42 U.S.C. § 9607(a), for all "costs of response" they have incurred at the ECARG Property.

### B. Past Costs of Response

Having concluded that Honeywell is liable to W.R. Grace & Co. and ECARG under Count II of their Third Amended Cross–Claims, pursuant to 42 U.S.C. § 9607(a), the Court hereby awards W.R. Grace & Co. and ECARG the following response costs:

(a) $132,000.00 for costs incurred in providing security at the ECARG Property (consisting of $32,200.00 for fence work, $87,500.00 for guard dogs, and $12,300.00 for a property care taker);

(b) $126,000.00, which is the incremental cost increase incurred in the disposal of chromium contaminated soil at an off-site hazardous waste disposal facility in connection with the cleanup of the gas station/car wash property; and

(c) $89,750.00, which represents a portion of the cost of certain interim remedial measures that were installed at the ECARG Property to address the chromium contamination.

In Count XII of their Third Amended Cross–Claims, W.R. Grace & Co. and ECARG seek a declaratory judgment that Honeywell is strictly liable under CERCLA § 107(a) for all future response costs that W.R. Grace & Co. and/or ECARG may incur at the ECARG Property. Section 113(g)(2) of CERCLA expressly provides for a declaratory judgment of this sort, stating that "[i]n any such action described in this subsection [including action brought under § 107(a) ], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (emphasis added). To obtain a declaratory judgment under CERCLA § 113(g)(2), a plaintiff need only prove that the elements of liability under CERCLA § 107(a) have been met. *See, e.g., United States v. Davis*, 20 F.Supp.2d 326, 332–4 (D.R.I.1998).

Having found that all elements of Honeywell's liability under CERCLA § 107(a) have been established as set forth above, the Court enters a declaratory judgment pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), declaring that Honeywell is strictly and jointly and severally liable for any and all future "costs of response" that W.R. Grace & Co. and/or ECARG may incur at the ECARG Property consistent with the NCP. 42 U.S.C. § 9613(g)(2).

### ECARG Is Not Liable To Honeywell For Contribution Under CERCLA § 113

In Count I of its Cross–Claims, Honeywell seeks contribution from ECARG pursuant to CERCLA § 113(f) for an allocative share of the alleged response costs Honeywell has incurred at the ECARG Property.[21] Having previously determined

---

21. The Court previously dismissed Honeywell's CERCLA contribution claims against

W.R. Grace & Co. and W.R. Grace Ltd. based

that ECARG qualifies for the CERCLA "third-party" defense set forth in CERC-LA § 107(b)(3), the Court concludes that ECARG is not liable to Honeywell under CERCLA § 113(f) and therefore will enter judgment for ECARG on Honeywell's CERCLA claim.

### Honeywell Is Liable To ECARG And W.R. Grace & Co. Under The New Jersey Spill Act

In Count IV of their Third Amended Cross–Claims, W.R. Grace & Co. and ECARG seek to recover from Honeywell under the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. § 58:10–23.11 *et seq.*, all "cleanup or removal costs" they have incurred, and may incur in the future, in connection with any discharges of chromium at the Site.

The Spill Act provides that "[a]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable ... for all cleanup and removal costs no matter by whom incurred." N.J.S.A. § 58:10–23.11.g.c.1. In addition, N.J.S.A. § 58:10–23.11.f.2 provides that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance."

To prevail on their Spill Act claim in Count IV, W.R. Grace & Co. and ECARG therefore must show that (1) the Site is a "facility" as defined in the Spill Act; (2) chromium or other "hazardous substances"[22] have been "discharged" at the Site; (3) Honeywell is "[a]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance" at the Site; and (4) W.R. Grace & Co. and ECARG have incurred "cleanup and removal costs" as defined in the Spill Act. *See* N.J.S.A. §§ 58:10–23.11.-g.c.1 and 58:10–23.11.f.2.

■ The Court concludes that the first two elements of Honeywell's liability under the Spill Act have been established on the basis of the parties' stipulations that the ECARG Property is a "facility," that the chromium at the property is a "hazardous substance," and that there have been "discharges" of chromium at the property as those terms are defined in the Spill Act.

The Court further concludes that Honeywell is "[a]ny person who has discharged[23] a hazardous substance, or is in any way responsible for any hazardous substance" within the meaning of N.J.S.A. §§ 58:10–23.11.g.c.1, on the basis of the undisputed evidence that Honeywell's predecessor Mutual dumped approximately one million tons of chromium contaminated COPR at the ECARG Property. *See, e.g., Atlantic City Municipal Utilities Authority v. Hunt,* 210 N.J.Super. 76, 96, 509 A.2d 225, 235–236 (App.Div.1986) (holding that "the pouring of hazardous waste on the ground" rendered defendant liable as a "discharger"); *Ventron,* 94 N.J. at 498–99, 468 A.2d 150 (disposal of mercury waste on ground rendered defendant liable under Spill Act).

---

on its finding that neither party have ever owned or operated the ECARG Property. *See ICO v. Honeywell International, Inc.,* 215 F.Supp.2d at 498–502.

**22.** Honeywell has stipulated that chromium is a "hazardous substance" as defined in the Spill Act.

**23.** The Spill Act defines a "discharge" as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the Site...." N.J.S.A. §§ 58:10–23.11.b(h).

Finally, as set forth in the discussion of Honeywell's liability under CERCLA, the Court concludes that W.R. Grace & Co. and ECARG have incurred recoverable "cleanup and removal costs" [24] at the ECARG Property by installing security fencing, by paying the incremental cost increase for the disposal of chromium-contaminated soil excavated at the gas station/car wash property, and by paying for a portion of the cost of certain interim remedial measures. The Court concludes that such costs were approved by and/or incurred at the direction of NJDEP and thus are recoverable under the Spill Act.

Accordingly, the Court concludes that W.R. Grace & Co. and ECARG are entitled to a judgment under Count IV of their Third Amended Cross–Claims, pursuant to N.J.S.A. § 58:10–23.11.g.c.1 and/or 58:10–23.11.f.2, awarding them the following "cleanup and removal costs" incurred.

A. $132,000 for costs incurred in providing security at the ECARG Property (consisting of $32,200.00 for fence work, $87,500.00 for guard dogs, and $12,300.00 for a property care taker);

B. $126,000.00, which is the incremental cost increase incurred in the disposal of chromium contaminated soil at an off-site hazardous waste disposal facility in connection with the cleanup of the gas station/car wash property; and

C. $89,750.00, which represents a portion of the cost of certain interim remedial measures that were installed at the ECARG Property to address the chromium contamination.

To avoid the necessity of re-litigating the issue of Honeywell's liability under the Spill Act for any future "cleanup and re-moval costs" that may be incurred at the ECARG Property, the Court enters a declaratory judgment under Count XII, pursuant to 28 U.S.C. §§ 2201 and 2202 and the Uniform Declaratory Judgments Law, N.J.S.A. § 2A:16–50 et seq., declaring Honeywell strictly liable to W.R. Grace & Co. and ECARG for any and all future "cleanup and removal costs" they may incur in connection with any COPR or other chromium contamination at the ECARG Property. See, e.g., Analytical Measurements v. Keuffel & Esser Company, 843 F.Supp. 920, 930 (D.N.J.1993) (entering a declaratory judgment that defendant was liable to plaintiff under the Spill Act "for all future costs associated with any clean-up, required by the NJDEP, of substances that were dumped on the property [by defendant]").

### ECARG Is Not Liable To Honeywell Under The Spill Act

■ The Court concludes that title to the ECARG Property passed from GRC to ECARG on November 26, 1986. See, e.g., Noyes v. Estate of Cohen, 123 N.J.Super. 471, 478–479, 303 A.2d 605 (Ch.Div.1973) (explaining that the doctrine is in essence "a fiction resting upon the principle that equity regards things which are directed to be done as having actually been performed where nothing intervened to prevent the performance").

It is clear that GRC, ECARG and W.R. Grace & Co. intended for ownership of the ECARG Property to pass to ECARG on November 26, 1986, rather than in October, 1994, when deeds memorializing the November 26, 1986 transfer were formally executed. The undisputed evidence reveals that: (i) deeds transferring the prop-

---

**24.** The Spill Act defines "clean up and removal costs" as "all costs associated with a discharge incurred by ... any person with written approval from the Department in the (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare ..." N.J.S.A. § 58:10–23.11b.

erty from GRC to ECARG were prepared in November 1986; (ii) in reliance upon the 1986 transfer, GRC and ECARG executed an "Assignment of Leases and Joint Venture" on November 26, 1986 whereby GRC's interest in the Ground Lease, the Operating Lease and the joint venture agreement was assigned from GRC to ECARG; (iii) in reliance upon the 1986 transfer, Goodrich and ECARG executed a new joint venture agreement in November 1986 that superceded the prior joint venture agreement between Goodrich and Diana; (iv) Harry Pierson (Director of Real Estate in 1986) testified that W.R. Grace & Co. intended for title to transfer from GRC to ECARG in November 1986; and (v) in December 1986, in reliance upon the 1986 transfer, W.R. Grace & Co. advised Goodrich that GRC had transferred all of its interest in Lots 14H and 14J to ECARG as of November 26, 1986.

The Court concludes that the date on which Daylin acquired Lot 14H and Lot 14J in 1981 is attributable to ECARG as its acquisition date because ECARG took title to Lot 14H and Lot 14J on the basis of an intra-corporate transfer from GRC, formerly known as Daylin.

The Court concludes that in 1986, intra-corporate transfers of property by a parent corporation from one subsidiary to another did not require an environmental assessment to be performed.

The Court concludes that ECARG qualifies as an "innocent purchaser" pursuant to § 58:10–23.11g.d.(5) because Daylin acquired fee title to Lot 14H and Lot 14J in 1981; Daylin acquired Lot 14H and Lot 14J after Mutual's discharge of a hazardous substance at the property; at the time Daylin acquired Lot 14H and Lot 14J, it did not know and had no reason to know that any hazardous substance had been discharged at the property; Daylin did not discharge the hazardous substance, is not in any way responsible for the hazardous substance, and is not a corporate successor to the discharger (Mutual/Honeywell) or to any entity that is in any way responsible for the hazardous substance or to anyone liable for cleanup and removal costs; Daylin notified NJDEP of Allied's/Honeywell's responsibility for the hazardous substance located at Lot 14H and 14J after the actual discovery of the discharge; Daylin and W.R. Grace & Co. fully cooperated with the NJDEP upon the actual discovery of the discharge of the hazardous substance; and at the time of Daylin's acquisition of Lot 14H and Lot 14J, it made all appropriate inquiry as to the previous ownership and uses of Lot 14H and Lot 14J, based upon the generally accepted good and customary standards being followed at the time.

■ In its Cross–Claims, Honeywell seeks contribution from ECARG pursuant to the New Jersey Spill Act for an allocative share of the alleged "cleanup and removal costs" Honeywell has incurred at the ECARG Property.[25] ECARG asserts a defense to Honeywell's Spill Act claim under the "innocent purchaser" defense set forth in N.J.S.A. § 58:10–23.11g.d.(5), which is available to a party who acquired contaminated property prior to September 14, 1993 and are able to demonstrate that (1) it did not "discharge" any of the wastes at issue at the site, (2) it did not know and had no reason to know of the discharges prior to acquiring the site, having exercised "all appropriate inquiry on the previous ownership and uses of the property based upon generally accepted good and customary standards at that time," and (3) it provided timely notice of the discharges

---

25. The Court previously dismissed Honeywell's Spill Act claims against W.R. Grace & Co. and W.R. Grace Ltd. based on its finding that neither party has ever owned or operated the ECARG Property. *See ICO v. Honeywell International, Inc.,* 215 F.Supp.2d at 498–502.

to NJDEP upon learning of them. *See* N.J.S.A. § 58:10–23.11g.d.(5).

Accordingly, because ECARG has a complete defense to liability under the Spill Act, the Court enters judgment in ECARG's favor on Honeywell's Spill Act claim. N.J.S.A. § 58:10–23.11g.d.(5)

**Honeywell Has Breached Paragraph 4.7 of the License Agreement**

In Count VIII of its Cross–Claims, ECARG seeks an order requiring Honeywell to comply with its obligation under paragraph 4.7 of the 1997 "License Agreement" between Honeywell and ECARG, which requires, *inter alia*, that Honeywell "fully and completely comply with all applicable laws, rules and regulations of NJDEP and any Governmental Agency" in the exercise of its RI/FS efforts and in connection with the cleanup of chromium contamination at the ECARG Property. *See* Grace 753, ¶¶ 1.2, 4.7.

The Court concludes, as set forth in the following paragraphs, that Honeywell is required under New Jersey law to remediate the hexavalent chromium contamination at the ECARG Property to NJDEP's residential soil cleanup criteria for hexavalent chromium of 240 ppm:

a. The Remediation Act, N.J.S.A. 58:10B–1 et seq., establishes two types of soil clean up standards for the remediation of contaminated sites in New Jersey: (i) "residential" levels that allow for the safe use of the land in an unrestricted manner by the owner; and (ii) alternative, less stringent "non-residential" levels that prohibit residential use and are enforced by means of a permanent deed restriction. *See* N.J.S.A § 58:10b–12(c)(1); N.J.S.A. § 58:10B–12.g(2).

b. The Remediation Act unambiguously provides that a contaminated property must be remediated to "residential" soil cleanup levels unless the owner of the property expressly consents to the recording of a deed restriction. *See* N.J.S.A.

58:10B–13(b). In this regard, Section 58:10B–13(b) of the Remediation Act states that: "If the owner of the real property does not consent to the recording of a notice [deed restriction] pursuant to paragraph (2) of subsection a. of this section, the department shall require the use of a residential soil remediation standard in the remediation of that real property." N.J.S.A. 58:10B–13(b).

c. Section 58:10B–13.a(2) of the Remediation Act similarly dictates that engineering or institutional controls may not be employed at a contaminated site without the consent of the landowner. *See* N.J.S.A. § 58:10B–13.a(2).

d. There is no dispute that ECARG has not consented to deed restrict the ECARG Property due to its plans to develop the property for residential/commercial use.

e. Accordingly, Honeywell must meet the residential cleanup standard for hexavalent chromium in connection with the cleanup of the property. N.J.S.A. §§ 58:10B–13(b), 58:1011–13.a(2); *see E.I. du Pont de Nemours and Company v. State, Department of Environmental Protection and Energy*, 283 N.J.Super. at 366, 661 A.2d 1314 (construing N.J.S.A. § 58:10B–13 and concluding that "[i]f the owner will not give his consent [to a deed restriction], DEP must require nothing less than a residential soil remediation standard").

The Court concludes that to date, Honeywell has failed to conduct a cleanup of chromium contamination at the ECARG Property to the mandatory New Jersey "residential" cleanup level, and thus that it has breached its obligation under paragraph 4.7 of the License Agreement.

**Remedy (License Agreement)**

Having found that Honeywell is in breach of its obligation under paragraph

4.7 of the License Agreement, the Court concludes that ECARG is entitled to a declaratory judgment under Counts VIII and XII, pursuant to 28 U.S.C. §§ 2201 and 2202 and the Uniform Declaratory Judgments Law, N.J.S.A. § 2A:16–50 et seq., that Honeywell, pursuant to paragraph 4.7 of the License Agreement, is required to conduct a remediation of all hexavalent chromium contamination at the ECARG Property to the applicable 240 ppm residential cleanup level. As more fully set forth above, the Court concludes that the only remedy that is capable of meeting the applicable 240 ppm cleanup level for hexavalent chromium is excavation and removal of all COPR and other materials containing hexavalent chromium at levels exceeding 240 ppm from the ECARG Property. The Court concludes that such removal remedy is necessary to protect human health and the environment, that it is in the public interest, and that the economic harm to Honeywell from the requirement that it fund such a permanent remedy does not outweigh the interests of ECARG and the public in a prompt clean up of the chromium contamination.

### Negligence

■ In Count VII of its Cross–Claims, ECARG asserts a negligence claim against Honeywell. ECARG argues that Honeywell's negligence arises from Mutual and Allied's failure to warn Daylin of the presence of hexavalent chromium and COPR at Lot 14H and Lot 14J.

Daylin acquired Lots 14H and 14J in 1981. At the time of Daylin's acquisition, neither Mutual nor Allied had warned Daylin in any manner that the property which Daylin was acquiring consisted entirely of COPR. Similarly, neither Mutual nor Allied warned Daylin of the health risks and/or environmental risks which the COPR and hexavalent chromium posed. However, by 1982, Daylin was aware of the fact that Lot 14H and Lot 14J were con-taminated with hexavalent chromium. Furthermore, by 1983, Daylin was aware that Lot 14H and Lot 14J consisted of approximately one million tons of COPR which had been disposed of by Mutual over a period of approximately sixty years.

ECARG's negligent failure to warn claim against Honeywell arose no later than 1983. The Court therefore concludes that ECARG's negligent failure to warn claim against Honeywell is time barred pursuant to N.J.S.A. 2A:14–1. Count VII of ECARG's Cross–Claims is dismissed.

### Honeywell's Claims For Contribution And Declaratory Judgment

■ In Counts III and IV of its Cross-claims, Honeywell seeks a judgment against the Grace Defendants under the New Jersey Joint Tortfeasors Contribution Law and a declaratory judgment, pursuant to CERCLA's declaratory judgment provision, 42 U.S.C. § 9613(g)(2), New Jersey's Uniform Declaratory Judgments Law, N.J.S.A. § 2A:16–50 et seq., and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Grace Defendants are liable for Honeywell's costs and damages at the ECARG Property. As set forth below, the Court enters judgment in favor of the Grace Defendants on Count III and IV because Honeywell's substantive RCRA, CERCLA and Spill Act claims against the Grace Defendants fail, and thus there is no basis for a claim for contribution or declaratory judgment.

■ A right to contribution only arises under the Joint Tortfeasors Contribution Law when an "injury or damage is suffered ... as a result of the wrongful act, neglect or default of joint tortfeasors" and one of the joint tortfeasors pays more than his pro rata share of the damage. N.J.S.A. 2A:53A–3 (1999); Erkins v. Case Power & Equip. Co., 164 F.R.D. 31, 33 (D.N.J.1995). A contribution claimant "must allege and prove that the party

against whom he makes [the claim] is a joint tortfeasor within the meaning of the Act." *Mijon v. Acquaire,* 51 N.J.Super. 426, 144 A.2d 161, 168 (1958); *New Jersey Office Supply, Inc. v. Feldman,* 1990 WL 74477, *5 (D.N.J. June 4, 1990) ("the onus of proof of the common burden is on the person demanding a share of the burden").

On the basis of the entire record, the Court concludes that Honeywell cannot meet this burden because there is no evidence that any of the Grace Defendants are "tortfeasors" with regard to the chromium contamination at the ECARG Property, let alone "jointly" with Honeywell. Thus, a judgment in the Grace Defendants' favor shall be entered on Honeywell's claim for contribution (Count III).

The Court further concludes that because Honeywell cannot sustain its burden on its substantive RCRA, CERCLA and Spill Act claims against the Grace Defendants, as set forth above, Honeywell is not entitled to a declaratory judgment. *Aralac v. Hat Corp.,* 166 F.2d 286 (3d Cir. 1948) (Declaratory Judgments Act provides no substantive rights; requirements and restrictions of underlying substantive cause of action still govern); *Southland Corp. v. Ashland Oil,* 696 F.Supp. 994, 999 (D.N.J.1988) (party seeking declaratory judgment of CERCLA liability must prove each element of § 107 CERCLA claim, including defendant's liability as "owner," "operator," etc.). Accordingly, a judgment in favor of the Grace Defendants is entered on Count IV of Honeywell's Cross–Claims.

### ECARG's Claims For Indemnity And Contribution

■ In Count IX of their Cross–Claims, the Grace Defendants seek indemnification from Honeywell pursuant to New Jersey common law for any and all costs, including attorney fees, that the Grace Defendants may be forced to incur as a result of or in connection with any

relief granted to plaintiffs against the Grace Defendants. A party is entitled to common law indemnification where its liability is entirely constructive, vicarious, and not based on any fault of its own. *See, e.g., T & E Industries,* 587 A.2d at 1263 (common law indemnity granted because "[a]s between an unsuspecting purchaser and a seller who has engaged in an abnormally dangerous activity and polluted the property, the polluter should bear the cleanup expenses"); *Adler's Quality Bakery v. Gaseteria, Inc.,* 32 N.J. 55, 159 A.2d 97 (1960).

■ On the basis of the entire record, the Court concludes that the Grace Defendants' liability under RCRA to Plaintiffs is entirely constructive, vicarious, and not based on any fault of the Grace Defendants, as the sole cause of the "imminent and substantial endangerment" which forms the subject of plaintiffs' RCRA claim is the COPR that was disposed at the ECARG Property by Mutual. The Court finds that these facts present a classic case for indemnity. *T & E Industries,* 587 A.2d at 1263.

In Count X of their Third Amended Cross–Claims, the Grace Defendants similarly seek a judgment against Honeywell under the New Jersey Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A–3 (1999), awarding the Grace Defendants any and all costs, including attorneys' fees, that they may be required to pay plaintiff in this action. A right to contribution arises under the Joint Tortfeasors Contribution Law when an "injury or damage is suffered ... as a result of the wrongful act, neglect or default of joint tortfeasors" and one of the joint tortfeasors pays more than his pro rata share of the damage. N.J.S.A. 2A:53A–3 (1999); *Erkins,* 164 F.R.D. at 33.

■ On the basis of the entire record, the Court concludes that Honeywell is the

sole tortfeasor with regard to the chromium contamination at the ECARG Property because its predecessor Mutual disposed of all the chromium-contaminated COPR at the ECARG Property. Thus, any costs that may be imposed on the Grace Defendants as a result of Plaintiffs' claim would exceed the Grace Defendants' pro rata share, and instead should be the responsibility of the only tortfeasor, Honeywell.

Accordingly, the Court enters a judgment for the Grace Defendants on Counts IX and X of their Third Amended Cross–Claims awarding them full and complete indemnity and contribution from Honeywell for any and all costs, including attorneys' fees, that the Grace Defendants may incur as a result of or in the performance of any relief awarded to plaintiffs in this action. *T & E Industries,* 587 A.2d at 1263; N.J.S.A. 2A:53A–3 (1999); *Erkins,* 164 F.R.D. at 33.

## A PERMANENT REMEDY IS NECESSARY TO ELIMINATE THE IMMINENT AND SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT CAUSED BY THE CONDITION OF THE SITE

This Court has both inherent power and specific statutory authority to enjoin Honeywell to remedy the imminent and substantial endangerment at the Site.

In issuing equity decrees, the trial court is vested with broad discretionary posers. *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Glenside West Corp. v. Exxon Co., USA* 761 F.Supp. 1118, 1132 (D.N.J.1991). A court of equity traditionally has had the power to fashion any remedy deemed necessary and appropriate to do justice in the particular case. *United States v. Price, supra,* 688 F.2d at 211.

Section 7002(a)(2) of RCRA, 42 U.S.C. 6972(a)(2), which gives the right to citizens to sue and which is the basis for this action provides that:

> The district court shall have jurisdiction, * * * *to restrain any person* who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), *to order such person to take such other action as may be necessary, or both,* or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under section 69028(a) and (g) of this title. [emphases added].

Section 7003(a) of the Act, 42 U.S.C. 6973(a), sets forth the right of the federal government to sue to abate imminent and substantial endangerments and contains the same language emphasized above concerning the statutory power to order appropriate injunctive relief. The House Committee report underlying Section 7003(a), states (Subcommittee on Oversight and Investigations, Committee on Interstate and Foreign Commerce, H.R. Committee Print No. 96–IFC 31, 96th Cong., 1st Sess. 32 (1979)(hereafter "H.R. Committee Print No. 96–IFC–31") (quoted in *United States v. Price, supra,* 688 F.3d at 213)):

> The section's broad authority to "take such other actions as may be necessary" includes both short and long-term injunctive relief, ranging from the construction of dikes to the adoption of certain treatment technologies, upgrading of disposal facilities, and *removal and incineration.* [emphasis added]

The Court of Appeals for the Third Circuit has held:

> The unequivocal statutory language and this legislative history make it clear that Congress, by enacting section 7003, intended to confer upon the courts the

authority to grant affirmative equitable relief *to the extent necessary to eliminate any risks posed by toxic wastes.* [Emphasis added] (*United States v. Price, supra,* 688 F.2d at 213–214)

This Court has the power to issue a mandatory injunction under RCRA to abate the risks posed by environmental contamination. *United States v. Price, supra,* 688 F.2d at 214 ("Congress, in the endangerment provisions of RCRA * * * sought to invoke nothing less than the full equity powers of the federal courts in an effort to protect public health, the environment, and public water supplies from the pernicious effects of toxic wastes. Courts should not undermine the will of Congress by either withholding relief or granting it grudgingly"). The expansive language of the statutory provisions contained both in Section 7003 and 7002 was intended to confer "overriding authority to respond to situations involving a substantial endangerment to health or the environment." *Id.* at 213 (citing H.R. Committee Print No. 96–IFC 31, *supra,* p. 32). There is no doubt that the provision authorizes the cleanup of a Site if the action is necessary to abate a threat to public health or the environment. *United States v. Price, supra,* 688 F.2d at 214.

The Supreme Court has stated that under RCRA, as opposed to CERCLA (the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. 9601, *et seq.*), there is no requirement that the response costs being sought are reasonable. *Meghrig v. KFC Western, supra* 516 U.S. at 486, 116 S.Ct. 1251. *See also* 42 U.S.C. 6972(a)(2) ("The district court shall have jurisdiction, * * * to order such person to take such other action as may be necessary * * *.") However, Plaintiffs submit that, in view of the overwhelming evidence of an imminent and substantial endangerment to human health and the environment (*see* Findings of Fact 64–231), the costs of excavation here are entirely reasonable.

Plaintiffs and the Grace Defendants have met the standards for the issuance of an injunction.

■■■ A court must consider four factors when determining whether a permanent injunction should issue: (1) success on the merits; (2) the possibility of irreparable harm to the movant if the injunction is denied; (3) the potential harm to the non-moving party; and, if applicable, (4) the public interest. *ACLU v. Black Horse Pike Regional Bd. Of Educ.,* 84 F.3d 1471,- 1477 n. 2(3d Cir.1996).

■■■ As stated above, this Court has concluded that Plaintiffs have succeeded on the merits in establishing Honeywell's liability for violation of section 7002(a) of RCRA, 42 U.S.C. 6972(a).

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.* irreparable." *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542(1987); *see PIRG v. Yates Industries, Inc.,* 757 F.Supp. 438, 454 (D.N.J.1991). If such injury is likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. *Ibid.*

This Court has concluded that the Site does present an imminent and substantial endangerment to health and the environment. The hexavalent chromium at the Site, left unabated, presents irreparable harm to human health and the environment. Moreover, NJDEP has determined that permanent measures must be implemented to prevent the ongoing exposure of human and environmental receptors to chromium from the Site. Therefore, the threat of irreparable harm to the public

and the environment favors the issuance of an injunction.

The Court further concludes that injunctive relief is necessary to prevent irreparable harm to Plaintiffs and the public in light of Honeywell's history of delay in investigating and remediating the Site since it was first directed to do so by the State of New Jersey some twenty years ago.

This Court also concludes that any potential economic harm to Honeywell from the issuance of an injunction is not sufficient grounds for this Court to refuse to enter an injunction. The only foreseeable harm to Honeywell from an injunction compelling it to remediate the Site is economic in nature. The Court is aware of the substantial costs involved in the Court Ordered remediation. However, Honeywell is a large international corporation with revenues in the billions of dollars. The Court therefore concludes that the economic harm to Honeywell from the requirement that it fund a permanent remedy for the Site does not outweigh the interests of the public in a prompt cleanup of the Site that is protective of human health and the environment.

This Court concludes that the excavation and removal of the COPR from the Site is necessary in order to remedy the imminent and substantial endangerment to health and the environment posed by the conditions at the Site.

Honeywell presented no credible evidence that a cap over Study Area 7 and/or a shallow ground water treatment methodology would be an effective permanent remedy to protect human health and the environment at the Site.

This Court concludes that Honeywell must also implement a further investigation and, if found to be necessary, further remedial actions, to remedy the imminent and substantial endangerment which may be posed to health and the environment by the highly contaminated deep groundwater at the Site.

This Court concludes further that Honeywell must implement measures to remedy the imminent and substantial endangerment to health and the environment posed by the chromium contamination of the sediments in the Hackensack River caused by discharges from the Site.

Finally, this Court concludes that due to the extensive nature of the cleanup and Honeywell's continued recalcitrance in effectuating an appropriate cleanup, that the appointment of a Special Master pursuant to Rule 53(b) of the Fed.R.Civ.P. is appropriate.

Therefore, this Court concludes that the issuance of a permanent injunction is appropriate. (See Order of May 15, 2003.)

Plaintiffs and Grace are directed to submit a proposed Order of Judgment; Defendant Honeywell shall submit any objections to the proposed Order within ten days of receipt of same.